# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN AND JANE DOES 1-9, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 25-0325 (JMC) |
| DEPARTMENT OF JUSTICE, | |
| Defendant. | |
| | |
| FEDERAL BUREAU OF INVESTIGATION AGENTS ASSOCIATION, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 25-0328 (JMC) |
| DEPARTMENT OF JUSTICE, et al., | |
| Defendants. | |

## <u>FIRST AMENDED COMPLAINT</u>

By and through their attorneys, Plaintiffs the Federal Bureau of Investigation Agents Association ("FBIAA"), John Does 1, 3 and 4 and Jane Does 1 through 3 (the "Doe Plaintiffs"), John and Jane Does 1-9, et al., individually and on behalf of the putative class (the "Doe Class Plaintiffs"), collectively, the "Plaintiffs" or the "consolidated Plaintiffs," hereby bring this First Amended Complaint against the Defendants United States Department of Justice and United States of America. In support thereof, upon personal knowledge as well as information and belief, Plaintiffs allege the following:

## NATURE OF THE ACTION

Doe Plaintiffs and Doe Class Plaintiffs consist of longtime current special agents and other personnel employed at the Federal Bureau of Investigation ("FBI"). They bring this case to prevent and otherwise remedy Defendants' unlawful retaliation against them for their participation in the lawful and predicated investigations arising from the attacks on the U.S. Capitol on January 6, 2021, which they conducted while employed with the FBI. FBIAA, a 501(c)(6) not-for-profit organization dedicated to safeguarding the careers, economic interests, conditions of employment and welfare of FBI agents, brings this case to vindicate its own interests and that of its members. The consolidated Plaintiffs collectively seek this Court's protection from Defendants' anticipated adverse employment actions against them and similarly situated FBI personnel, including publicly exposing their personal information for opprobrium and potential vigilante action by those who they investigated and prosecuted. Plaintiffs further seek relief from the harm they will encounter as a result of Defendants' constitutional violations.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' causes of action arise under the Constitution and laws of the United States. The Court also has jurisdiction under 28 U.S.C. § 1361 because Plaintiffs seek a writ of mandamus to compel officers and employees of the United States and its agencies to perform duties owed to Plaintiffs and required under law.

2.      Sovereign immunity for non-monetary relief is waived under 5 U.S.C. § 702, which entitles Plaintiffs to relief when Defendants acted unconstitutionally and beyond statutory authority.

3.      Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) and (e).

**PARTIES**

4.      FBIAA is a non-profit professional organization headquartered in Virginia and dedicated to the service of FBI agents. Its mission is to advocate for the careers, economic interests, conditions of employment, and welfare of its members. Its membership includes both current and former Special Agents. FBIAA has approximately 14,000 members. The FBI, headquartered in Washington, D.C., employs approximately 13,800 Special Agents.  Approximately 12,000 of the FBI's 13,800 Special Agents are members of FBIAA.  FBIAA provides a variety of employment related services to its members, including (1) the assistance of legal counsel for internal advocacy in connection with any adverse employment action; (2) liaising with the FBI on behalf of members concerning work conditions; (3) representing members in connection with workplace complaints; and (4) coordinating external advocacy like lobbying for its members' interests.  FBIAA members were involved in investigations related to the violent attack on the Capitol on January 6, 2021. They received and responded to the Survey. Other members were assigned to other criminal investigations that involved then-former-President Trump, like the August 2022 search warrant execution at Mar-a-Lago.

5.      Between January 27, 2025, and continuing through the present day, the FBIAA has received an enormous influx of requests for assistance from its members (Special Agents) seeking legal consultation concerning their placement on the list of respondents to a survey  (the "Survey") created and distributed by the Acting Deputy Attorney General ("A/DAG") Emil Bove III, their responses to the Survey, and the effects that both may have on their employment status, and other related questions.  The influx of requests for employment and legal assistance is unprecedented and has severely impeded the FBIAA's ability to support its members and fulfill its mission.  The FBIAA's ability to conduct effective external advocacy on behalf of its members concerning the

disorder caused by the Survey and the more traditional issues on which it lobbies has been substantially impaired.

6.     The Doe Plaintiffs include Special Agents, forensic examiners, a forensic analyst, and an intelligence analyst. Each is currently employed by the FBI. The Doe Plaintiffs were involved in investigations related to the violent attack on the Capitol on January 6, 2021. They either received and responded to the Survey, or should be listed on it due to the work they performed.

7.     The Doe Class Plaintiffs include Special Agents and other FBI employees. Each is currently employed by the FBI. The Doe Class Plaintiffs were involved in investigations related to the violent attack on the Capitol on January 6, 2021. They received and responded to the Survey.

8.     Defendant, the United States Department of Justice, headquartered in Washington, D.C., is a Cabinet agency within the Executive Branch of the United States government and controls its subordinate component FBI, which employs the Plaintiffs.

9.     Defendant, the United States of America, is responsible for the exercise of state action being challenged by Plaintiffs in this case.

## FACTS

### A.   The Mission and Operation of the FBI

10.     FBI employees are regularly called upon to undertake some of the most critical and high-stakes law enforcement investigations in our nation. They work at the direction of senior leaders within the Department of Justice to investigate and help prosecute complex crimes, often against sophisticated and powerful adversaries.

11.     The FBI's mission is as diverse as it is sensitive. FBI Special Agents have among the broadest of investigative authorities and are frequently the lead investigators on cases involving counterterrorism, public corruption, fentanyl trafficking, child pornography, cybercrime, and other

critical threats. FBI agents are empowered by law to conduct investigations of and to make arrests for offenses enumerated in the United States Code.

12.     The criminal targets of their investigations often have many tools of their own at their disposal that they use to interfere with the FBI's work or to endanger its agents.

13.     On any given day, an FBI agent may be face-to-face with an individual who would rather resort to violence than submit to the law. They regularly interact with dangerous, armed individuals who are uninhibited by adherence to law and order. In many operations, FBI agents, including those among the consolidated Plaintiffs, often work undercover using pseudonyms for their own safety.  Undercover work advances the FBI's mission in any given operation while also preserving the integrity of future law enforcement investigations.

14.     Other employees of the FBI, for example, certain of the Doe Plaintiffs and Doe Class Plaintiffs, are not Special Agents but support investigations in other ways like computer or intelligence analysis and forensic examination.

15.     Accession into the FBI is different from the hiring process at other government agencies.  In order to be considered for employment, prospective Special Agents must pass an extensive background check.  They also must pass a fitness test to ensure they have the physical capabilities for the job.  They must have achieved some level of advanced education—at least a bachelor's degree, though many agents hold degrees beyond that.  Perhaps most significantly, new agents attend between 16-20 weeks of training at the FBI Academy in Quantico, Virginia.  In all, nearly $300,000 might be spent on the training and clearance for each new Special Agent to enter service with the FBI.

16.     Once a Special Agent has finished the training and reported to his or her first assignment, the agent remains on "probationary status" for approximately one to two years. Probationary employees are extremely important members of the FBI.  They are young, energized,

and recently trained.  Thus, they are frequently put on tough and arduous assignments like 24-hour surveillance of terrorism targets, monitoring of wiretaps related to large-scale drug dealers, and manning for arrest teams for high-threat targets (for example, when a target is believed to be armed and has shown propensity for confronting law enforcement with violence).

17.    Upon completion of any probationary term, FBI employees are entitled by law to certain procedural protections should they face any disciplinary action or allegation of misconduct. Procedures for adverse action are governed by established FBI and internal DOJ processes and procedures.

18.    There are three main ways that an FBI employee who has completed probation can face adverse action or dismissal. The first is through Security Division ("Sec-D") activity.  A Sec-D investigation seeks to determine whether an employee is unfit to hold a Top Secret security clearance.  Since the ability to maintain a Top Secret clearance is a requirement for all employees, revocation of clearance equates to a firing.  Suspension of a clearance, while it does not equate to a firing, effectively halts an agents' work until the suspension is lifted.  The second way an employee may face action is through Human Resources Division ("HRD").  This type of action relates to poor performance.  An employee might be placed on a Performance Improvement Plan and would be judged as to whether he or she met or failed to meet that plan.  Lastly, an employee or agent may be subject to an internal (administrative) inquiry.  These are initiated by either the DOJ's Office of Inspector General ("OIG") or the FBI's own Internal Investigations Unit.  Such investigations often culminate in the compelled interview of the employee.  The full investigation would be forwarded to FBI's Office of Professional Responsibility ("OPR") for adjudication.  If OPR determines punishment is warranted, it would refer to the FBI's Penalty Guidelines.  If OPR determines dismissal is warranted, this normally means dismissal is merely being proposed, and

the employee therefore has the opportunity (either *pro se* or through counsel) to respond to the allegations with both a written responsive brief and an oral hearing.[1]

19.     FBIAA's own statistics, as the leading organization for provision of legal advocates to agents who face these actions, can provide a rough guidepost for how often an agent's actions allegedly fall into one of above categories.  According to FBIAA, less than 5% of requests for internal advocacy relate to Sec-D investigations; less than 5% relate to HRD investigations; and over 90% relate to OPR investigations.

**B. January 6, 2021**

20.     The attacks on January 6, 2021 and the events leading to that violence have been well documented by judges in this Circuit. Specifically, "[o]n January 6, 2021, a mob professing support for then-President Trump violently attacked the United States Capitol in an effort to prevent a Joint Session of Congress from certifying the electoral college votes designating Joseph R. Biden the 46th President of the United States. The rampage left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol. Then-Vice President Pence, Senators, and Representatives were all forced to halt their constitutional duties and flee the House and Senate chambers for safety." *Trump v. Thompson*, 20 F.4th 10, at 15-16 (D.C. Cir. 2021).

21.     On November 3, 2020, "Americans elected Joseph Biden as President, giving him 306 electoral college votes."  *Trump v. Thompson*, 20 F.4th at *18 (quoting President Donald J. Trump, Statement on 2020 Election Results at 0:34-0:46, 18:11-18:15, C- SPAN (Dec. 2, 2020), *https://www.c-span.org/video/?506975-1/president-trump-statement-2020-election-results*).     In

---

[1] In exceedingly rare circumstances, a Special Agent may be subject to a summary dismissal. This occurs when public safety, FBI employee safety, national security interests, or other exigent circumstances are at stake.  For example, this might occur if an FBI employee is found to be in a sexual relationship with an intelligence officer of a hostile foreign intelligence service.

advance of the certification of electoral votes scheduled for January 6, 2021, "[t]hen-President Trump . . . refused to concede, claiming that the election was 'rigged.'" *Id.*

22.     On January 6, 2021, Congress undertook its Constitutional duty "[a]s required by the Twelfth Amendment to the Constitution and the Electoral Count Act," and "a Joint Session of Congress convened on January 6, 2021 to certify the results of the election." *Id.* (citing 3 U.S.C. § 15; 167 Cong. Rec. H75-H85 (daily ed. Jan. 6, 2021)).

23.     On January 6, 2021, "[s]hortly before noon . . . President Trump took the stage at a rally of his supporters on the Ellipse, just south of the White House," where he gave a speech "reiterat[ing] his claims that the election was 'rigged' and 'stolen,' and urged then-Vice President Pence, who would preside over the certification, to 'do the right thing' by rejecting various States' electoral votes and refusing to certify the election in favor of Mr. Biden." *Id.* at 18-19 (quoting Donald J. Trump, Rally on Electoral College Vote Certification at 3:33:05-3:33:10, 3:33:32-3:33:54, 3:37:19-3:37:29, C-SPAN (Jan. 6, 2021), *https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification* ("January 6 Speech")). President Trump "[u]rg[ed] the crowd to 'demand that Congress do the right thing and only count the electors who have been lawfully slated[,]' he warned that 'you'll never take back our country with weakness' and declared '[w]e fight like hell and if you don't fight like hell, you're not going to have a country anymore.'" *Id.* (quoting January 6 Speech); *see also id.* at 3:47:20-3:47:42, 4:41:17-4:41:33).

24.     Thereafter, "[s]hortly after the speech, a large crowd . . . including some armed with weapons and wearing full tactical gear—marched to the Capitol and violently broke into the building to try and prevent Congress's certification of the election results." *Id.* Violence ensued. "The mob quickly overwhelmed law enforcement and scaled walls, smashed through barricades, and shattered windows to gain access to the interior of the Capitol. Police officers were attacked

with chemical agents, beaten with flag poles and frozen water bottles, and crushed between doors and throngs of rioters." *Id.* at 18 (citations omitted).

25.    "Soon after, rioters breached the Senate chamber. In the House chamber, Capitol Police officers barricaded the door with furniture and drew their weapons to hold off rioters. Some members of the mob built a hangman's gallows on the lawn of the Capitol, amid calls from the crowd to hang Vice President Pence." *Id.* (quotation marks and citations omitted); *see also United States v. Alford*, 89 F. 4th 943, 947 (D.C. Cir. 2024) ("That afternoon, however, a mob broke through the perimeter, tore down the barricades and clashed with police. Members of the mob entered the Capitol through broken windows and then threw open the doors to their compatriots. Ultimately, the mob delayed the electoral certification by several hours. Both the Senate and the House recessed shortly after 2:00 p.m. and did not resume until 8:00 p.m. that night after law enforcement secured the building.").

26.    "Approximately 140 law enforcement officers were injured, and one officer who had been attacked died the next day." *Thompson*, 20 F.4th at 19.

**C. Federal Criminal Investigations and Prosecutions in the Aftermath of January 6**

27.    Following the events of January 6, 2021, and in accordance with their statutory duties, the FBI (including the consolidated Plaintiffs) and Department of Justice commenced investigations into the myriad federal crimes committed in connection with those events. In fact, federal law enforcement mobilized that very day to assist in quelling the riots, bringing order to the Capitol, and seeking out those who broke the law. Of course, this occurred prior to the inauguration of former President Biden.  Investigations into the violent attacks were initiated at the direction and subject to the supervision of the Department of Justice under President Trump.

28.    Investigative efforts were centered in the District of Columbia federal district ("DDC"). Functionally, this meant that—at the direction of the United States Attorney's Office—

FBI agents' investigative efforts developed facts to support search and arrest warrants. The search and arrest warrants were based on, inter alia, physical evidence, electronic (phone) evidence, video surveillance, and witness statements. FBI agents drafted and swore to the accuracy of those warrants, which were presented to DDC magistrate judges for review and consideration. Upon receipt and review of these affidavits and accompanying warrants, magistrate judges found the requisite probable cause to issue the search and arrest warrants, authorizing the FBI agent or FBI Task Force Officer (local law enforcement detailed to an FBI task force) to execute them.

29.    In some instances, individuals were charged pursuant to a grand jury indictment. In these cases, at the request of an Assistant United States Attorney ("AUSA") from the DOJ, FBI agents testified in front of a federal grand jury under Federal Rule of Criminal Procedure Rule 6. If the grand jury found probable cause that a crime was committed, a supervising court would then issue a lawful arrest warrant for execution.

30.    Many of the perpetrators of the January 6 riots fled Washington, D.C. immediately after the carnage. In response, the FBI coordinated efforts across the country to locate the assailants and to amass additional evidence. Those efforts included applying for search warrants under Federal Rule of Criminal Procedure Rule 41 in the federal district where the evidence was located. Again, the FBI applied for warrants via sworn affidavits presented to neutral and detached magistrate judges all over the country. In the context of search warrants for physical property (*e.g.*, phones, weapons, clothes, stolen property), these lawful warrants were issued by a multitude of magistrate judges outside of DDC.

31.    United States Attorney's Offices from around the country worked alongside their corresponding FBI field offices, with AUSAs directing and approving Special Agents' investigations of the rioters.

32.     For example, the United States Attorney's Office for the Southern District of New York ("SDNY") relied on the FBI's New York Field Office's Joint Terrorism Task Force ("JTTF") to assist with investigations, searches, and arrests pertaining to January 6 rioters in located in the New York City area.  The JTTF consisted of FBI agents as well as local law enforcement Task Force Officers.  A/DAG Bove, who was then an AUSA and a co-chief in SDNY's counterterrorism unit, participated in weekly JTTF meetings and helped coordinate federal investigative and prosecution activities aimed at January 6 rioters who had a connection to New York City.

33.     On information and belief, A/DAG Bove was directly involved in, and had direct knowledge of, investigations and prosecutions into January 6 rioters within SDNY's jurisdiction. On information and belief, A/DAG Bove never objected, raised any concerns, or otherwise flagged suspected corruption or "weaponization" tactics while meeting with the JTTF about January 6 cases.  *See* Michael Daly, *Trump Minion Leading Jan. 6 Witch Hunt Should Be on Purge List Himself: Sources,* The Daily Beast (February 6, 2025), *https://www.thedailybeast.com/trump-minion-heading-up-jan-6-witch-hunt-should-be-on-purge-list-himself-sources/*.  To the contrary, those who worked with A/DAG Bove in the immediate wake of January 6 report that he aggressively pursued cases for his own office's prosecution. *See* Ryan Lucas, *Trump Official Targeting Jan. 6 Investigators Worked On Those Cases Himself*, NPR (February 12, 2025), *https://www.npr.org/2025/02/12/g-s1-48193/trump-doj-january-6-cases*.

34.     On information and belief, those who worked with then-AUSA Bove regarded him as one of the more forceful prosecutors in targeting January 6 rioters.  Specifically, those who worked with then-AUSA Bove perceived that he made a point to attempt to establish SDNY as venue for January 6 cases, specifically so that his team could claim supervision of the prosecution of the cases.  *See, e.g.*, Ken Dilanian & Ryan J. Reilly, *Trump's Feared DOJ Enforcer Has a Secret: He, Too, Investigated Jan. 6*, NBC News (February 12, 2025),

*https://www.nbcnews.com/politics/justice-department/trumps-feared-doj-enforcer-secret-*

*investigated-jan-6-rcna191796.*

35.     For example, on information and belief, then-AUSA Bove would make specific use of "Urgent Matter Reports" ("UMRs") in order to claim ownership over certain January 6 cases. The UMRs were used by then-AUSA Bove to alert other areas of the DOJ that his team at SDNY was working on a specific case.

36.     Then-AUSA Bove would also supervise routine matters of investigative activity by FBI agents, like the issuance of grand jury subpoenas. On information and belief, then AUSA-Bove directly supervised multiple January 6 cases that included, but were not limited to, the investigation and arrests of certain high-profile January 6 defendants.

37.     On information and belief, there is likely an extensive digital record of then-AUSA Bove's communications both with FBI agents and with the AUSAs he supervised or worked alongside during his time with the JTTF and as co-chief at SDNY.  This record would include text messages, emails, Skype or other intraoffice communication messages, and other correspondence like UMR letters that might still exist, if subject to a retention policy at either the FBI or DOJ.

38.     Throughout 2021 and 2022, the Department of Justice continued its investigation into the facts surrounding the violent attacks on January 6.  On November 18, 2022, then-Attorney General Merrick Garland appointed Jack Smith as a Special Counsel to investigate matters relating to the events of January 6, 2021.  *See In re Sealed Case*, 77 F. 4th 815 (D.C. Cir. 2023).  In a related case, FBI agents were assigned to investigate then-former-President Trump's alleged mishandling of classified documents. As part of these assignments, certain FBI agents, including members of FBIAA, were detailed to the search of the then-former-President Trumps's Mar-a-Lago residence.

39.     Even prior to Attorney Smith's appointment, however, federal law enforcement

investigated and prosecuted over 1,500 individuals in connection with the events of January 6, 2021. Ultimately, the Department of Justice charged nearly 1,600 individuals with crimes from the attack. *See* All Things Considered, The Jan. 6 Attack: The Cases Behind the Biggest Criminal Investigation in U.S. History, NPR News (Feb. 13, 2025), *https://www.npr.org/2021/02/09/965472049/the-capitol-siege-the-arrested-and-their-stories*. Approximately 1,030 rioters pled guilty.  Another approximately 261 opted for bench or jury trials. Of those 261 cases that went to trial, 257 resulted in convictions from either a neutral judge or unanimous jury.  *Id.*

40.     In the ensuing years, President Trump repeatedly and publicly referred to the defendants in the cases arising from the events of January 6, 2021 as "hostages." *See, e.g.*, *https://truthsocial.com/@realDonaldTrump/posts/112210383255858788* (with audio of incarcerated January 6 defendants); Emma Barnet and Jillian Frankel, *Trump says there will be a "bloodbath" if he loses the election*, NBC News (March 16, 2024) (discussing his comments at a 2024 rally referring to January 6 prisoners as "hostages"), *https://www.nbcnews.com/politics/donald-trump/trump-bloodbath-loses-election-2024-rcna143746*.

41.     By contrast, while portraying January 6 defendants in a sympathetic light, President Trump has repeatedly and publicly attempted to portray the FBI personnel who investigated the attacks as "[t]hugs", "[t]yrants," and "Gestapo." *See https://truthsocial.com/@realDonaldTrump/posts/109745175533954622* (last visited February 4, 2025) *and https://truthsocial.com/@realDonaldTrump/posts/109529028482982758* (last visited February 4, 2025).

### D.  Threatening Online Activity Since the January 20, 2025 Inauguration

42.     One of President Trump's first actions following his inauguration was to pardon or

commute the sentences of every person prosecuted by the Department of Justice for conduct related to January 6, 2021. Proclamation, "Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021" (Jan. 20, 2025) *https://www.whitehouse.gov/presidential-actions/2025/01/granting-pardons-and-commutation-of-sentences-for-certain-offenses-relating-to-the-events-at-or-near-the-united-states-capitol-on-january-6-2021/.*

43.    Since receiving their presidential pardons or commutations, the leaders of the January 6 riots and others have used social media to publicly target FBI agents who worked on the investigation and prosecutions of those rioters.

44.    For example, on February 1, 2025, a leader of the violent Proud Boys gang publicly posted the following on social media:



@NobleOne, X, (February 1, 2025, 5:14 p.m.), *https://x.com/NobleOne/status/1885889389160513818*) (last visited Feb. 4, 2025).

45.    Originally sentenced to twenty-two years in prison after a jury convicted him of seditious conspiracy, among other crimes, Enrique Tarrio has been released from federal custody. He has openly expressed his intent to seek retaliation against the FBI. In his "X" biography line, he claims to be the "United States Secretary of Retaliation" and "Seditiously Unapologetic."

46.    Mr. Tarrio has also threatened that "[t]he people who did this, they need to feel the heat, they need to be put behind bars, and they need to be prosecuted…. Success is going to be retribution." Rachel Leingang, *Proud Boys Leader Thanks Trump for January 6 Pardon and Vows Revenge*, The Guardian (Jan. 24, 2025), *https://www.theguardian.com/us-news/2025/jan/24/trump-pardon-proud-boys-enrique-tarrio*.

47.    On February 21, 2025, one month after his release from prison, Mr. Tarrio was arrested outside the Capitol Building on assault charges.  *See* Alan Feuer, NY Times, *Ex-Proud Boys Leader Arrested on Charges of Assault Outside Capitol*, February 21, 2025, available at *https://www.nytimes.com/2025/02/21/us/politics/tarrio-proud-boys-capitol.html*.

48.    As of the date of this Complaint, multiple hashtags are trending on X that allow January 6 convicts-turned-pardonees to link to each other in posts promoting violence and insurrection against law enforcement agents, thus rendering these posts viral. For example, the below user @magashredguitar ("Steve"), whose bio claims he was a "J6 attendee," re-posted the following post from another January 6 convict-turned-pardon recipient Chris Quaglin (@CQuaglin) which apparently depicts Mr. Quaglin's FBI interview subsequent to his arrest in 2021. On February 3, 2024, Steve captioned his re-post "This FBIer better have filled out that survey today asking about his J6 prosecution (persecution) involvement."  The subject "survey" is discussed in greater detail, below.



49.    According to DOJ, Quaglin was ultimately sentenced to 12 years in prison before being pardoned by President Trump. The Department of Justice described that on January 6, 2021, Quaglin, dressed in a hard-sided helmet, full-faced gas mask, and carrying a backpack and bear spray (chemical irritant), "was part of the initial group of rioters who overtook the police line," assaulted multiple Capitol Police officers, hit another officer with his gas mask, stole another police officer's shield and attacked him with it, and "raised a can of chemical irritant in the air, reaching around the officers' shields, and sprayed the officers directly in their faces."

50.    DOJ further reported that Quaglin showed no remorse for his crimes and instead claimed to be a political prisoner, despite the fact that his assaults on multiple police officers were caught on camera. *See https://www.justice.gov/usao-dc/pr/new-jersey-man- sentenced-12-years-prison-assaulting-law-enforcement-and-other-charges* (last visited February 17, 2025).

51.     Violent threats against FBI agents who carried out lawful orders in relation to January 6 or who participated in the subsequent investigations now disfavored by President Trump have been a persistent issue for the FBI for the past few years. For example, in 2022, agents who carried out the search of then-former-President Trump's home were doxxed on Trump's social media network. The incident climaxed when an individual attempted a siege of the FBI field office in Ohio, resulting in his death.

52.     Around the same time, a Pennsylvania man was arrested and charged with threatening to kill FBI agents. The threats of retaliation by vigilantes was so profound that "the FBI issued a joint intelligence bulletin warning of an increase in threats, quietly hardened its facilities and ***scrubbed personal information from websites*** to protect personnel from possible danger." *See* Perry Stein et al., *As the FBI Comes Under Threat, its Leaders Try to Stay out of the Fray*, Wash. Post (August 20, 2022) (emphasis added) *https://www.washingtonpost.com/national-security/2022/08/20/fbi-comes-under-threat-its-leader-tries-stay-out-view/*.

53.     Another January 6 arrestee was convicted in a federal criminal trial conspiracy to murder federal employees, solicitation to commit a crime of violence, and influencing a federal official by threat.  According to the DOJ's press releases, Edward Kelley, 35, of Maryville, Tennessee, "developed a plan to murder law enforcement, including FBI agents and employees," while he awaited trial for his January 6 arrest. *See* DOJ Press Release, *Federal Jury Convicts Man of Conspiring to Murder FBI Employees*, November 20, 2024, available at *https://www.justice.gov/archives/opa/pr/federal-jury-convicts-man-conspiring-murder-fbi-employees*. A cooperating defendant in that case testified that Kelley and others "strategized about assassinating FBI employees in their homes and public places such as movie theaters."  *Id*.

54.    Yet another January 6 pardon, upon release from prison, threatened that his next actions would be "[t]o regroup, go home and find out the nefarious actors in local homes and towns." Ryan J. Reilly and Gary Grumbach, *Relief, Revenge but Little Repentance: Trump's Pardons Delight Jan. 6 Offenders*, NBC News (Jan. 22, 2025), *https://www.nbcnews.com/politics/donald-trump/relief-revenge-little-repentance-trumps-pardons-delight-jan-6-offender-rcna188798*.

55.    Even in the wake of this lawsuit and the consent order entered into between the DOJ and the FBI, online interest in the public disclosure and retaliation against FBI agents remains at a fever pitch.  For example, on February 10, X user @FreeStateWill who describes himself as a "Pro Se J6er" and has over 57,000 followers, posted prolifically about releasing the names of January 6 FBI agents.  In just one example of these, he wrote, "Unless President Trump publicly releases the names of every January 6 prosecutor and FBI agent who gets fired, we will need to expose their injustices. If we don't know who's already been fired, we will have to publicly shame them all until the Trump administration takes action."  The post has been viewed over 6,100 times and reposted by other users 62 times.



56.    This same user had previously posted about an expectation that the DOJ would be forwarding the names of FBI agents who worked January 6 cases to the White House.  On

February 4, 2025—the day this lawsuit was filed—he wrote, ""Dear President Trump, When you get the list of FBI agents who worked for January 6 cases, don't just fire them. Please also etch their names into a 'wall of shame' cautioning the dangers of radical government extremism and place it as a monument in front of the FBI Hoover Building."  This post has been viewed over 3,600 times and reposted by other users 62 times.



57.    In addition to the stated intentions of January 6 criminal defendants, senior Executive Branch officials in the current administration have regularly publicized the names of disfavored individual civil servants in an attempt to intimidate them. For example, White House Advisor Elon Musk, of the Department of Government Efficiency (otherwise known as "DOGE"), recently shared the names and titles of individual civil servants holding "relatively obscure climate-related government positions," generating a "barrage of negative attention" for those employees and leading at least one of them to delete their social media accounts. Hadas Gold and Rene Marsh, *Elon Musk Publicized the Names of Government Employees He Wants to Cut. It's Terrifying Federal Workers*, CNN (Nov. 27, 2024), *https://www.cnn.com/2024/11/27/business/elon-musk-government-employees-targets/index.html*.

58.    Mr. Musk has shown a particular, oft-expressed interest of what he and his supporters characterize as "radical transparency."    In his February 18, 2025 re-post of user

@KanekoaTheGreat's X post, he promoted such radical transparency and "[m]assive declassification" of the FBI and DOJ's alleged systemic suppression of political movements. His re-post promoted the "[r]elease of the declassified documents through President Trump's and Elon Musk's X accounts."



59.    And on February 10, 2025, after this Court heard the consolidated Plaintiffs' concerns about DOJ granting Mr. Musk and DOGE's access to the Survey list, Mr. Musk posted that "Everything @DOGE does will be published for the world to see," in an apparent reference to another case where DOGE's access to Social Security data was being challenged. Notably, at the February 6, 2025 hearing where DOGE's potential access to the list was discussed, the Court asked Government counsel whether "the DOJ disseminated further that information that was provided by the FBI in response to these surveys beyond any DOJ component or division, branch, whatever you

want to call it?"  Government counsel responded, "I don't have reason to believe it has occurred but I can't make a definitive representation."  Draft Hearing Tr. at 39:15-25.



60.    Federal employee identifying information has also been compromised in connection with the Administration's recent attempts to collect data on federal employees.  Recently, in an effort to comply with an order related to shrinking the federal workforce, the Central Intelligence Agency sent a list of employees' names over an unclassified system to the Office of Personnel Management. Although the list included only the first names and first initials of the employees, this security lapse constitutes an extreme security risk to the intelligence community.  *See* David E. Sanger & Julian E. Barnes, *C.I.A. Sent an Unclassified Email With Names of Some Employees to Trump Administration*, N.Y. Times (February 5, 2025), *https://www.nytimes.com/2025/02/05/us/politics/cia-names-list.html*.

**E. Executive Branch Activity Since January 20, 2025**

61.    During his inauguration speech on January 20, 2025, President Trump referenced his perceived "weaponization" of federal law enforcement. He remarked that the "vicious, violent and unfair weaponization of the Justice Department and our government will end." *See* White House Inaugural Address (Jan. 20, 2025), *https://www.whitehouse.gov/remarks/2025/01/the -inaugural-address/* (last visited February 4, 2025).

62.    Later that day, President Trump issued an Executive Order, "ENDING THE WEAPONIZATION OF THE FEDERAL GOVERNMENT." *See* Executive Order (Jan. 20, 2025), *https://www.whitehouse.gov/presidential-actions/2025/01/ending-the-weaponization-of-the-federal-government/* (last visited Feb. 16, 2025) (hereinafter, the "Weaponization EO").

63.    The Weaponization EO references the "prior administration" and the "previous administration." The Weaponization EO's "Purpose" section referenced the "previous administration['s]" actions against its "perceived political opponents" and infliction of "political pain." The "Purpose" section also referenced the "weaponization of prosecutorial power" and the "target[ing of] individuals who voiced opposition to the prior administration's policies." It expressly noted within the "Purpose" section that the "Department of Justice has ruthlessly prosecuted more than 1,500 individuals associated with January 6, and simultaneously dropped nearly all cases against BLM rioters." The "Policy" section of the Weaponization EO stated, in relevant part:

> [t]he Attorney General, in consultation with the heads of all departments and agencies of the United States, shall take appropriate action to review the activities of all departments and agencies exercising civil or criminal enforcement authority of the United States, including, but not limited to, the Department of Justice . . . over the last 4 years and identify any instances where a department's or agency's conduct appears to have been contrary to the purposes and policies of this order, and prepare a report to be submitted to the President, through the Deputy Chief of Staff for Policy and the Counsel to the President, with recommendations for appropriate remedial actions to be taken to fulfill the purposes and policies of this order.

64.     Since January 20, 2025, the Defendants summarily fired or forced into retirement numerous law enforcement personnel involved in investigations and prosecutions arising out of the events of January 6, 2021, purportedly under the auspices of the Weaponization Executive Order. For example, on January 27, 2025, the Administration fired more than a dozen prosecutors who worked on Special Counsel Jack Smith's team. *See* Sarah N. Lynch & Andrew Goudsward, *Trump's Justice Department Launches Sweeping Cuts Targeting Jan. 6 Prosecutors, FBI Agents*, Reuters (Jan. 31, 2025), *https://www.reuters.com/world/us/fbi-launches-wide-ranging-round-cuts-sources-say-2025-01-31/.*

65.     On Friday, January 31, 2025, A/DAG Bove "told the top federal prosecutors in each state to compile a list of all prosecutors and FBI agents who worked on the investigation of the Capitol riot." *Id*. (emphasis added). A/DAG Bove did so by issuing a memo entitled "Terminations." "That memo ordered eight FBI officials to resign or be fired, saying that their participation in the Jan. 6 cases represented part of what Trump has called the 'weaponization' of government." *Id*. The memo identified by name at least some of the terminated officials. *See* Ken Dilanian et. al.,, *Senior FBI official forcefully resisted Trump administration firings*, NBC News (Feb. 1, 2025), *https://www.nbcnews.com/politics/national-security/senior-fbi-official-forcefully-resisted-trump-administration-firings-rcna190301.*

66.     The employees' names were listed under a heading "Employees To Be Terminated Pursuant To The Foregoing."  The "Foregoing" is an apparent reference to the introductory paragraphs referencing the Weaponization Executive Order and the "grave national injustice" of January 6 investigations.

67.     Underneath the list of "Employees To Be Terminated Pursuant To The Foregoing," a short paragraph followed which directed personnel action to be taken against the then-Special Agent in Charge of the Washington Field Office "[f]or the same reasons" as the other

"terminations." In the very next paragraph, the "Terminations" memo directed the Acting Director of the FBI to identify by noon on February 4, 2025 "all current and/or former FBI personnel assigned at any time to investigations and/or prosecutions related to [January 6 investigations]." [2] The "Terminations" memo asserted that A/DAG Bove would commence a "review process" to determine if any **additional** personnel actions" (emphasis added) are necessary.

68.     On Sunday, February 2, 2025, Defendants ordered certain FBI agents to answer a questionnaire about their work on cases related to the events of January 6, 2021. The Defendants directed that all agents were required to complete the survey by 3:00 p.m. the following day. The survey was titled "A/DAG Memo Response: Events that Occurred at or Near the US Capitol on January 6, 2021." The survey memo included the following questions (all marked "required"), each accompanied by a drop-down menu of available answers:

1. Are you submitting this form for yourself or on behalf of your employee?
2. What is your current title?
3. Are you currently a supervisor?
4. Are you currently an ASAC or SSIA?
5. Are you currently an SES employee (e.g., SAC, Section Chief, DAD, AD, etc…)?
6. What was your title when you participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021?
7. Were you a supervisor when you participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021?
8. Were you an ASAC or SSIA when you participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021?
9. Were you an SES employee when you participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021?
10. What division are you currently in? (The drop-down menu is sorted first by Field Offices, Legal Offices, then HQ divisions, and then in alphabetical order by the division's 2-character code).
11. What division were you in when you participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021?

---

[2] The "Terminations" memo also referenced an October 7-related counterterrorism case out of the Southern District of New York. A/DAG Bove provided no context as to how or if that case relates to the Weaponization Executive Order.

12. What was your role in the investigation(s) or prosecution(s) relating to events that occurred at or near the US Capitol on January 6, 2021?[3]

13. What was the approximate date of your last activity relating to the investigation(s) or prosecution(s) relating to events that occurred at or near the US Capitol on January 6, 2021?

69.     On information and belief, the nationwide collection of the foregoing investigation-specific data is unprecedented and not remotely routine, nor tailored to any legitimate law enforcement agency purpose.  Also, oddly, the FBI agents tasked with completing the survey included many who did little to no work on January 6 investigations, while others who did work January 6 investigations did not receive a survey request. On information and belief, DOJ either could not or did not attempt to confirm the accuracy of this basic informational data of its members.

70.     On information and belief, an individual associated with SpaceX, a company owned by Elon Musk, has for some time maintained a presence in the FBI headquarters as an apparent representative of DOGE.  On information and belief, the current Administration has issued this person a security clearance so that the person can be involved in FBI personnel-related discussions.

71.     Between January 27, 2025, and continuing through the present day, the FBIAA has received an enormous influx of requests for assistance from Special Agents seeking legal consultation concerning their placement on the list of Survey respondents, their responses to the Survey the effects that both may have on their employment status, and other related questions.  The influx of requests for employment and legal assistance is unprecedented and has severely impeded the FBIAA's ability to support its members and fulfill its mission.

_____

[3] For this answer, a respondent can check from the following box options: [] Analytical support; [] Approved ECs or other documents in a case file; [] Arrest – led operation or participated in arrest; [] Assigned as case agent for investigation(s); [] Assigned as co-case agent for investigation(s); [] Conducted baseline database checks for case opening; [] Conducted surveillance of subject(s); [] Discovery; [] Evidence collection or disposition; [] Grand jury subpoena – submission or review; [] HQ Program Management Support; [] Interviewed witness(es), subject(s), and/or complainant(s); [] Responded to lead set [sic] by another office; [] Search warrant – led operation or participated in search; [] Supervised squad conducting investigation(s); [] Testified at trial; and [] Other (with a fillable space).

72.    On February 4, 2025, consolidated Plaintiffs filed this lawsuit against the Department of Justice and the United States.

73.    On February 5, 2025, one day after the public announcement of the lawsuit, A/DAG Bove sent another email to all FBI personnel.  In it, he stated that he had "additional information" regarding his January 31, 2025, "Terminations" memorandum.  In sum and substance, A/DAG Bove insisted that the February 2, 2025, survey was intended to create a database of all agents who had worked on the January 6 cases from which he could pare down a "core team" to investigate pursuant to the Weaponization Executive Order.  A/DAG Bove asserted in the February 5 message: "Let me be clear: No FBI employee who simply followed orders and carried out their duties in an ethical manner with respect to January 6 investigations is at risk of termination or other penalties."

74.    Despite being served with a lawsuit seeking a restraint of his suspected planned public release of the survey results, A/DAG Bove did not disavow his intention to publicly release the results of the survey or identify the names of the FBI personnel who participated in the investigations of the January 6 cases.  Nor did he disavow any intention to release the names to a third party, who would then release the list to the public.

75.    Consolidated Plaintiffs continue to live in a state of fear that their names will be disclosed to the public after A/DAG Bove did not make any affirmative statements that he would protect these individuals' names from public disclosure.  In other words, having been put on notice of the lawsuit, the DOJ has done nothing to deny the necessity of the relief requested in this lawsuit.

76.    On the same day, February 5, 2025, United States Attorney General Pam Bondi was sworn into office.  She immediately issued a memorandum, "Restoring the Integrity and Credibility of the Department of Justice" (hereinafter, the "Restoring Integrity Memo").  *See* *https://www.justice.gov/ag/media/1388506/dl?inline/.*   The Restoring Integrity Memo requires "immediate" action by the DOJ to "ensure that the department's personnel are ready and willing to

faithfully implement the policy agenda of the duly elected President of the United States," in light of the "unprecedented, third-world weaponization of prosecutorial power" under the Biden Administration. Attorney General Bondi made clear that this includes the "weaponization of numerous Federal law enforcement agencies" against "perceived political opponents." *Id*.

77.    The Restoring Integrity Memo established a Weaponization Working Group charged with examining, among other things, "Weaponization by Special Counsel Jack Smith and his staff, who spent more than $50 million targeting President Trump, and the prosecutors and law enforcement personnel who participated in the unprecedented raid on President Trump's home." Although the Restoring Integrity Memo proposes to establish a review process, the plain language of the memo states that the Department of Justice has already concluded that so-called "weaponization" occurred and implied that it occurred through the work of "law enforcement personnel."

78.    The Restoring Integrity Memo also directed the Weaponization Working Group to examine "[t]he pursuit of improper investigative tactics and unethical prosecutions relating to events at or near the United States Capitol on January 6, 2021 – **as distinct from good faith actions by federal employees simply following orders from superiors** – which diverted resources from combatting violent and serious crime and thus, were pursued at the expense of the safety of residents of the District of Columbia. *Id*. (emphasis in original). Contrary to proper investigative procedure, the Restoring Integrity Memo presumes the existence of "improper investigative tactics and unethical prosecutions" before any review process has even begun.

79.    On February 6, 2025, AUSAs representing Defendants appeared at a hearing before this Court and agreed that no FBI employees' names had been compiled because the Acting FBI Director had provided only Employee Identification Numbers ("EINs"). Evidently unbeknownst

to the AUSAs at the time of the hearing, A/DAG Bove was contemporaneously in a meeting with acting FBI leadership demanding that the FBI turn over the Survey names.

80.    Ultimately, the FBI complied with A/DAG Bove's directive and provided a list of names linked to EINs.  His actions that occurred contemporaneously with the hearing were focused entirely on obtaining the recognizable names of the Survey respondents, without any relation to the facts and circumstances of any specific January 6 cases in which they were purportedly involved, or any context which might justify aggregating data related to the purported purposes of the Weaponization Executive Order or the Restoring Integrity Memo.

81.    Given A/DAG Bove's earlier comments, consolidated Plaintiffs remain fearful that their identities, specifically their names, will be released to the public.  Moreover, the only apparent metric being used by the DOJ to determine "weaponization" is whether an investigation, however righteous, is perceived by current DOJ leadership to have had negative consequences for the current Administration or its allies.

82.    Creating further doubt about the intentions of current DOJ officials are the public postings of the Acting United States Attorney for the District of Columbia, Ed Martin.  On February 7, 2025, Mr. Martin publicized via his X page a letter he wrote to Mr. Elon Musk and DOGE claiming that he would use his office to investigate people criminally not only if they have broken the law, but if he has decided that they "acted simply unethically."  A verbatim copy of the substantive body of the letter, written on U.S. Department of Justice letterhead and using Mr. Martin's title as United States Attorney, is as follows:

> Thank you for the referral of individuals and networks who appear to be stealing government property and/or threatening government employees. After your referral, as is my practice, I will begin an inquiry. Please let me reiterate again: if people are discovered to have broken the law *or even acted simply unethically*, we will investigate them and **we will chase them down to the end of the Earth to hold them accountable**. We will not rest or cease in this. No one should abuse American taxpayer dollars nor American taxpayer worker. **Noone** [sic] **is above**

**the law**. I am proud that we have been able to assist local law-enforcement [sic] in protecting the DOGE workers and others over the past week or so. A safe DC is a priority for President Trump and all of us.

(***Bold italicized*** emphasis added; **bolded** emphasis in original.)

83.     In other words, in plain and extreme language, United States Attorney Martin publicly announced that he would use federal law enforcement to investigate people who have not committed a crime, but who, in his own determination, "acted simply unethically."

84.     One need not look far to determine how Mr. Martin measures ethics. A prolific social media poster, Mr. Martin's historical Twitter/X feed is replete with his tying a lack of "ethics" directly to a specific political affiliation. Taken in totality, Mr. Martin appears to have unconditionally grouped one political ideology into the category of un-American ethics, while also promising to use Department of Justice resources to investigate non-criminal acts related to ethics.

### F. Anticipated Unlawful Terminations and Other Adverse Action

85.     On information and belief, acting leadership at DOJ is planning the imminent, mass, unlawful termination, or other adverse action, of Bureau employees who had any involvement in certain investigations related to President Trump, including lawful investigation of January 6 cases and the lawful search of President Trump's residence at Mar-a-Lago. Adam Goldman at al., *Trump Officials Fire Jan. 6 Prosecutors and Plan Possible F.B.I. Purge*, N.Y. Times (Jan. 31, 2025); Evan Perez, et al., *Trump DOJ demands list of thousands of FBI agents, others who worked on Jan. 6 and Trump investigations for possible firing*, CNN (Jan 31, 2025), *https://www.cnn.com/2025/01/31/politics/fbi-agents-who-investigated-january-6-fired* (last visited February 4, 2025).

86.     On information and belief, as many as 6,000 FBI employees may currently be targeted for unlawful firing or other adverse employment action. *See* Adam Goldman et al., *Top F.B.I. Agent in New York Vows to 'Dig In' After Removals at Agency*, N.Y. Times (Feb. 2, 2025)

("Mr. Trump's political appointees plan to purge career bureau officials, including rank-and-file field agents. That number could reach 6,000 — or about a sixth of the bureau's 38,000 employees, according to the F.B.I."), *https://www.nytimes.com/2025/02/02/us/politics/ fbi-new-york-email-trump.html* (last visited Feb. 4, 2025).

87.    In addition to being unlawful, a mass firing of 6,000 FBI employees would be catastrophic to the Bureau and to our country's national security interests.

88.    Similarly, any adverse action that amounts to less than a firing but equal to a suspension of work would render the country unacceptably vulnerable to threats.

89.    On February 7, 2025, President Trump held a joint news conference with the Prime Minister of Japan. In response to a reporter's question concerning whether he was planning to fire January 6 investigators, President Trump stated in relevant part, "I'll fire some of them" and that "We had some corrupt agents, and those people are gone or they will be gone, and it will be done quickly and very surgically." Ryan J. Reilly, et al., NBC News, *Trump Pledges to 'fire some' FBI Agents as the Bureau Faces Heat Over Jan. 6 Cases* (Feb. 7, 2025), *https://www.nbcnews.com/politics/justice-department/trump-pledges-fire-fbi-agents-bureau-faces-heat-jan-6-cases-rcna191126.*

90.    On information and belief, in conjunction with the suspected unlawful adverse employment actions they are planning, Defendants have persisted in the position that they have lawful authority to publicly disseminate the names of targeted agents, including but not limited to those employees who responded to the Survey, and/or those employees who the Defendants plan to demote, transfer and/or terminate based on this survey, and/or publicly disseminate employees' responses to the Survey questions outlined above. Although defense counsel has intimated that the Defendants have no plans to make such disclosures, they have oddly rejected the Plaintiffs proposal

to maintain the status quo during the course of this litigation by agreeing to an extension of the current Consent Order.

91.     Defendants will not disavow the public disclosure, notwithstanding that federal law prohibits such an action.  Title 18, Section 119, entitled "Protection of individuals performing certain official duties," states that: "(a) In general.--Whoever knowingly makes restricted personal information about a covered person, or a member of the immediate family of that covered person, publicly available-- (1) with the intent to threaten, intimidate, or incite the commission of a crime of violence against that covered person, or a member of the immediate family of that covered person; or (2) with the intent and knowledge that the restricted personal information will be used to threaten, intimidate, or facilitate the commission of a crime of violence against that covered person, or a member of the immediate family of that covered person," has committed a federal crime.

92.     Such public disclosures would directly put the safety of all impacted individuals at risk as well as their family members.

93.     The FBIAA would similarly be directly affected.  The FBIAA is a not-for-profit, 501(c)(6) organization that is funded by membership dues. A mass disclosure of FBI agent identities and the inevitable termination of employment that would follow will impose massive consequences on the FBIAA that far outstrip its available resources. In the near term, the FBIAA will be required to provide legal counsel to thousands of FBIAA members who have been subject to the unlawful adverse employment action and the security risks accompanying it. This effort to provide counsel will immediately deplete FBIAA resources, leaving many of its members without effective counsel and gutting all other member services provided by FBIAA.  Moreover, given the allegations set forth herein, it is reasonable to conclude that the mass disclosure of FBI agents' identities will result in physical attacks on FBIAA members. Further, the mass disclosure of FBI agents' identities will likely cause an exodus of those agents from the FBI, which, in addition to jeopardizing the nation's

security, would hollow out the FBIAA's membership placing the FBIAA's own existence at risk. Lastly, the current leadership within DOJ has created an environment where FBIAA's protected speech on behalf of its members—namely, external advocacy that often requires bipartisan support—risks drawing a government response that harms its members.

### COUNT ONE: Violation of the Privacy Act, 5 U.S.C. § 552a(e)(6)

94.    Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein. The Privacy Act requires that an agency, "prior to disseminating any record about an individual to any person other than an agency . . . make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes." 5 U.S.C. § 552a(e)(6).

95.    On information and belief, Defendants have disseminated or will imminently disseminate records about the Plaintiffs and their involvement in sensitive investigations.

96.    On information and belief, Defendants have not made any reasonable efforts to ensure that the maintenance and public release of the records at issue in this case are accurate, complete, timely, and relevant for agency purposes.

97.    Defendants' violation will cause substantial and irreparable harm to Plaintiffs. Defendants' anticipated intentional, willful, and unauthorized disclosure(s) of records pertaining to Plaintiffs will have demonstrable adverse effects on them. Among others, these effects include a risk to their safety and that of their family members, damage to their personal and professional reputations, harm to future employment opportunities and the ability to earn a living, and significant emotional distress. This bell cannot be unrung, and once the Plaintiffs' personal information is released it will be eternally available on social media.

## COUNT TWO: Violation of the Privacy Act, 5 U.S.C. § 552a(b)

98.     Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

99.     Defendant DOJ is an "agency" within the meaning of the Privacy Act, *Whittle v. Moschella, et. al.*, 756 F. Supp. 589, 596 (D.D.C. 1991), and maintains one or several "system of records" as defined by 5 U.S.C. § 552a(a)(5). This/these system(s) of records contain(s) "records," as defined by 5 U.S.C. § 552a(a)(4) that pertain to and are about Plaintiffs, including their personally identifying information. The disclosures of Plaintiffs' names based on their work on investigations and prosecutions arising out of the January 6, 2021 events came from FBI and/or DOJ sources. The information about Plaintiffs' case assignments is stored exclusively within FBI and/or DOJ systems of records.

100.    5 U.S.C. § 552a(b) provides that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the records pertains." No exception to this disclosure prohibition applies in this case. Upon information and belief, Defendants plan to willingly and intentionally disclose Plaintiffs' identifying information without their prior consent or approval, in violation of this provision.

101.    Defendants' violation will cause substantial and irreparable harm to Plaintiffs. Defendants' anticipated intentional, willful, and unauthorized disclosure(s) of records pertaining to Plaintiffs have demonstrable adverse effects on them. Among others, these effects include a risk to their safety and that of their family members, damage to their personal and professional reputations, harm to future employment opportunities and the ability to earn a living, and significant emotional distress. Once the Plaintiffs' personal information is released it will be eternally available on social media.

**COUNT THREE: Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)**

102.    Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

103.    Under the APA, a court shall "hold unlawful and set aside agency action found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . contrary to constitutional right, power, privilege, or immunity . . . without observance of procedure required by law . . . [or] . . . unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." 5 U.S.C. § 706(2)(B).

104.    Defendants' current and anticipated actions are contrary to the Defendants' right to privacy, their right to qualified immunity as law enforcement officers acting pursuant to lawful orders, and are in flagrant violation of well-established procedures for the safeguarding of personally identifiable information.

**COUNT FOUR: Mandamus Under 28 U.S.C. § 1361**

105.    Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

106.    The provisions of 28 U.S.C. § 1361 provide a statutory basis for jurisdiction in cases seeking relief in the nature of mandamus against federal officers, employees, and agencies, and they provide for an independent cause of action in the absence of any other available remedies.

107.    Defendants' actions, as set forth above, constitute unlawful, intimidating, and threatening behavior towards Plaintiffs in response to Plaintiffs' lawful actions of executing lawful search and arrest warrants and participating in lawful investigations of crimes committed by January 6 perpetrators.

108.    Defendants do not have discretion to redefine criminal law as it existed on January 6, 2021. Nor do Defendants have any discretion to recast the lawful actions taken by the FBI and the

previous leaders within the Department of Justice as illegal simply by adding a label, let alone any discretion to retaliate and disclose names.

109.    Defendants have no discretion when it comes to ensuring the safety of the American people from extremist violence or ensuring the safety of their own employees.

110.    If no other remedy is available through which the threatened disclosure may be enjoined, then Plaintiffs are entitled to relief in the nature of mandamus compelling Defendants to not disclose the list of names and to cease all unconstitutional adverse employment actions.

## COUNT FIVE: First Amendment Violation for Retaliation Based on Perceived Political Affiliation

111.    Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

112.    The First Amendment protects government employees from discrimination and adverse action based on a perception—even an incorrect one—about the employee's political beliefs, expression, or affiliation. *See Heffernan v. City of Paterson*, 578 U.S. 266, 268, 272 (2016); Branti v. Finkel, 445 U.S. 507, 516–17 (1980).

113.    Defendants' statements and actions indicate that they believe that at least some, if not all, FBI agents including Plaintiffs, who participated in the January 6 cases contributed to the "weaponization" of the FBI or acted with "corrupt" or "partisan intent."

114.    Defendants have not defined what they mean by "weaponization."

115.    Defendants' statements and actions suggest that they believe that at least some FBI agents including Plaintiffs, may be "culpable," should be "concerned," and may be "at risk" of "termination" and other "penalties."

116.    Defendants' statements and actions indicate that the actions of "culpable actors" "have politicized the Bureau, harmed its credibility, and distracted the public from the excellent work being done every day."

117.    Defendants have instructed all FBI personnel "who have witnessed such behavior" to "report it through appropriate channels."

118.    Pursuant to the Terminations Memo, Defendants have already identified eight senior FBI employees by name. These FBI personnel were either terminated or forced into retirement, for their participation in the January 6 cases. No explanation was given for why the eight FBI agents were terminated–only a conclusion that they were part of weaponizing the FBI based on nothing more than their involvement in January 6 cases.

119.    Defendants' statements and actions indicate that they are in the process of identifying a "core list" of individuals who participated in the January 6 investigations. Plaintiffs' names, agents who worked on the January 6 investigations and cases, are likely to appear on the "core list." The "core list" will be judged whether Defendants' can determine "partisan intent."

120.    Based on Defendants' statements and actions, Plaintiffs reasonably fear retaliation– in the form of disclosure of their identities and/or termination from the FBI–based on their perceived political affiliation as agents who participated or worked on the January 6 cases.

121.    As set forth above, Defendants are subjecting Plaintiffs to imminent and irreparable risks of physical, reputational, and financial harm based solely on their perceived lack of political loyalty, in violation of their First Amendment freedoms. This retaliation is all the more outrageous given that it is based solely on their faithfully performing their job duties to investigate crimes and uphold the law.

**COUNT SIX: Due Process Violation – Intentional Violation of Privacy Interests**

122.    Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as

if fully set forth herein.

123.    The Fifth Amendment requires the government to balance federal officers' constitutional privacy interests against the purported public interest in disclosure.

124.    Defendants' disclosure of the identities of Plaintiffs and other similarly situated persons would cause irreparable harm to Plaintiffs by exposing them to the reasonable probability of violence. As set forth above, there are multiple indications on social media and other sources promoting vigilantism and insurrection against law enforcement agents, including FBI agents such as Plaintiffs and other similarly situated persons. Plaintiffs therefore have a reasonable probability that the compelled disclosure of their identities will subject them to threats, harassment, or reprisals either from the government or private parties.

125.    Plaintiffs' constitutional privacy interests outweigh any limited public interest in the compelled disclosure of their identities. Thus, Plaintiffs have a right to nondisclosure under the circumstances here.

**COUNT SEVEN: First Amendment Violation Based Upon the Chilling of Free Speech**

126.    Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

127.    Based on the factual allegations above, Defendants have indicated that they will specifically be basing adverse action and possible disclosure of names based on what they determine is "partisan intent" or "weaponization." They have not committed to following proper procedures or reviews, and instead have baldly labeled January 6 investigations as "weaponized" without any fact-finding or other explanation.

128.    Consolidated Plaintiffs have no choice but to restrain their personal expression of free speech and political advocacy so as to not be labeled as having "partisan intent." Indeed, the only metric for "weaponization" findings, based on published Executive Branch documents and

communications, appears to be activity that occurred under the Biden administration ("over the last 4 years" (Weaponization EO); "grave national injustice that has been perpetrated upon the American people over the last four years" (January 31, 2025 A/DAG memo, quoting the January 6 Pardons Executive Order); "weaponization in the prior administration" (February 5, 2025, A/DAG email); and "review of . . . civil or criminal enforcement authority of the United States over the last four years" (DOJ Restoring Integrity Memo)).

129.    Thus, consolidated Plaintiffs who either wish to discuss politics in their private lives, express support for the prior administration or its political allies, or who simply wish to associate with others who share similar political beliefs, are restricted from doing so lest their speech be used as evidence of "weaponization."  Similarly, even if there are certain Plaintiffs who do not identify nor have a need to seek the support of the prior administration's political party, their protected speech, too, must be chilled to excise any political thought in order to avoid any incorrect interpretations or perceptions.

130.    Organizational Plaintiff also engages in lobbying activities and other political speech as part of its core mission. Defendants' actions have had the effect of chilling Plaintiffs' political speech.

131.    As set forth above, Defendants are subjecting Plaintiffs to imminent and irreparable risks of physical, reputational, and financial harm based solely on their perceived lack of political loyalty, in violation of their First Amendment freedoms.

**REQUEST FOR RELIEF**

132.    WHEREFORE, Plaintiffs request that this Court:

a)  Enjoin Defendants from any further collection or dissemination of personally

identifiable information of Plaintiffs and other similarly situated persons;

b)  Enjoin the Defendants from taking any additional action which would infringe on

Plaintiffs' constitutional rights;

c)  Issue writs of *mandamus* as appropriate;

d)  Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and

e)  Award other relief as the Court deems just.

Dated: February 24 2025

Respectfully submitted,


LAW OFFICE OF MARK S. ZAID, P.C.

By: _____*Mark S. Zaid*_____
    MARK S. ZAID, D.C. Bar # 440532
    BRADLEY P. MOSS, D.C. Bar # 975905
    1250 Connecticut Avenue, NW, Suite 700
    Washington, D.C. 20036
    (202) 498-0011
    Mark@MarkZaid.com
    Brad@MarkZaid.com
    *Attorneys for John Does 1,3-4,*
    *Jane Does 1-3 (25-328)*

CENTER FOR EMPLOYMENT JUSTICE

By: _____*Pamela M. Keith*_____
    PAMELA M. KEITH, D.C. Bar # 448421
    SCOTT M. LEMPERT, D.C. Bar # 1045184
    650 Massachusetts Ave., NW, Suite 600
    Washington, DC 20001
    (202) 800-0292
    pamkeith@centerforemploymentjustice.com
    Slempert@centerforemploymentjustice.com
    *Attorneys for John and Janes Does 1-9, et al. (25-325)*


STATE DEMOCRACY DEFENDERS FUND

By: _____*Norman L. Eisen*_____
    Norman L. Eisen D.C. Bar # 435051
    Pooja Chaudhuri, D.C. Bar # 888314523
    600 Pennsylvania Avenue, SE, #15180
    Washington, D.C. 20003
    (202) 594-9958
    norman@statedemocracydefenders.org
    pooja@statedemocracydefenders.org
    *Attorney for John and Janes Does 1-4*
    *Attorneys for John Does 1,3-4,*
    *Jane Does 1-3 (25-328)*

KOSKOFF, KOSKOFF & BIEDER, PC

By: _____*Margaret M. Donovan*_____
    Christopher M. Mattei, Bar # 27500 (*pro hac vice*)
    Margaret M. Donovan, Bar # 31787 (*pro hac vice*)
    350 Fairfield Ave., Suite 501
    Bridgeport, CT 06604
    (203) 336-4421
    cmattei@koskoff.com
    mdonovan@koskoff.com
    *Attorneys for Federal Bureau of Investigation*
    *Agents Association (25-328)*