**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN AND JANE DOES 1-9, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 25-0325 (JMC) |
| DEPARTMENT OF JUSTICE, | |
| Defendant. | |
| FEDERAL BUREAU OF INVESTIGATION AGENTS ASSOCIATION, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 25-0328 (JMC) |
| DEPARTMENT OF JUSTICE, et al., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR**
**PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ..................................................................................................3

    A.    The January 6, 2021 Riot at the United States Capitol. ................................3

    B.    January 20, 2025 Inauguration and Executive Actions................................3

    C.    DOJ Activity Following the January 6 Pardons Proclamation, Weaponization EO....5

        1.    The January 27, 2025 Firings of Federal Prosecutors............................5

        2.    The January 31, 2025 Terminations Memorandum. ................................6

        3.    The February 2, 2025 Survey....................................................................7

        4.    DOJ Actions Taken After the Filing of this Lawsuit. ..............................8

    D.    Threats and other Events Since the Filing of this Lawsuit. .......................10

ARGUMENT ........................................................................................................................11

    I.    PLAINTIFFS HAVE STANDING TO BRING THEIR CLAIMS. ..............................11

    A.    The Individual Doe Plaintiffs Have Standing. ..........................................11

    B.    FBIAA Has Associational Standing. .........................................................15

    C.    FBIAA Has Organizational Standing. .......................................................17

    II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ...............................19

    A.    Plaintiffs Are Likely to Succeed on the Merits of Their Privacy Act Claim Under Section 552a(b) and Their Administrative Procedure Claim Under 5 U.S.C. § 706.20

    B.    Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claim Based on Perceived Political Affiliation....................................................24

    C.    Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claim Regarding the Chilling of Their Free Speech. ..........................................27

    D.    Plaintiffs Are Likely to Succeed on the Merits of Their Privacy Claim Under the Due Process Clause of the Fifth Amendment. ...........................................30

    III.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY INJUNCTIVE RELIEF................................................................................32

IV.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR
       GRANTING PLAINTIFFS' INJUNCTIVE RELIEF. ..................................................33

CONCLUSION...........................................................................................................................33

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Ames v. Dep't of Homeland Sec.*,
   861 F.3d 238 (D.C. Cir. 2017)....................................................................................20, 21

*Ams. For Prosperity Found. v. Bonta*,
   594 U.S. 595 (2021)....................................................................................................13, 28

*Apotex, Inc. v. FDA*,
   449 F.3d 1249 (D.C. Cir. 2006).........................................................................................19

*Ark. Dairy Coop. Ass'n, Inc. v. U.S. Dep't of Agric.*,
   573 F.3d 815 (D.C. Cir. 2009)...........................................................................................19

*Ashbourne v. Hansberry*,
   No. 17-752 (LLA), 2024 WL 3443324 (D.D.C. July 17, 2024)............................................21

*Branti v. Finkle*,
   445 U.S. 507 (1980)....................................................................................................14, 25

*Buckley v. Valeo*,
   424 U.S. 1 (1976)................................................................................................................29

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006)....................................................................................19, 32

*Citizens United v. Federal Election*,
   558 U.S. 310 (2010)....................................................................................................28, 29

*Ctr. for Sustainable Econ. v. Jewell*,
   779 F.3d 588 (D.C. Cir. 2015)...........................................................................................15

*Doe v. Stephens*,
   851 F.2d 1457 (D.C. Cir. 1988).........................................................................................21

*Elrod v. Burns*,
   427 U.S. 347 (1976)............................................................................................................24

*F.T.C. v. Superior Court Trial Lawyers Ass'n*,
   493 U.S. 411 (1990)............................................................................................................18

*FDA v. All. for Hippocratic Medicine*,
   602 U.S. 367 (2024)............................................................................................................17

*Food Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015)...........................................................................................17

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000)................................................................................................11

*Havens Realty Corp. v. Coleman*,
455 U. S. 363 (1982)..............................................................................................17

*Heffernan v. City of Paterson*,
578 U.S. 266 (2016).........................................................................................24, 25

*Henke v. Dep't of Com.*,
83 F.3d 1453 (D.C. Cir. 1996)...............................................................................20

*Hunt v. Wash. State Apple Adver. Comm'n*,
432 U.S. 333 (1977)...............................................................................................16

*John Doe No. 1 v. Reed*,
561 U.S. 186 (2010)...............................................................................................30

*Kallstrom v. City of Columbus*,
136 F.3d 1055 (6th Cir. 1998) ....................................................................13, 30, 31

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ...................................................................................19

*Love v. Johnson*,
146 F. Supp. 3d 848 (E.D. Mich. 2015)..................................................................13

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)..........................................................................................11, 14

*Manhattan Beach Police Officers Ass'n, Inc. v. City of Manhattan Beach*,
881 F.2d 816 (9th Cir. 1989) ..................................................................................25

*Meyer v. Grant*,
486 U.S. 414 (1988)...............................................................................................27

*Nixon v. Admin. of Gen. Servs.*,
433 U.S. 425 (1977)...............................................................................................30

*Nken v. Holder*,
556 U.S. 418 (2009)...............................................................................................32

*Open Cmtys. All. v. Carson*,
286 F. Supp. 3d 148 (D.D.C. 2017).........................................................................33

*Pennell v. City of San Jose*,
485 U.S. 1 (1988)....................................................................................................14

*PETA v. Dep't of Agriculture*,
    797 F.3d 1087 (D.C. Cir. 2015) ...................................................................................18

*Pilon v. Dep't of Justice*,
    73 F.3d 1111 (D.C. Cir. 1996) .............................................................................20, 23

*Rutan v. Republican Party of Ill.*,
    497 U.S. 62 (1990)..........................................................................12, 13, 25, 27

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ...................................................................................19

*Tao v. Freeh*,
    27 F.3d 635 (D.C. Cir. 1994) ....................................................................................25

*Townsend v. United States*,
    236 F. Supp. 3d 280 (D.D.C. 2017) ...........................................................................21

*In re U.S. Office of Pers. Mgmt. Data Sec. Data Breach Litig. v. Office of Pers. Mgmt.*,
    928 F.3d 42 (D.D.Cir. 2019)......................................................................................14

*United States v. Harriss*,
    347 U.S. 612 (1954)............................................................................................18, 29

*Waters v. Thornburgh*,
    888 F.2d 870 (D.C. Cir. 1989) ...................................................................................20

*Whalen v. Roe*,
    429 U.S. 589 (1977)...................................................................................................30

*Wieman v. Updegraff*,
    344 U.S. 183 (1952)...................................................................................................24

*Wilson v. Libby*,
    498 F. Supp. 2d 74 (D.D.C. 2007) .............................................................................23

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)......................................................................................................33

**Statutes**

5 U.S.C. § 552a(b)(1)-(13)....................................................................................21, 23

5 U.S.C. § 552a(e)(6) ...................................................................................................11

5 U.S.C. § 706 ..............................................................................................................19

**Other Authorities**

*Protecting Individual Privacy in Federal Gathering, Use and Disclosure of Information*, 93d Cong., 2d Sess. 51-52 (Sept. 26, 1974)........................................................21

Glenn Thrush, et al., *Justice Dept. Fires Prosecutors Who Worked on Trump Investigations*, NY Times (Jan. 27, 2025) ............................................................................................................5

## INTRODUCTION

Applying an electroshock weapon to an officer's neck.[1] Crushing a cop with his own shield.[2] Reaching over riot gear to spray chemical irritants into police's eyes.[3] Ripping off an officer's gas mask.[4] Dragging a policeman by the neck and shouting, "Hey! I got one!"[5] Leading "Heave! Ho!" chants to break law enforcement's riot control line.[6] "If you have a weapon, you need to get your weapon!"[7] "F—you b—ass cops."[8] "Yes, I'm calling for violence! And I will be violent!"[9]

These are the actions and voices of January 6 rioters against law enforcement. These individuals and others were investigated by the FBI, afforded due process rights, brought to justice,

---

[1] United States Attorney's Office, District of Columbia ("USAO-DC"), Press Release, *California Man Sentenced to Prison for Felony Charges, Including Conspiracy and Assault Police Officer During Capitol Breach*, June 21, 2023, https://www.justice.gov/usao-dc/pr/california-man-sentenced-prison-felony-charges-including-conspiracy-and-assaulting-police.

[2] Department of Justice, Office of Public Affairs, Press Release, *Connecticut Man Charged with Assaulting an Officer During U.S. Capitol Breach*, (Jan. 20, 2021), https://www.justice.gov/archives/opa/pr/connecticut-man-charged-assaulting-officer-during-us-capitol-breach.

[3] USAO-DC, Press Release, *New Jersey Man Sentenced to 12 Years In Prison for Assaulting Law Enforcement and Other Charges During Jan. 6 Capitol Riot*, (May 24, 2024), https://www.justice.gov/usao-dc/pr/new-jersey-man-sentenced-12-years-prison-assaulting-law-enforcement-and-other-charges.

[4] *See supra* note 2.

[5] USAO-DC, Press Release, *Virginia man Sentenced to More Than Five Years in Prison for Assaulting Law Enforcement During Jan. 6 Capitol Breach*, (Jan. 17, 2025), https://www.justice.gov/usao-dc/pr/virginia-man-sentenced-more-five-years-prison-assaulting-law-enforcement-during-jan-6.

[6] USAO-DC, Press Release, *Texas Man Sentenced to Prison for Assaulting Law Enforcement During Jan. 7 Capitol Breach*, May 2, 2024, https://www.justice.gov/usao-dc/pr/texas-man-sentenced-prison-assaulting-law-enforcement-during-jan-6-capitol-breach-1.

[7] *Id.*

[8] USAO-DC, Press Release, *California Man Sentenced for Assaulting Law Enforcement with a Dangerous Weapon During Jan. 6 Capitol Breach*, (Aug. 9, 2024), https://www.justice.gov/usao-dc/pr/california-man-sentenced-assaulting-law-enforcement-dangerous-weapon-during-jan-6.

[9] *See supra* note 6.

and sentenced to prison. All of them have now been released from their sentences. None of them are subject to supervised release.

The excerpts above are taken from Department of Justice ("DOJ") press releases. It is all the more stunning, then, that in response to this lawsuit DOJ has refused to safeguard the names of FBI employees that it collected pursuant to the unprecedented January 6 "Survey." Through its opposition to this Motion and its remarks at the February 6, 2025 hearing, DOJ refuses to confirm that it will never release the Survey results to the public. DOJ refuses to commit to safeguarding the men and women of the FBI from harm's way. DOJ does this notwithstanding that disclosure would violate the Privacy Act, the constitutional rights of FBI personnel, and the federal criminal code.

Instead, DOJ does not recognize any limitation on its power to use this sensitive data, and continues to preserve its option to release it to third parties in other agencies, to the public, and potentially to the pardoned January 6 rioters. When DOJ embarked on its unprecedented mission of marshaling the names of any FBI employee who worked on a January 6 case, its leadership kept its intentions deliberately opaque.  DOJ leadership provided FBI personnel and the public with little information on why the Survey had any lawful, legitimate purpose. The Government has not taken any steps to assure Plaintiffs or the public that its actions—compiling a list of FBI personnel who worked on the January 6 cases, investigating them, and subjecting them to review—are not rooted in any improper purpose or a desire for some type of political vengeance. The Government has relied on a series of rhetoric-laced, conclusory orders, memos, and communications that signal to Plaintiffs and those similarly situated that their fates will be decided by the Government's own, unilateral determination that rank-and-file FBI agents and employees harbored "partisan intent."

By and through their attorneys, Plaintiffs the Federal Bureau of Investigation Agents Association ("FBIAA"), John Does 1, 3, and 4 and Jane Does 1 through 3 (the "Doe Plaintiffs"), John and Jane Does 1-9, et al., individually and on behalf of the putative class (the "Doe Class Plaintiffs"), collectively, the "Plaintiffs" or the "consolidated Plaintiffs," seek to vindicate their statutory and constitutional rights under the Privacy Act, the First Amendment, and the Fifth Amendment. They move this Court to issue preliminary injunctive relief against the Government to prevent the disclosure of the Plaintiffs' identities, along with the identities of those similarly situated, by DOJ, either directly or indirectly, to any third parties. They further seek to enjoin the Defendants from taking any additional action which would infringe on Plaintiffs' Constitutional rights, as the Court determines.

The Court should not countenance an outcome that results in the suppression of Plaintiffs' statutory and fundamental constitutional rights. The Court should grant preliminary injunctive relief for the reasons below.

## FACTUAL BACKGROUND

### A.    The January 6, 2021 Riot at the United States Capitol.

The events of January 6, 2021 are well documented before this Court. They are further documented in the Plaintiffs' First Amended Complaint. FAC ¶¶ 20-26. The violent attack on the Capitol injured more than 140 people, inflicted millions of dollars of damage, and left five people dead. *Id.* Over 1,500 people were arrested in connection with the attack, resulting in over 1,200 convictions, with many cases still pending at the time of the 2025 inauguration.

### B.    January 20, 2025 Inauguration and Executive Actions.

On January 20, 2025, President Donald J. Trump was sworn in as the 47th President of the United States. That same day, he took several Presidential actions.

He issued Proclamation 10887 titled "Granting Pardons and Commutations of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021 (the "January 6 Pardons Proclamation"). Exhibit ("Ex.") . The January 6 Pardons EO referenced, without further elaboration, a "grave national injustice that has been perpetrated upon the American people over the last four years." It commuted the sentences of several high-profile January 6 convicts. It further granted a "full, complete and unconditional pardon to all other individuals convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021." Ex. 1. As a result, anybody serving prison time for a January 6 offense was immediately released from their sentence, regardless of whether or not a court had found them to be a threat to public safety.

That same day, the President released an Executive Order 14147 titled "Ending the Weaponization of the Federal Government" (the "Weaponization EO"). Ex. 2. In relevant part, the Weaponization EO's "Purpose" section asserted that the "previous administration engage[d] in a systemic campaign against its perceived political opponents, weaponizing the legal force of numerous Federal law enforcement agencies . . . against those perceived political opponents in the form of investigations, prosecution, civil enforcement actions, and other related actions." *Id*. The Weaponization EO went on to describe that such actions "appear oriented more toward inflicting political pain than toward pursuing actual justice of legitimate government objectives." *Id*. The "Purpose" section also referenced the "weaponization of prosecutorial power to upend the democratic process" and the "target[ing of] individuals who voiced opposition to the prior administration's policies." *Id*. The "Purpose" section expressly noted that the "Department of Justice has ruthlessly prosecuted more than 1,500 individuals associated with January 6, and simultaneously dropped nearly all cases against BLM rioters." *Id*.

The "Policy" section of the Weaponization EO stated, in relevant part, that the United States would "identify and take appropriate action to correct past misconduct by the Federal Government related to the weaponization of law enforcement." *Id*. Finally, it directed the United States Attorney General to review "the activities of . . . the Department of Justice . . . over the last 4 years and identify any instances where a department's or agency's conduct appears to have been contrary to the purposes and policies of this order, and prepare a report to be submitted to the President . . . with recommendations for appropriate remedial actions to be taken." *Id*. The Weaponization EO notes that when acting in furtherance of the order, "departments and agencies are directed to comply with applicable document-retention policies and legal obligations" and that noncompliance with these requirements "will be referred to the Attorney General." *Id*.

### C. DOJ Activity Following the January 6 Pardons Proclamation, Weaponization EO.

#### 1. The January 27, 2025 Firings of Federal Prosecutors.

One week after the inauguration, on January 27, 2025, interim DOJ leadership issued a memorandum firing over a dozen federal prosecutors who had been affiliated with either of the two federal criminal investigations into President Trump. According to news reports, the firings were not based on any investigation or finding that the prosecutors demonstrated poor performance or improper conduct, but instead the firings were executed under an asserted Article II constitutional authority to fire career staff members. The memo, reportedly signed by then-Acting Attorney General James McHenry, stated: "Given your significant role in prosecuting the president, I do not believe that the leadership of the department can trust you to assist in implementing the president's agenda faithfully." S*ee* Glenn Thrush, et al., *Justice Dept. Fires Prosecutors Who Worked on Trump Investigations*, NY Times (Jan. 27, 2025); Sarah N. Lynch & Andrew Goudsward, *Trump's Justice Department Launches Sweeping Cuts Targeting Jan. 6*

Prosecutors, FBI Agents, Reuters (Jan. 31, 2025), https://www.reuters.com/world/us/fbi-launches-wide-ranging-round-cuts-sources-say-2025-01 31/.

### 2.    The January 31, 2025 Terminations Memorandum.

On January 31, 2025, Acting Deputy Attorney General ("A/DAG") Emil Bove III issued a memorandum to the then-Acting Director of the FBI titled "Terminations" (the "Terminations Memo") Ex. 3. The memo fired eight senior leaders within the FBI. A/DAG Bove began the memo by quoting the Weaponization EO's language about the "previous administration['s] . . . systemic campaign against its perceived political opponents, weaponizing the legal force of numerous Federal law enforcement agencies. . . ." A/DAG Bove went on to conclude, in his own words, "This includes the FBI. For example, the FBI—including the Bureau's prior leadership—actively participated in what President Trump appropriately described as a 'grave national injustice'" with respect to conducting January 6 investigations. Ex. 3. A/DAG Bove did not provide any reasoning for why or how he reached the conclusion that the FBI was implicated by the Weaponization EO, other than the lone reference to the FBI having been involved with the response to the January 6 attack.

A/DAG Bove wrote that he "d[id] not believe that the current leadership of the Justice Department could trust these FBI employees to assist in implementing the President's agenda faithfully." Ex. 3. He then "deem[ed] the[] termination necessary" pursuant the Weaponization EO. Again, A/DAG provided no context as to how he concluded these individuals had been "weaponized," other than to reference his own belief that they lacked "faithful[ness]" and "responsiveness" to the President.

The next section of the Terminations Memo included a heading, "Employees To Be Terminated Pursuant to the Foregoing." Under the heading were seven names. Beneath those names was a reference to an eighth individual, who was then the assistant director in charge of the

Washington Field Office ("WFO"). WFO was the lead field office for January 6 investigations. Ex. 3.

In the very next paragraph of the Terminations Memo, A/DAG Bove directed the Acting Director of the FBI to identify by noon on February 4, 2025 "all current and/or former FBI personnel assigned at any time to investigations and/or prosecutions related to (1) [January 6 investigations]; and (2) *United States v. Haniyeh, et al.*, 24 Mag. 438 (S.D.N.Y.)." Ex. 3. The "Terminations" memo asserted that A/DAG Bove would commence a "review process" to determine if any "*additional* personnel actions are necessary" (emphasis added). *Id*. The *Haniyeh* case does not appear to have anything to do with the Weaponization EO, and instead relates to a turf war between the FBI's New York and Washington Field Offices over a prosecution connected to the October 7 Hamas attack on Israel. *See, e.g.*, Adam Goldman, *Tensions Over F.B.I.'s Work on Hamas Case Spill Into the Open*, NY Times (Feb. 14, 2025), https://www.nytimes.com/2025/02/14/us/politics/fbi-justice-dept-hamas.html.

### 3.     The February 2, 2025 Survey.

On Sunday, February 2, 2025, DOJ ordered FBI agents and other personnel, including Plaintiffs, to answer a questionnaire about their work on cases related to the events of January 6 (the "Survey"). DOJ directed that FBI employees complete the Survey by 3:00 p.m. on the following day. The survey was titled "A/DAG Memo Response: Events that Occurred at or Near the US Capitol on January 6, 2021." The Survey included a number of questions, all marked "required." A copy of these questions and the available dropdown menus of answers is detailed in the First Amended Complaint ("FAC"). FAC ¶ 68; *see also* Decl. Frank Figliuzzi, Ex. 2.

In sum, the Survey asked no questions to suss out whether an employee had "weaponized" his/her role, which, of course, was assigned by DOJ itself.  It asked no questions about the cases themselves, the allegations of misconduct or weaponization, whether any agent wished to report

misconduct or weaponization, whether any complaints had been made as to the Special Agents' conduct during the prosecution of the cases, or the process by which Special Agents were assigned to these cases. The questions appeared to serve no other purpose than to compile a list of agents who were involved in January 6 investigations without any apparent reason.

To the best of Plaintiffs' knowledge, there is no precedent in either FBI or DOJ history for compiling such an expansive, sensitive list.

Apparently aware of the incendiary nature of the list, on or about February 4, then-Acting FBI Director transmitted the list to A/DAG Bove using only employee identification numbers. FAC ¶ 79. Realizing that the DOJ was just one step away from either publicly disclosing the list or providing the list to third parties who might then disclose the data, *see* FAC ¶ 72, Plaintiffs filed this lawsuit to protect themselves.

### 4.    DOJ Actions Taken After the Filing of this Lawsuit.

On February 5, 2025, one day after the public announcement of the lawsuit, A/DAG Bove sent another email to all FBI personnel. Ex. 4. In it, he stated that he had "additional information regarding the [Terminations] [M]emo." In sum and substance, A/DAG Bove blamed "insubordination" by acting FBI leadership who had refused to identify a "core team" whose conduct he could "review" for weaponization. *Id.* A/DAG Bove then insisted that it was the FBI's own fault that led him to issue the Terminations memo, since "the written directive was intended to obtain a complete data set that the Justice Department can reliably pare down to the core team that will be the focus of the weaponization review pursuant to the Executive Order." *Id.* A/DAG Bove provided no explanation for how and why the summary firings of the eight individuals listed in the Terminations Memo could have been justified if he had not yet even begun his "weaponization review." *Id.*

A/DAG Bove again reiterated, this time with emphasis, that "the information was intended to 'commence a review <u>process</u>' that will be used to 'determine <u>whether</u> any additional personnel actions are necessary." *Id.* (emphasis in original). A/DAG Bove asserted in the February 5 message: "Let me be clear: No FBI employee who simply followed orders and carried out their duties in an ethical manner with respect to January 6 investigations is at risk of termination or other penalties." *Id.* A/DAG Bove did not provide any explanation as to how the Survey would have indicated whether Plaintiffs were "simply following orders" or acting "in an ethical manner."

A/DAG Bove advised that "[t]he only individuals who should be concerned about the process initiated by my January 31, 2025 memo are those who acted with corrupt or partisan intent, who blatantly defied orders from Department leadership, or who exercised discretion in weaponizing the FBI." *Id.* Again, A/DAG Bove did not provide any explanation as to how the Survey would have indicated whether Plaintiffs acted "with a partisan intent," whether they "defied orders," or whether they "exercised discretion in weaponizing the FBI."

Despite presumable knowledge this lawsuit which details the concrete concerns of FBI agents and staff, A/DAG Bove's message to FBI employees on February 5, 2025, did not make any promises that the FBI would not release their names to the public.

Also on February 5, 2025, newly sworn in Attorney General Pam Bondi issued a memorandum, "Restoring the Integrity and Credibility of the Department of Justice" (the "Restoring Integrity Memo"). Ex. 5. The memo requires "immediate" action by the DOJ to "ensure that the Department's personnel are ready and willing to faithfully implement the policy agenda of the duly elected President of the United States." *Id.* The memo then quoted the conclusory language from the Weaponization EO about the "prior administration" and its "systemic campaign against perceived political opponents." *Id.*

The Restoring Integrity Memo included the following peculiar language about how the DOJ would determine whether or not someone had participated in "weaponization," stating that "[n]o one who has acted with a righteous spirit and just intentions has any cause for concern" about the DOJ's "efforts to root out" weaponization. *Id*. The Restoring Integrity Memo provided no other details about what might determine whether someone acted "with a righteous spirit and just intentions." *Id*.

The Restoring Integrity Memo did, however, establish a Weaponization Working Group charged with examining various items that the DOJ had already deemed "weaponized," notwithstanding that working group to establish such a finding did not exist yet. FAC ¶ 77.

The Restoring Integrity Memo also directed the Weaponization Working Group to examine "[t]he pursuit of improper investigative tactics and unethical prosecutions relating to events at or near the United States Capitol on January 6, 2021–**as distinct from good faith actions by federal employees simply following orders from superiors**–which diverted resources from combatting violent and serious crime and thus, were pursued at the expense of the safety of residents of the District of Columbia." Ex. 5 (emphasis in original). Contrary to proper investigative procedure, the Restoring Integrity Memo presumes the fact of "improper investigative tactics and unethical prosecutions" before any review process has even begun in order to adduce that fact.

### D.    Threats and other Events Since the Filing of this Lawsuit.

The First Amended Complaint provides several examples of threats to agents made by January 6 vigilantes. See FAC ¶¶ 43-56. It also provides numerous instances where January 6 rioters have demanded to learn the names of FBI agents assigned to the cases. *See, e.g.*, FAC ¶ 55-56. Just days before this filing, Enrique Tarrio—one of the most notorious January 6 convictions who has openly targeted the agent who testified against him—was arrested for assault outside the Capitol. FAC ¶ 47.

The Acting United States Attorney for the District of Columbia, Ed Martin, has also published troubling communications. On February 7, Mr. Martin publicized via his X page, @EagleEdMartin, a letter he wrote to Mr. Elon Musk and DOGE claiming that he would use his office to investigate people criminally not only if they have broken the law, but if he has decided that they "acted simply unethically." Ex. 6; *see also* FAC ¶ 82. In other words, in plain language, United States Attorney Martin, who is supervising the defense of this lawsuit, publicly announced that he would use federal law enforcement to investigate people who have not committed a crime, but who, in his own determination "acted simply unethically."

## ARGUMENT

## I.    PLAINTIFFS HAVE STANDING TO BRING THEIR CLAIMS.

To establish standing under Article III of the Constitution, a plaintiff must allege "(1) an injury-in-fact, which is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) that it is likely the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

Each set of Plaintiffs can establish standing to bring this suit.

### A.    The Individual Doe Plaintiffs Have Standing.

The Plaintiffs have suffered an invasion of concrete and particularized legally protectible interests, and the injury is actual and imminent. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The bases of the Doe Plaintiffs claims are both statutory and constitutional.

The statutory basis for this injury is the potential disclosure of the Doe Plaintiffs' personal information to members of the public. This would violate their legally protected interest in anonymity as warranted by Section 552a(b) of the Privacy Act which places restrictions on the

collection, maintenance, and release of agency records.[10] This harm is one step away from coming to fruition. The DOJ amassed the sensitive data in its unprecedented creation of this list. FAC ¶¶ 68-70. Although having the names of the employees would have served no purpose to effectuate the Government's purported goal of detecting weaponization, A/DAG Bove insisted on obtaining names nonetheless. Those pardoned for their January 6 convictions have called for retaliatory violence against the FBI for years, and sprang to life on social media to demand the release of the list. FAC ¶¶ 55-56. They did so while appealing to a leader who has indicated their past violence against law enforcement was acceptable, condoned, and justified, and who has pandered to their requests. FAC ¶ 42. Meanwhile, others in Government have made threats of "radical transparency" with a history of doxxing civil servants. FAC ¶ 58.

If any of the names are unlawfully publicly released, then Plaintiffs have little to no means of safeguarding their privacy and anonymity. As the saying goes, "that genie can never be put back into the bottle."

The First Amendment also protects non-political, career-level employees from adverse employment actions and hiring decisions—such as the disclosure of employees' identities, demotions, changes in security clearances, or termination—taken because of their political affiliation. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 (1990). Indeed, by virtue of their participation in the January 6 investigations and cases, the Government has branded Plaintiffs as disloyal to the current administration regardless of what their actual political views are. The survey and ongoing "review" for "additional" personnel actions have had immediate negative impacts on the assignments that Plaintiffs can currently take and has further placed Plaintiffs at a distinct

---

[10] The Plaintiffs also allege in the First Amended Complaint a violation of 5 U.S.C. § 552a(e)(6), but are not moving on it in this Motion. That count is not the basis of this motion.

disadvantage as to their future employment. Moreover, the Plaintiffs have now improperly been grouped into a sub-category across FBI personnel as participating in "weaponization," whereas those employees who, for whatever reason, did not receive the Survey, are not part of this "weaponized" group. *See, e.g.*, Decl. John Doe #1 (328) ¶ 16; Decl. John Doe #3 (328) ¶ 16; Decl. John Doe #4 (328) ¶ 16; Jane Doe #1 (325) Decl. ¶ 19; Jane Doe #2 (325) Decl. ¶ 20.

Moreover, Plaintiffs have a cognizable claim that the Government's crackdown on their work in particular—combined with the Government's statements on weaponization, a proxy for politicization—has impermissibly chilled their free speech as protected under the First Amendment. *Rutan*, 497 U.S. at 79; *see Ams. For Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) (disclosure of anonymous donors' identities to government "creates an unnecessary risk of chilling in violation of the First Amendment"). For example, as political targets of the current administration, Plaintiffs have significantly curtailed their private political speech and are hesitant to express their political views in their private lives. *See* Jane Doe #3 (325) Decl. ¶¶ 25–27.

Plaintiffs also have a legally cognizable interest in their right to privacy, *e.g.*, protecting their bodily integrity from harm, under the Due Process Clause. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1062-63 (6th Cir. 1998) (collecting cases); *see also Love v. Johnson*, 146 F. Supp. 3d 848, 853 (E.D. Mich. 2015). Plaintiffs reasonably fear the disclosure of their identities to members of the public. Their fears are substantiated by the fact members of the current Administration has shown a propensity for doxxing civil servants, FAC ¶¶ 40-41; that January 6 rioters are specifically calling for this relief and the Administration's track record of answering their prayers is a strong one, FAC ¶¶ 48-56, that the Government's collection focused specifically on names and not anything that might support a justification under the Weaponization EO, FAC ¶ 65, 73; and that the Government has refused to commit to nondisclosure. Indeed, even the current

consent order contemplates a scenario where the Government will release the list it has created. ECF No. 22, para. 2. Were Plaintiffs' identities to become public knowledge, they would be subject to retaliation by violent actors. *See, e.g.*, Jane Doe #1 (328) Decl. ¶ 21, Jane Doe #2 (328) Decl. 21, Jane Doe #3 (328) Decl. ¶ 23, John Doe #1 (328) Decl. ¶ 23, Jane Doe #2 (325) Decl. ¶ 2, Jane Doe #1 (325) Decl. ¶ 25, Jane Doe #3 (325) ¶ 23, Decl. FAC ¶¶ 48-55.

The harm suffered by Plaintiffs is both "actual" and "imminent." *Lujan*, 504 U.S. at 560. Indeed, the "chilling" harm created by the list has already manifested. *See, e.g.*, Decl. Jane Doe #1 (328) ¶¶ 18-19, 21, Jane Doe #2 (328) ¶¶ 18-19, 21, John Doe #1 (328) ¶¶21, 23, John Doe #3 (328) ¶¶ 21, 23, Jane Doe #3 (325) Decl. ¶ 25-27. As for any future harm that would be caused by the disclosure of Plaintiffs' identities to the public or even intra-agency, Plaintiffs have valid concerns that such an outcome is imminent where other sensitive information related to January 6 investigations has become public knowledge. Given the exceptional nature of this case, even the slightest possibility of the Survey's disclosure poses an unacceptable risk. The Plaintiffs have well-founded concerns that they will become targets of violent individuals involved in the January 6 riots. These individuals have demonstrated a personal vendetta against law enforcement personnel who investigated and prosecuted them. Consequently, any chance of disclosure, no matter how great or small, could have severe consequences for the Plaintiffs' safety and well-being. *See In re U.S. Office of Pers. Mgmt. Data Sec. Data Breach Litig. v. Office of Pers. Mgmt.*, 928 F.3d 42 (D.D.Cir. 2019) (finding government worker plaintiffs had standing to bring claim of future harm where past events of cyber breaches substantiated the heightened risk of future identity theft). Here, the substantial risk of future adverse employment action provides a basis for standing. *Branti v. Finkle*, 445 U.S. 507 (1980) (assistant public defenders had standing to bring a claim where they were "selected for termination" because they were Republicans); *see also Pennell v. City of San*

14

*Jose*, 485 U.S. 1 (1988) (in the context of city ordinance, landlords demonstrated "likelihood of enforcement . . . is a sufficient threat of actual injury to satisfy Art. III's requirement" even though they had not alleged which properties or how many tenants would be impacted).

Plaintiffs easily meet the remaining requirements for establishing standing. First, there is no doubt that the Government's actions have given rise to Plaintiffs' alleged injuries. Second, Plaintiffs' injuries are redressable through the declaratory and injunctive relief requested here.

**B.    FBIAA Has Associational Standing.**

An organization may assert standing on behalf of its individual members when: (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015) (*quoting Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

The FBI has around 13,800 Special Agents; approximately 12,000 are members of FBIAA. FBIAA Decl. ¶ 10. FBIAA has 14,000 members in total, a number larger than the total number of FBI Special Agents because FBIAA members are both current and former Special Agents. *Id*. Thousands of FBIAA members investigated the violent attack on the Capitol on January 6, 2021, and were compelled to respond to the survey detailing the nature of their involvement. *Id*. ¶ 24. Other members were assigned to other criminal investigations that involved then-former-President Trump. *Id*. ¶ 35. The impacted FBIAA members, therefore, have been the targets of the Government. *Id*. ¶¶ 51-59. The disclosure of their identities and the associated hiring decisions that will follow implicate their statutory and constitutional rights as alleged in the First Amended Complaint.

15

The harm to FBIAA members is ongoing. Their placement on the Survey list is itself stigmatizing, particularly in view of the fact that DOJ leadership is reviewing their conduct under the baseless guise of an anti-weaponization initiative. The Government's actions have also chilled their political speech. This present and ongoing harm is both independent of and compounded by the risk they face due to the imminent public disclosure of their identities. *Id.* ¶¶ 46-59. FBIAA members thus would have standing to sue in their own right for the same reasons that the 325 and 328 Doe Plaintiffs have standing. *See* Argument I.A.

The interests that FBIAA seeks to protect are germane to its purpose. Indeed, FBIAA's mission is to advocate for the careers, economic interests, conditions of employment, and welfare of its members. FBIAA Decl. ¶ 4. It is self-evident that FBIAA members have an interest in (1) preventing the public disclosure of their participation in the January 6 investigations and the resulting security risk to their personal safety, (2) being subjected to employment decisions that are undertaken based on their perceived "partisan intent", and (3) protecting their core political speech. All of these interests are at the heart of FBIAA's mission—advocating for its members' job, digital, and personal security—which requires FBIAA to represent its members who suffer precisely the types of harm challenged here. *Id.* ¶¶ 5-7, 12-14. DOJ leadership's public statements and conduct targeting FBI employees who worked on the January 6 investigations have impaired FBIAA members' ability to perform their jobs and subjected them to a work environment in which they are suspect. Helping these individuals navigate their conditions of employment and promoting their welfare thus falls squarely within FBIAA's mission. *See id.*

The relief sought here—declaratory and injunctive as to all FBIAA members who participated in the January 6 investigations and any criminal investigations involving President Trump—does not make the individual participation of each injured FBIAA member

"indispensable to the proper resolution of the case" and therefore, the association is "an appropriate representative of its members, entitled to involve the court's jurisdiction." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977).

### C.    FBIAA Has Organizational Standing.

Organizations may have standing "to sue on their own behalf for injuries they have sustained." *Havens Realty Corp. v. Coleman*, 455 U. S. 363, 379, n.19 (1982). This Circuit employs a two-part approach, (1) "whether the agency's action or omission . . . injured the [organization's] interest and (2) whether the organization used its resources to counteract the harm." *Food Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). Furthermore, recent Supreme Court precedent instructs that an organizational plaintiff must show "far more than simply a setback to the organization's abstract social interests," *id.*, and a setback in the organization's financial and business interests. *FDA v. All. for Hippocratic Medicine*, 602 U.S. 367, 395–96 (2024).

An injury to interest requires a defendant's conduct have "perceptibly impaired the organization's ability to provide services," *id.* (quoting *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015), such as "daily operations" and the ability to provide regular services." *Id.* (quoting *PETA v. Dep't of Agriculture,* 797 F.3d 1087, 1094 (D.C. Cir. 2015)). Injuries to interest do not include injuries to *mission. See id.* These expenditures do not typically include costs arising from "litigation, investigation . . . or advocacy," *id.* or "resources to educate its members" about the challenged action. *Id.* (quoting *Nat'l Taxpayers Union, Inc.*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)). However, further expenditure on advocacy and education may be considered injuries to interest if they subject "the organization to operational costs beyond those normally expended" for this work. *Food Water Watch*, 808 F.3d at 919 (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434).

The focus is not "voluntariness," but whether the expenditures were "in response to" the challenged action, not "in anticipation of litigation." *Id.*

Here, the FBIAA's core mission is internal and external advocacy for its members in the interest of their professional, personal, and digital security. The Government's actions squarely injured the FBIAA in two distinct ways. First, the Government has impaired the mission of the FBIAA by straining FBIAA's resources to provide its continuing services. FBIAA Dec. ¶¶ 50-52. This Circuit has found standing where agency action has hindered an organization's ability to "accomplish[] its mission" through its typical means. *PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015). In other words, the requisite burden did not relate to responding to the agency action, but to the organization's continuing to undertake its prior pursuits. Here, FBIAA has experienced an overwhelming number of requests for assistance in the wake of the Terminations Memo and the Survey collection. *Id.* ¶ 50.  But providing that assistance has come at the expense of FBIAA's other activities. For example, FBIAA has had to restructure its administrative inquiry system. *Id.* ¶¶ 11-12, 41-42. The volume and nature of these requests for assistance have forced the FBIAA to restructure its daily operations, re-train staff, retain counsel, and defer and/or abandon other initiatives that are vital to FBIAA's mission. *Id.* ¶ 52. Therefore, as in *Havens* where the defendant gave the employees of plaintiff false information about apartment availability which in turn "perceptibly impaired" the plaintiff's ability to provide counseling and referral services for their constituents, the FBIAA has had to change its internal structure to accommodate the influx of calls from impacted members. *Id.* And this has interfered with its "core" structure and activities.

Second, FBIAA has established that the Government's actions chill its protected speech. As for lobbying in particular, the Court has recognized that lobbying itself is speech which may

be regulated but may not be banned altogether. *United States v. Harriss*, 347 U.S. 612, 625 (1954) (noting Congress "has merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose"); *F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 426 (1990). FBIAA engages in external advocacy, including lobbying, within the parameters of its non-profit status and that lobbying advances the needs of its members. FBIAA Decl. ¶¶ 38-42 The Government's actions have imposed on the FBIAA a constitutionally abhorrent choice: (1) risk being perceived as a "weaponized" instrument of its members by continuing to engage in zealous bi-partisan external advocacy, or (2) curtail its external advocacy to avoid being held in political disfavor by the Administration. *Id.* ¶¶ 43-45. The FBIAA has standing to challenge this unconstitutional state of affairs.

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

"A plaintiff seeking a preliminary injunction must establish (1) a likelihood of success on the merits, (2) a likelihood of suffering irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the plaintiff's favor, and (4) that an injunction is in the public interest.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

While there exists an "open question" in this Circuit, which employs the "sliding scale" approach, as to the weight to be accorded to each of these factors, a failure to show a substantial likelihood of success on the merits has been deemed sufficient to defeat a motion for a preliminary injunction. *Ark. Dairy Coop. Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009); *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253– 54 (D.C. Cir. 2006); *see also League of Women Voters v. Newby*, 838 F.3d 1, 6-8 (D.C. Cir. 2016). Courts in this Circuit have also held that demonstrating irreparable harm is equally important and may provide grounds to refuse issuing an

injunction "even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

Plaintiffs satisfy all four factors required for seeking a preliminary injunction.

**A.    Plaintiffs Are Likely to Succeed on the Merits of Their Privacy Act Claim Under Section 552a(b) and Their Administrative Procedure Claim Under 5 U.S.C. § 706.**

At its core, the Plaintiffs' Privacy Act claim in Count II (in conjunction with their Administrative Procedure Act claim in Count III) seeks to enjoin the Government from disseminating outside of DOJ the information contained in the Survey without written consent from the individual FBI personnel. The scope of this claim is not limited to ensuring the Survey remain confidential only from the public and/or non-governmental third parties. Rather, Plaintiffs' request for relief is that the Survey itself stay within DOJ as the agency conducts the internal review of personnel, and that the prohibition on dissemination extend to the White House (including the Executive Office of the President) writ large

The Privacy Act "safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records." *Henke v. Dep't of Com.*, 83 F.3d 1453, 1456 (D.C. Cir. 1996). The statute "supports 'the principle that an individual should to the greatest extent possible be in control of information about him which is given to the government.'" *Waters v. Thornburgh*, 888 F.2d 870, 875 (D.C. Cir. 1989).

Section 552a(b) specifically prohibits an agency from "disclos[sing] any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." 5 U.S.C. § 552a(b); *see Ames v. Dep't of Homeland Sec.*, 861 F.3d 238, 240 (D.C. Cir. 2017). The legislative history of the Privacy Act makes expressly clear the

importance Congress attributed to the limitation on the disclosure of records outside of the agency in which it is stored. *See Pilon v. Dep't of Justice*, 73 F.3d 1111, 1121 (D.C. Cir. 1996) (quoting legislative history from both House Report and Senate Report focusing upon consent requirement and its importance); *see also id*. at 1122 ("This section is designed to prevent the office gossip, interoffice and interbureau leaks of information about persons of interest in the agency or community, or such actions as the publicizing of information of a *sensational and salacious nature or of that detrimental to character or reputation*.") (emphasis added), *quoting* S. REP. NO. 93-1183, *Protecting Individual Privacy in Federal Gathering, Use and Disclosure of Information*, 93d Cong., 2d Sess. 51-52 (Sept. 26, 1974). Because the Privacy Act does not specifically authorize injunctive relief for violations of 5 U.S.C. § 552a(b), the courts have concluded that relief can only be secured in coordination with another statute, such as the APA. *See Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C. Cir. 1988); *see also American Fed'n of Teachers, et al. v. Scott Bessent, et al.*, Civil Action No. 25-0430 (DLB) (D. Md.), Dkt. 38 at *18 (Memorandum Opinion and Temporary Restraining Order) (issued February 24, 2025) (making clear Privacy Act injunctive relief for unauthorized disclosure is appropriate through the APA) (citing *Doe v. Chao*, 435 F.3d 492, 504 (4th Cir. 2006)).

The sole relevant exception to this statutory restriction in the Privacy Act is a circumstance in which the disclosure qualifies as a "routine use." *Ames*, 861 F.3d at 240; 5 U.S.C. §552a(b)(3). To constitute a "routine use" disclosure that is exempt from the Privacy Act's dissemination prohibition, the agency's disclosure of a record must be both "(i) 'for a purpose which is compatible with the purpose for which it was collected' and (ii) within the scope of a routine use notice published by the agency." *See Ashbourne v. Hansberry*, No. 17-752 (LLA), 2024 WL 3443324, *6 (D.D.C. July 17, 2024) (*quoting* 5 U.S.C. § 552a(a)(7), § 552(e)(4)(D)); *Townsend v.*

*United States*, 236 F. Supp. 3d 280, 318 (D.D.C. 2017); *Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C. Cir. 1988) ("It is by now well-established that agencies covered by the Privacy Act may not utilize the 'routine use' exception to circumvent the mandates of the Privacy Act.").

The Executive Order requests information from DOJ, specifically that DOJ "identify any instances where a department's or agency's conduct appears to have been contrary to the purposes and policies of this order" and "prepare a report to be submitted to the President" with "recommendations for appropriate remedial actions." Ex. 2. Separately, the Executive Order outlines that the "purpose and policies" at issue are to "identify and take appropriate action to correct past misconduct by the Federal Government related to the weaponization of law enforcement and the weaponization of the Intelligence Community." *Id.* Given this clear verbiage, and the language in the Terminations and Restoring Integrity Memos (Exhs. 3 and 5, respectively) the Survey data, in its raw form, if disseminated outside of DOJ (even to the White House) could *not* be for any purpose compatible with the purpose for which it was originally collected.

That is because the information contained in the Survey exceeds the parameters of the Executive Order. The information contained in the Survey, provided in response to the twelve questions delineated in the Questionnaire, does not identify any determinations or findings of misconduct by agency personnel. It does not memorialize any determinations or findings related to the "weaponization of law enforcement" by agency personnel, but, rather, broadly contains a compilation of names, position titles, and descriptions of the work performed by the individual personnel with respect to investigations and prosecutions into January 6.

The Government may take the position that it can lawfully disseminate the information to the White House as a part of its written report with recommendations for remedial action against individual personnel deemed to have engaged in misconduct. That information, however, is not

contained anywhere within the four corners of the Survey, and that question is not presently before this Court. A review has yet to be conducted, no findings have been made, and no instances of misconduct have been delineated in a written report. Without any long-term assurance from DOJ that will keep the Survey confidential, including away from the White House, Plaintiffs fear that they may be publicly doxxed, shamed and threatened.

To permit the Government to avoid any commitment to keeping the Survey within DOJ (including sharing it with the White House) runs in direct conflict to the Privacy Act's clear statutory prohibition, as set forth in Section 552(a)(b).The plain language of the statutory provision does not contain an exception or "carve out" for the White House. *See Pilon*, 73 F.3d at 1119 ("We start with 'the fundamental canon that statutory interpretation begins with the language of the statute itself.'"), *quoting Penn. Dep't of Public Welfare v. Davenport*, 495 U.S. 552, 557-58 (1990). If Congress had intended to include an exception along those lines, it certainly was capable of crafting one, as evidenced by the thirteen different exceptions to the provision that it did include in the Privacy Act. *See* 5 U.S.C. § 552a(b)(1)-(13). Congress did not, and this Court should construe the language as such.

The need to adhere to the clear language of the statutory prohibition is more pronounced given that the Privacy Act is not applicable to the White House itself, including the Executive Office of the President or the Office of the Vice President. *See Wilson v. Libby*, 498 F. Supp. 2d 74, 89 (D.D.C. 2007) (collecting cases noting that courts have concluded Offices of President and Vice President do not qualify as"agency" for purposes of Privacy Act). If this Court were to read an unwritten exception into the restriction of Section 552a(b) allowing an agency to disseminate to the White House information that it would not otherwise be permitted to disseminate to any other part of the U.S. Government, it would constitute a perverse circumvention of the very

23

purpose of the Privacy Act's protections. In such a circumstance, DOJ would have the unfettered discretion to disseminate the Survey to the White House, and the Plaintiffs would lack any legal recourse under the Privacy Act (or the APA) to prevent the White House—and particularly the President from making that information public for all to see.

Accordingly, Plaintiffs will likely succeed in establishing that the public disclosure of the information at issue is a clear violation of the Privacy Act and can be enjoined pursuant to the Privacy Act or the APA.

### B. Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claim Based on Perceived Political Affiliation.

In Count V, Plaintiffs allege that the Government's actions against them stem from a misguided perception about their political beliefs, expression, or affiliation—particularly their loyalty to the current administration. The new Administration, from the very beginning, has acted on the false premise that involvement in the January 6 investigations and cases indicated disloyalty to its leadership. *See* Part A of Factual Background. The Government's unsupported claims about the FBI being "weaponized" and their exclusive focus on FBI personnel involved in the January 6 cases, rather than all personnel, further betrays the Government's false premise that these individuals are disloyal. This targeted approach by the Government reveals a bias against anyone who participated in the January 6 cases, erroneously linking that participation to political allegiance. *Wieman v. Updegraff*, 344 U.S. 183, 184–86 (1952) (invalidating as unconstitutional state law requiring state-level public employees to take "loyalty oaths" disavowing membership in "communist front or subversive organization" as a condition of continued employment with the government).

The Supreme Court has made clear that, with one exception, the Government is prohibited under the First Amendment from making employment decisions based on an employee's actual or

perceived political allegiance. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The exception applies to employees who hold positions with significant policymaking responsibilities. *Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016). In *Branti*, the Court found that the First Amendment prohibits the Government from attempting to discharge employees based on the employees' political views, when political affiliation itself was not a job requirement. *Branti v. Finkel*, 445 U.S. at 507, 519–20 (1980) (generally observing "[i]f First Amendment protects a public employee from discharge based on what has said, it must also protect him from discharge based on what he believes"). The Court extended *Branti's* holding in *Rutan*, ruling that employment decisions—such as promotions, transfers, and recalls—based on an employees' political belief and association violates the First Amendment unless the Government has a "vital interest" in its decision making. *Rutan*, 497 U.S. at 68, 78. And in *Heffernan*, the Court held that a hiring decision (in that case, a demotion of an employee) based on a mistaken assumption of the employee's political beliefs supported a First Amendment claim. 578 U.S. at 273.

The *Rutan* Court observed that "even an act of retaliation as trivial as failing to hold a birthday party…when intended to punish her for exercising her free speech rights," was an adverse employment decision and supported a claim under the First Amendment. In fact, this Circuit applied the principles set forth in *Rutan* and found that requiring an employee to work an additional twenty-seven hours to be considered for promotion was an adverse action for First Amendment purposes. *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994); *see also Manhattan Beach Police Officers Ass'n, Inc. v. City of Manhattan Beach*, 881 F.2d 816, 819 (9th Cir. 1989) (if police officers could establish they were denied promotion because government "acted in order to quell public criticism and not because of plaintiffs' actual qualifications for the job, or the nature of the assignment itself," then they could clearly establish violation of First Amendment rights).

The Constitution's robust First Amendment protections, as reflected in these precedents, extend to Plaintiffs here. Individual Does and the members of FBIAA are career FBI personnel who are not in the types political or policymaking positions that may call for political loyalty to the prevailing party. *See, e.g.*, Jane Doe #1 (328) Decl. ¶ 3, Jane Doe #2 (328) Decl. ¶ 3, Jane Doe #3 (328) Decl. ¶ 3, Jane Doe #1 (325) Decl., ¶ 2; Jane Doe #2 (325) Decl. ¶ 2, Jane Doe #3 (325) Decl. ¶ 2. They were assigned to the January 6 cases, and they faithfully discharged their duties in accordance with the law. *See, e.g.*, Jane Doe #3 Decl. ¶¶ 4, 6-7, John Doe #4 (328) Decl., ¶¶ 4, 6-7, Jane Doe #3 (325) Decl. ¶ 5-8, Jane Doe #1 (325) Decl., ¶¶ 20-21; Jane Doe #2 (325) Decl. ¶ 22-23. Yet, the Government has taken the position that these individuals harbored "partisan intent," and therefore subjected only them to internal review. By collecting Plaintiffs' names and the details of their work related to January 6 for review, the Government has taken an adverse employment action based on political affiliation. Indeed, the Government has betrayed its true intentions—to target Plaintiffs as political enemies of the administration because they investigated and prosecuted the supporters of President Trump. These actions—undertaken *because* of Plaintiffs' perceived political loyalty to the current administration (of which there is ample evidence)—are sufficient to trigger First Amendment protections.

Apart from Plaintiffs' involvement in the January 6 investigations, the Government has provided no other governmental interest, let alone a "vital interest," for targeting Plaintiffs alone. There is no evidence indicating that Plaintiffs, themselves, engaged in any misconduct or that their performance has be unsatisfactory that would justify compiling their names into a "database" for further "review" by leadership. *See generally* Decls. For these reasons, Plaintiffs have demonstrated a likelihood of success on the merits of their First Amendment retaliation claim based on perceived political affiliation.

C.  **Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claim Regarding the Chilling of Their Free Speech.**

In Count VIII, Plaintiffs allege that the Government's branding of them as disloyal to the new administration because of their work on the January 6 cases has had the effect of chilling the private political speech of the Individual Plaintiffs and the members of FBIAA and of FBIAA as an organization.

Under the Supreme Court's precedents, when the Government, without sufficient justification, "pressure[s] employees to discontinue the free exercise of their First Amendment rights, those governmental actions are impermissible and must be halted." *Rutan*, 497 U.S. at 79. After being placed under "review" as one of the agents who worked on the January 6 cases, Jane Doe 3 has started avoiding political conversations in her private life because she fears she may be targeted if she asserts any "political views with friends or family." *See* Jane Doe #3 (325) Decl. ¶ 25. She has continued to censor her political speech in private emails and text messages, and she has taken extraordinary steps to ask her county election supervisor whether her voter registration information can be made private. *Id*. ¶¶ 25–27. The same is true for FBIAA's members who have curtailed their private political speech for fear that their political views, if contrary to the current administration's, will be discovered. FBIAA Decl. ¶¶ 46-49.

Thus the Government's actions targeting Individual Plaintiffs and the members of FBIAA have had the effect of chilling their private political speech or otherwise protected speech. There is no question that speech of this kind is entitled to the highest constitutional protection. "Interactive communication concerning political change" is "core political speech." *Meyer v. Grant*, 486 U.S. 414, 421 (1988). When governmental action has the effect of curtailing that speech, resulting in the "limit[ing] the number of voices" and "reduc[ing] the total quantum of speech," *id.* at 423, the Supreme Court has made clear that First Amendment "protection is at its

zenith," *id*. at 425. The Government's actions—namely, collecting Plaintiffs' information for a database, subjecting them to a survey questionnaire, and requiring them to undergo internal "review" solely because they worked on January 6—have quelled Plaintiffs' private speech and have had a broader ripple effect beyond the parties in this case.

First Amendment protections also apply when governmental action "may have the effect of curtailing the freedom to associate." *Ams. for Prosperity Found*., 594 U.S. at 616. In *AFPF*, the Court struck down a state law—requiring the anonymous donors' of an organization to reveal their identities in public tax disclosures—on First Amendment grounds. *Id.*  The Court concluded that such disclosure "may have a deterrent effect" on the organization's donors' freedom to associate. *Id.* Under the Court's precedents, the freedom of association may be violated in a number of instances, including "where individuals are punished for their political affiliation." *Id.* at 606 (quoting *Elrod v. Burns*, 427 U.S. 347, 355 (1976) (plurality opinion). Plaintiffs have demonstrated that not only are they the political targets of the Government, but that the Government's actions, including its failure to commit to maintaining the confidentiality of the List, the results of the survey, and the outcomes of any investigation, have had a deterrent effect on their right to associate. *See* Jane Doe #3 (325) Decl. ¶¶ 25–27; FBIAA Decl. ¶ 49.

Moreover, FBIAA as an organization has become keenly aware that any impression that they are cooperating with the political adversaries of this Administration—even in instances where such cooperation has nothing to do with the instance case, such as the organization's typical lobbying activities—risks that the perceived affiliation will contribute to the Defendants' misguided conclusion that its members are "weaponized." FBIAA Decl. ¶¶ 43-45.

Furthermore, the Government's statements and actions have chilled FBIAA's core political speech. In *Citizens United v. Federal Election Commission*, the Court held that corporations,

including nonprofits, had free speech rights under the First Amendment and particularly that political spending was a form of protected speech. 558 U.S. 310, 364 (2010). The Court observed, that "the First Amendment underwrites the freedom to experiment and to create in the realm of thought and speech," *id.* at 372, and expressly concluded that the First Amendment does not permit Congress to make "categorical distinctions" based on the identity of the speaker and the content of the political speech, *id.* at 364. As for lobbying in particular, the Court has recognized that lobbying itself is speech which may be regulated but may not be banned altogether. *Harriss,* 347 U.S. at 625 (noting Congress "has merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose"). The Court's precedents would cover Governmental action that has the effect of chilling the lobbying speech and other political speech of an organization like the FBIAA.

Moreover, FBIAA as an organization has become keenly aware that any impression that they are cooperating with the political adversaries of this Administration—even in instances where such cooperation has nothing to do with the instance case, such as the organization's typical lobbying activities—risks that the perceived affiliation will contribute to the Defendants' misguided conclusion that its members are "weaponized." FBIAA Decl. ¶¶ 43-45. FBIAA engages in external advocacy and lobbying within the parameters of its non-profit status and that the lobbying is directly responsive to advocating for the needs of its members. *Id*. ¶¶ 38-42. The Government's partisan targeting of FBI agents for their work on the January 6 incident has led FBIAA to cull its lobbying and political speech, for risk of being used as an indicator of "partisan intent' of its members." FBIAA Decl. ¶ 45.

In each of these cases, the Court has applied the exacting scrutiny standard, requiring the Government to show that its "significant encroachment[s]," *Buckley v. Valeo*, 424 U.S. 1, 49

(1976), serves a legitimate governmental purpose. In other words, the Government must clear the high bar of demonstrating that there is a "substantial relation" between its intrusion and a "sufficiently important" governmental interest. The Government cannot meet this test. The Government has impermissibly burdened Plaintiffs' First Amendment right to speech and association, failing to demonstrate that there is a substantial relation between its actions and a governmental interest that would support its unwarranted intrusion.

**D.     Plaintiffs Are Likely to Succeed on the Merits of Their Privacy Claim Under the Due Process Clause of the Fifth Amendment.**

Count VI alleges that the Government's actions—failing to maintain in the long-term the confidentiality of Plaintiffs' identities and the outcomes of any investigations—violate Plaintiffs' right to privacy, particularly of their bodily integrity, under the Due Process Clause. *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977) (noting constitutional right to privacy protects a person's interest in avoiding the disclosure of personal information which would be harmful if disclosed); *Nixon v. Admin. of Gen. Servs.*, 433 U.S. 425, 457 (1977) ("One element of privacy has been characterized as 'the individual interest in avoiding disclosure of personal matters'") (*quoting Whalen*, 429 U.S. at 599).

The Sixth Circuit considered a similar situation in *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998), where undercover officers sought injunctive relief to prevent disclosure of their personnel files to the public for fear that a violent gang they were investigating would use the information to "seek revenge." *Id.* at 1063. In *Kallstrom*, the relevant issue the court confronted was whether disclosure of the identities of the police officers to the "defense counsel" of the violent gang violated the officers' Due Process rights to bodily integrity. *Id.* at 1063. Applying a balancing test weighing the imminent harm to the police officers against the benefits of public disclosure, even though it was made to defense counsel and to the public generally, the court reasoned that

30

the officers' right to their privacy far outweighed any limited public interest in disclosure. *Id.* at 1070. Because the harmful disclosure had already occurred, the court did not issue injunctive relief but remanded to the district court for consideration of damages. *Id.* at 1068–69. *Cf. John Doe No. 1 v. Reed*, 561 U.S. 186, 200 (2010).

Given the circumstances, any chance of the Survey data becoming public, no matter how great or small, poses a grave danger. The sensitive nature of the List demands absolute confidentiality and clear assurance from the Government that they will not disseminate the List outside of DOJ, not even to the White House. Plaintiffs' fears about disclosure are not unfounded considering the propensity of members of this Administration to publicly doxx civil servants on the social media platforms controlled by the President and Mr. Musk. Furthermore, the outstanding demands of the pardoned rioters for the names of FBI personnel, this Administration's track record of acquiescing to the rioters' claimed causes, its apparent refusal to acknowledge that the rioters are violent as demonstrated by the blanket pardons, its clumsy handling of classified data, and its insistence on reserving the right to disclose the risk notwithstanding that it would be in violation of federal criminal law, are not particularly reassuring. *See generally* FAC. As in *Kallstrom*, where the court found that the disclosure of the officers' identities to defense counsel endangered the officers' privacy, here, any disclosure even to another agency or to the White House has the potential to endanger Plaintiffs' privacy. *Id.* at 1064–65.

The consequences to Plaintiffs, if the information is made public, would be detrimental. Their fears—anxiety and concern about their personal safety and the safety of their families—are reflected in detail in their declarations. *See, e.g.*, Jane Doe #1 (328) Decl. ¶ 21, Jane Doe #2 (328) Decl. 21, Jane Doe #3 (328) Decl. ¶ 23, John Doe #1 (328) Decl. ¶ 23; FAC ¶¶ 48-55. It was therefore unsurprising that at the February 6 TRO hearing, the Government did not dispute that

Plaintiffs would suffer harm from the disclosure of their identities. *See* Feb. 6, 2025 Hearing Tr. at 41-42. And although the Government agreed "not disseminate the list at issue in these consolidated cases . . . to the public, directly or indirectly, before the Court rules on Plaintiffs' motions for a preliminary injunction," its failure to make any permanent commitment casts doubt on its future plans.

Plaintiffs have established a likelihood of success on the merits of their Privacy Act claim, and this Court should not wait until FBI personnel have been seriously harmed before granting the relief requested by Plaintiffs.

## III.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY INJUNCTIVE RELIEF.

Plaintiffs' irreparable injury is "both certain and great" and "actual and not theoretical," and the injury is "beyond remediation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Absent preliminary injunctive relief, Plaintiffs will suffer severe and irreparable harm because of the Government's unlawful actions.

First, any risk that the List may be shared outside DOJ with other agencies or to the public would be detrimental to the safety of the Plaintiffs and FBIAA's members. Second, the Government's actions have resulted in irreparable harm to Plaintiffs because its investigation into those FBI personnel who worked on the January 6 cases has had the effect of falsely branding Plaintiffs disloyal, partisan actors. Third, the Government's selection of these individuals for investigation has chilled the core political speech of Individual Does and the members of FBIAA, and of FBIAA as an organization.

For these reasons, Plaintiffs have established that they will suffer irreparable harm unless this Court issues a preliminary injunction.

## IV.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR GRANTING PLAINTIFFS' INJUNCTIVE RELIEF.

When preliminary injunctive relief is sought against the government, the balance of the equities and the public interest "merge." *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The balance of harms and the public interest weigh strongly in favor of granting a preliminary injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008) (explaining court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief").

In contrast to the irreparable injury facing Plaintiffs, Defendants have presented no evidence of harm resulting from an injunction, or of any "adverse impact on the public interest" resulting from the injunction. *Winter*, 555 U.S. at 24. The Government's targeting of FBI agents undermines the morale, integrity, and work of law enforcement. *See Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) ("There is generally no public interest in the perpetuation of unlawful agency action."). *See also* Decl. Lewis Schiliro; Decl. Frank Figliuzzi.  The public interest thus favors granting Plaintiffs' requested relief.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant their Motion for Preliminary Injunctive Relief.


Dated: February 24, 2025


Respectfully submitted,

LAW OFFICE OF MARK S. ZAID, P.C.

By: _____*Mark S. Zaid*_____
    MARK S. ZAID, D.C. Bar #440532
    BRADLEY P. MOSS, D.C. Bar #975905
    1250 Connecticut Avenue, NW, Suite 700
    Washington, D.C. 20036
    (202) 498-0011
    Mark@MarkZaid.com
    Brad@MarkZaid.com
    *Attorneys for John Does 1,3-4,*
    *Jane Does 1-3 (25-328)*

CENTER FOR EMPLOYMENT JUSTICE

By: _____*Pamela M. Keith*_____
    PAMELA M. KEITH, D.C. Bar #448421
    SCOTT M. LEMPERT, D.C. Bar #1045184
    650 Massachusetts Ave., NW, Suite 600
    Washington, DC 20001
    (202) 800-0292
    pamkeith@centerforemploymentjustice.com
    Slempert@centerforemploymentjustice.com
    *Attorneys for John and Janes Does 1-9, et al.*
    *(25-325)*

STATE DEMOCRACY DEFENDERS FUND

By: _____*Norman L. Eisen*_____
    Norman L. Eisen D.C. Bar # 435051
    Pooja Chaudhuri, D.C. Bar # 888314523
    600 Pennsylvania Avenue, SE, #15180
    Washington, D.C. 20003
    (202) 594-9958
    norman@statedemocracydefenders.org
    pooja@statedemocracydefenders.org
    *Attorneys for John Does 1,3-4,*
    *Jane Does 1-3 (25-328)*

KOSKOFF, KOSKOFF & BIEDER, PC

By: _____*Margaret Donovan*_____
    Christopher Mattei, Bar # 27500 (*pro hac vice*)
    Margaret Donovan, Bar # 31787 (*pro hac vice*)
    350 Fairfield Ave., Suite 501
    Bridgeport, CT 06604
    (203) 336-4421
    cmattei@koskoff.com
    mdonovan@koskoff.com
    *Attorneys for Federal Bureau of Investigation*
    *Agents Association (25-328)*