UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN AND JANE DOES 1-9, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>DEPARTMENT OF JUSTICE,<br><br>  Defendant. | Civil Action No. 25-0325 (JMC) |
| FEDERAL BUREAU OF INVESTIGATION AGENTS ASSOCIATION, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>DEPARTMENT OF JUSTICE, et al.,<br><br>  Defendants. | Civil Action No. 25-0328 (JMC) |

**DECLARATION OF**  [REDACTION]

I, [REDACTION], pursuant to the provisions of 28 U.S.C. § 1746, declare, under penalty of perjury, as follows:

1. I make these statements based on personal knowledge and knowledge obtained in the course of my official duties with the Federal Bureau of Investigation Agents Association ("FBIAA").

2. I am the Executive Director of FBIAA. I have been so employed since December 9, 2024. Prior to holding this position, I was a Special Agent with the Federal Bureau of Investigation ("FBI") for 21 years. My assignments included working as a Special Agent at the

Los Angeles Field Office, FBI Headquarters, the Washington Field Office, and the FBI's Training Division. As an agent, my focus was primarily on violent gang crime, transnational organized crime, and drug trafficking. I served as a case agent for investigations into violent, Mexican-based drug cartels and other international drug trafficking operations. I later served as [REDACTION] [REDACTION], focused specifically on the transnational gang, MS-13.

3. Before I became the Executive Director, I was a member of FBIAA for 21 years of my active FBI service.

### The FBIAA

4. FBIAA is a not-for-profit professional organization established under 501(c)(6) dedicated to the service of FBI agents. Founded in 1981, its mission is to advance and safeguard the careers, economic interests, conditions of employment and welfare of FBI Special Agents, both active and retired. We fulfill this mission by providing support and advocacy for our more than 14,000 members. We are the only organization specifically dedicated to the service of active FBI Special Agents. As a 501(c)(6) organization, we are authorized to participate in certain forms of political or lobbying activities while maintaining our not-for-profit status.

5. One of our core functions is to advocate for our members' interests within the FBI. This work focuses on a range of issues, including agent safety and wellness, education, enforcement, and financial security. For example, FBIAA has recently advocated for internal FBI improvements concerning the following: (1) supplying every Agent with covert body armor; (2) equipping overt body armor with ballistic plates; (3) expanding mental health services; (4) easing eligibility requirements for hardship transfers and office of preference transfers; (5) improving the process for addressing payroll and benefits errors; (6) expanding on-the-job training benefits for veterans; (7) opening the Warrior Program to Agents who deploy to agent involved shooting

situations; (8) increasing resources to fight violent crime against children; (9) expanding access to workman's compensation funds, 9/11 illness funds, and burn pit exposure funds; (10) policies to address the high cost of living; (11) impact of Covid-19 restrictions on workplace freedom; and (12) revisions to the FBI's deadly force policy.

6. Another core function is to provide legal services and advice to Special Agents for internal FBI employment-related actions.

7. Another core function is to advocate for our members' interests on issues of importance to Special Agents with audiences external to the FBI, including U.S. Congress, Executive Branch officials, and the public. This advocacy is non-partisan and issue-driven and includes lobbying, strategic engagement, and communications ("External Advocacy").

8. We have a central office in Virginia. Much of our workforce is comprised of remote or hybrid employees. For example, the attorneys who do much of the internal FBI advocacy for our members are located throughout the country. These attorneys are available to travel to the various FBI field offices where the Special Agents are assigned in order to provide services.

9. We also contract with counsel in Washington, D.C. and elsewhere who advise and assist on External Advocacy issues including engagement with policymakers in Congress and the Executive Branch, the public, and the media to advance our members' interests. Naturally, much of the External Advocacy work done by the organization takes place in and around Washington, D.C..

10. Our membership is comprised of active and retired FBI Special Agents. Of our 14,000 members, approximately 12,000 of them are active agents. By comparison, there are approximately 13,800 active FBI agents. Thus, FBIAA's membership represents approximately

85% of today's active FBI Special Agents. Over the past two years, nearly all new Special Agents have become members of FBIAA.

11. FBIAA is funded by membership dues, charitable donations, and grants. In general, membership dues are used for operating expenses and the salaries of staff and legal counsel for the agents and the organization. FBIAA's annual expenditures are comprised primarily of: (1) salary and benefits for FBIAA's attorneys who are responsible for representing individual FBI Special Agents for adverse employment actions brought by the FBI and the United States Department of Justice ("DOJ"); (2) salary and benefits of FBIAA staff; (3) operating expenses like workspace, office supplies, and communications equipment; (4) management of FBIAA's 501(c)(3) funds (Memorial College Fund and Membership Assistance Fund); (5) external advocacy and lobbying; and (6) other miscellaneous expenses.

12. On average, our staff of attorneys who represent Special Agents handle over 300 such matters on an annual basis. These attorneys are responsible for advocacy on behalf of individual FBI Special Agents from inception of an internal inquiry through appeal. They also provide counsel to Special Agents when there is an investigation into an agent-involved shooting. They may also provide assistance if a Special Agent feels he or she has been unfairly discriminated against, or conversely if a Special Agent has been accused of unfairly discriminating against someone. Another example of internal advocacy may be assisting an agent with navigating a demotion in rank or a locational reassignment. Internal advocacy is also provided to Agents who are facing ethical complaints.

13. Separately, our External Advocacy is active year-round. As described in further detail below, our External Advocacy activities are directly responsive to the needs and requests of

our members, and are directly supervised by the FBIAA's National Executive Board (NEB) and Executive Director.

14. In addition to the FBIAA's legal and External Advocacy services, it provides other membership benefits and resources, including professional liability and accidental death and dismemberment policy, charitable funds, and digital security services. The FBIAA's digital security service is a resource facilitated by the FBIAA, where the FBIAA has negotiated a member price for this service. The service is designed to assist FBIAA members in protecting their identity, money and assets, family and reputation, and privacy.

15. FBIAA's Membership Assistance Fund ("MAF") was established to help FBIAA members and families cope with emergencies and unforeseen tragedies. The FBIAA MAF provides assistance to FBIAA members and their families who have been affected by a sudden, unforeseen tragedy. The FBIAA MAF has helped members' families make emergency travel, afford treatments for grave illnesses and injuries, purchase necessary medical equipment and pay for funeral expenses.

16. FBIAA's Memorial College Fund ("MCF") aims to help the children of deceased FBI agents achieve their college dreams. The FBIAA MCF provides college scholarships to the children and spouses of FBI Agents who have passed away while actively employed by the FBI or within one year of retiring from active service.

17. The Special Agent Jeffrey Drubner Legacy Fund (the "Drubner Fund") works in conjunction with the FBIAA MAF to provide financial assistance to families of fallen Special Agents who have been killed in the line of duty. The Drubner Fund also pays assistance to Special Agents who are shot in the line of duty during an adversarial action (e.g., an engagement with an investigative target) and face a financial hardship. The Drubner Fund assists grieving family

members with costs that might not otherwise be covered by the fallen agent's worker compensation, like childcare and other out-of-pocket expenses.

### Recent Events Affecting the FBIAA and its Members

18. Beginning in early 2025, FBIAA members and FBIAA as an organization have had to grapple with the effects of an unexpected, unprecedented development initiated by the Department of Justice. Two relevant Executive Orders predated this development.

19. First, on January 20, 2025, President Donald J. Trump issued a Proclamation titled "Granting Pardons and Commutations of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021 (the "January 6 Pardons Procl."). The January 6 Pardons Procl. referenced, without further elaboration, a "grave national injustice." It granted a "full, complete and unconditional pardon to all other individuals convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021," while also commuting the sentences of others who were similarly convicted.

20. Second, also on January 20, 2025, the President released an Executive Order titled "Ending the Weaponization of the Federal Government" (the "Weaponization EO"). The Weaponization EO's "Purpose" section referenced the "previous administration['s]" actions against its "perceived political opponents" and infliction of "political pain." The "Purpose" section also referenced the "weaponization of prosecutorial power" and the "target[ing of] individuals who voiced opposition to the prior administration's policies." It expressly noted within the "Purpose" section that the "Department of Justice has ruthlessly prosecuted more than 1,500 individuals associated with January 6, and simultaneously dropped nearly all cases against BLM rioters." The "Policy" section of the Weaponization EO stated, in relevant part, that the United States would "identify and take appropriate action to correct past misconduct by the Federal

Government related to the weaponization of law enforcement." Finally, it directed the United States Attorney General to review "the activities of . . . the Department of Justice . . . over the last 4 years and identify any instances where a department's or agency's conduct appears to have been contrary to the purposes and policies" of the Weaponization EO.

21. The effect of the January 6 Pardons Procl. was wide-ranging. On one hand, certain lower-level, non-violent offenders who had been convicted of misdemeanors as a result of their participation in the January 6 attack on the United States Capitol were pardoned of their convictions. On the other hand, multiple violent offenders who had assaulted police officers with weapons, chemical spray, and police shields, had lengthy criminal histories, or had threatened retaliation against specific FBIAA members, were released from prison or otherwise pardoned. The result has been an apparent empowerment of this latter group who now seem to believe that their past violent actions, and by extension their threats of future violent actions, are justified.

22. The effect of the Weaponization EO has been similarly off kilter. Notwithstanding any potential good faith intentions, interim Department of Justice leadership appear to be relying on the Weaponization EO in order to unfairly target FBIAA members as potential perpetrators of alleged misconduct. The DOJ is doing so in an arbitrary way, without any evidentiary, rational, or historical basis for making such an accusation. The arbitrary nature of DOJ's approach is laid bare by the fact that FBI personnel who participated in the January 6 investigations were *assigned* that responsibility and lacked discretion or authority to choose otherwise.

23. On January 31, 2025, the Acting Deputy Attorney General ("A/DAG") Emil Bove III issued a memorandum to the then-Acting Director of the FBI titled "Terminations." The "Terminations" memo referenced eight individuals whose jobs were to be terminated pursuant to the Weaponization EO. It further directed the Acting Director to identify by noon on February 4,

7

2025 "all current and/or former FBI personnel assigned at any time to investigations and/or prosecutions related to [January 6 investigations]." The "Terminations" memo asserted that A/DAG Bove would commence a "review process" to determine if any "**additional** personnel actions" (emphasis added) are necessary. In my opinion, a fair reading of this last point would imply that some sort of "personnel action" had already taken place by the mere creation of this list.

24. On February 2, 2025, A/DAG Bove directed FBI personnel to complete a survey requesting, inter alia, their name, title, and role in the investigations or prosecutions arising from the January 6, 2021 attacks on the United States Capitol (the "Survey"). Approximately 5,100 FBI employees completed the survey, many of whom are FBIAA members.

25. Based on my conversations with FBIAA members, and my review of publicly available information related to the Survey, I know that the Survey asked no questions about the cases themselves, no questions about allegations of misconduct or "weaponization," no questions about whether any agent wished to report misconduct or "weaponization," no questions about whether any legal challenges were raised as to Special Agents' conduct during the prosecution of the cases, and no questions about the process by which FBIAA members were assigned these cases.

26. Based on my understanding of the questions of the Survey, and based on my past experience as an FBI Supervisor, and based on my experiences as the Executive Director of FBIAA, it appears that the Survey that DOJ sent to FBIAA members serves no other purpose but to compile a list of agents who were involved in January 6 investigations without any further context. In other words, it does nothing to identify misconduct or otherwise advance the purported goals of the Weaponization EO.

27. On February 4, 2025, I learned that the results of the Survey were transmitted from the FBI to the DOJ. FBIAA members were identified within these results.

28. On February 5, 2025, I learned that A/DAG Bove sent a message via forwarded email to all FBI employees with the Subject Line: Message from the Acting Deputy Attorney General. In the message, A/DAG Bove wrote with "additional information" regarding the "Terminations" memo.

29. In relevant part, A/DAG Bove wrote: "Let me be clear: No FBI employee who simply followed orders and carried out their duties in an ethical manner with respect to January 6 investigations is at risk of termination or other penalties. The only individuals who should be concerned about the process initiated by my January 31, 2025 memo are those who acted with corrupt or partisan intent, who blatantly defied orders from Department leadership, or who exercised discretion in weaponizing the FBI."

30. A/DAG Bove's February 5 message referenced Special Agents who acted in an "ethical manner." To my knowledge, since January 6, 2021, FBIAA has received no requests for internal advocacy assistance related to ethical complaints lodged against Agents in connection with their investigative work on the January 6 investigations. I infer from this that there were few, if any, internal ethical complaints lodged against Special Agents generally.

31. I understand from speaking with my organization's legal counsel in this case that the DOJ has objected to providing any information about what factors it will be considering when determining whether FBIAA members engaged in "weaponization," "partisan intent," or "exercis[ing] discretion."

32. I further understand from speaking with my organization's legal counsel in this case that the DOJ has objected to providing any information about what it intends to do with the data collected from the Survey, its process behind creating and distributing the Survey, and the

9

identification of who currently possesses, or has previously possessed, the information contained within the Survey.

33. I further understand that the DOJ has opposed a request by FBIAA in this litigation to explain the purpose of the Survey, how the information will be used, whether it constitutes the initiation of an investigation into the thousands of Survey respondents.

34. FBIAA filed this suit on behalf of its members that have been impacted by this collection of data via the Survey.  For example, FBIAA members have reached out for guidance as to whether or not the Survey constitutes, in substance, an adverse action, an allegation of misconduct, or any other instance where FBIAA might step in to assist its members with internal FBI actions.

35. FBIAA further anticipates that its members who participated in the Mar-a-Lago search warrant in 2022 or were otherwise assigned to investigations related to then-former-President Trump will face unlawful adverse actions because they fulfilled their assigned duties.

36. In sum, FBIAA initiated this suit on behalf of its members who, according to the DOJ, have now been unfairly placed onto a list of suspected perpetrators of "weaponization."  This is particularly concerning for FBIAA when considering that its members were performing their assigned duties *as overseen by the Department of Justice itself* throughout the years' worth of January 6 investigations and prosecutions.

### Harm Related To FBIAA's Protected Speech

37. Both the organization and its members are currently suffering harm from such characterization.

38. Prior to the events of the last few weeks, the FBIAA's usual course of business included External Advocacy on behalf of its members on policy matters and issues of public interest.

39. The FBIAA's sole motivator for External Advocacy is the service needs of its members.

40. The organization has advocated and provided public commentary on wide range of important public policy matters—issues ranging from ensuring that support is available to federal employees suffering health problems related to the investigation of the 9/11 attacks to the need to ensure that law enforcement can lawfully access electronically stored evidence.

41. FBIAA's External Advocacy activities have extended over decades and have been consistently focused on advancing the careers and welfare of its members. For example, in 1990 the organization worked to pass the Federal Employees Pay Comparability Act, in 1994 it helped lead the effort to create Law Enforcement Availability Pay ("LEAP Pay" or "AVP"), in 1997 FBIAA advocated for the restructuring of the FBI's administrative inquiry system, and allowing basic due process rights for its members for the first time. In 2010 the organization helped lead External Advocacy efforts related to the enactment of the *Special Agent Smauel Hicks Families of Fallen Heroes Act*. FBIAA's External Advocacy on a range of issues concerning the health, safety, and employment conditions of its members has spanned the entirety of its existence.

42. FBIAA frequently engages with policymakers in Congress and the Executive Branch and provides private and public commentary on matters of public interest. Moreover, the success of the organization's advocacy and communications efforts are consistently dependent on the organization remaining, and being perceived as remaining, nonpartisan and focused on the issue areas of interest of its members.

43. Since the implementation of the January 6 Pardons Procl., the Weaponization EO, the Terminations Memo, the Survey, the February 5 email from A/DAG Bove, and the DOJ's refusal to explain how it is evaluating "partisan intent," there has been a palpable chilling effect as to how FBIAA conducts its business.

44. For example, even in its efforts to advocate for the harm its members are suffering as a result of the Survey, FBIAA understands that any partnership that appears to align with policymakers, groups, or public officials affiliated with the "previous administration" will risk the organization being seen as running afoul of the current administration's efforts against "weaponization." Similarly, any attempts at engaging in advocacy or communications activities with policymakers, groups, or public officials who hold the view that the January 6 investigations and prosecutions were not a "grave national injustice" may be viewed by the DOJ as an act demonstrating unacceptable "partisan intent." The risk of DOJ coming to such a conclusion chills FBIAA advocacy and communications in a manner that could jeopardize FBIAA's mission.

45. In other words, if FBIAA is seen as engaging in External Advocacy—which it is entitled to do as a 501(c)(6)—it now risks such activity being portrayed as evidence of the "partisan intent" of its members.

### Harm Related to FBIAA's Members' Protected Speech

46. Since February 2, 2025, the FBIAA has received many communications from FBIAA members expressing fear and concern that they are being targeted by DOJ due to a misperception that their participation in the January 6 investigations - as ordered by the DOJ itself -was motivated by partisan political biases and that they are, therefore, untrustworthy, unreliable, and unsuitable for FBI employment.

47.     In many cases, an individual's mere presence on the list itself has given rise to a concern that his/her legitimate personal activities and affiliations will be unfairly scrutinized to support a false inference that political bias played a role in his/her work on the January 6 investigations.

48.     This concern has been fueled by public statements made by DOJ and White House officials. It has contributed to a belief among Survey respondents that their continued employment at the FBI is contingent on the extent to which their legitimate personal activities and affiliations are perceived by DOJ and the White House as politically acceptable.

49.     Recently, FBIAA employees have reached out to me saying that they want to resign, because they feel their exercise of First Amendment speech is going to put the FBIAA's mission at risk. FBIAA employees would otherwise want to continue working, but they feel they cannot participate in democracy in their personal lives without bringing some form of backlash against the organization.

### Harm Related To FBIAA's Daily Operations and Members' Daily Lives

50.     Since the administration of the survey, the collection of responsive data, and the resulting specter of public disclosure of FBI personnel who responded to the survey, the FBIAA has suffered a direct and ongoing impact on its daily business operations. Our office has received a substantial increase in calls for assistance from FBI personnel and their family members. In short, staff has reported to me that the increase in calls and emails has been overwhelming. Most frequently, these communications have involved (1) requests for legal representation in connection with any disclosure or other related adverse employment action; (2) requests for security assistance; (3) requests for post-FBI employment concerns and questions; (4) expressions of fear and concern that they will be targeted because of DOJ's perception of their political

13

associations/beliefs due to their participation in the January 6 investigations; and (5) questions concerning whether they can continue to perform their duties.

51. FBIAA members have faced threats from January 6 rioters for years. January 6 rioters frequently publicly name the FBIAA members who investigated them on social media platforms like "X" and "Truth Social," in an attempt to garner support for retaliation against those members. Since the onset of the January 6 Pardons Procl., the Weaponization EO, and the Survey collection, FBIAA has created a process for assisting its members to report these threats to the FBI's Threat Management Unit.

52. The volume and nature of these requests for assistance have forced the FBIAA to restructure its daily operations, re-train staff, retain counsel, and defer and/or abandon other initiatives that are vital to FBIAA's mission, including, *inter alia*, enhancing opportunities for MCF beneficiaries, upgrading technology, applying for grant funding. In addition, FBIAA has experienced an increase in threats to its members, which I believe is attributable to DOJ's collection of the Survey data and the heightened expectations of January 6 participants who believe the current leadership within the DOJ will respond to the rioters' calls to release FBI personnel identifying information. It is substantially for this reason that the FBIAA is currently conducting a security assessment of its own physical offices, which online actors have recently sought to identify.

53. In addition to the foregoing direct and ongoing impacts on FBIAA's business operations, the FBIAA and its members will suffer direct harm if survey data is released publicly because such disclosure would immediately put its member Special Agents in physical danger from individuals who feel emboldened to seek what they believe is justified retribution that will be condoned by the Department of Justice.

54. FBIAA is responsible for assisting FBI agents who are the victims of harassment, threats of physical violence, and violence itself. The harassment, threats of violence, and violence that will be directed at FBIAA members if survey data is publicly disclosed will substantially undermine FBIAA operations, deplete FBIAA resources, and result in a reduction in FBIAA membership. If FBI agents are killed, which is the expressed desire of many individuals who survey respondents investigated, the FBIAA will be responsible for providing funding and support to surviving family members, including through various charitable funds the FBIAA oversees.

55. Of course, the foreseeable tragedies in the above paragraph also constitute a direct threat of physical harm to FBIAA members. Disclosure of the list will immediately and irreparably harm our member Special Agents. The violent actors now freed and pardoned from their acts on January 6 have openly expressed that they are seeking violent, vigilante-style revenge on those who investigated them. Disclosure would overwhelm the digital security services that we facilitate to our members.

56. In addition to physical harm, the collection and likely dissemination of survey data is an adverse employment action that is likely to precede other adverse employment actions. Agents, as a result of the survey, are subject to arbitrary and capricious adverse actions, such as revocation of security clearances, demotions, or pretextual locational reassignments, this will create an immense strain on FBIAA's ability to provide legal assistance. The sheer volume of requests for legal assistance that would come in as a result of challenges to mass, suspected unlawful adverse actions would rapidly deplete FBIAA's legal resources. This would leave many of FBIAA's members without effective counsel while also gutting all other member services provided by FBIAA.

57. In the event of a mass termination, the FBIAA would incur massive costs that far outstrip its available resources. In the near term, the FBIAA will be required to provide legal counsel to thousands of FBIAA members who have been subjected to the unlawful termination. In the long term, the mass exodus of unemployed agents from FBIAA's membership might place FBIAA's own existence at risk, since it could no longer rely on membership dues as a significant portion of its income.

58. FBIAA members have also expressed concern that their mere presence on the list of survey respondents will impede their ability to perform important job functions of the unfair perception among some that an agent's participation in the January 6 investigations is itself a cause for suspicion.

59. In sum, FBIAA members' daily lives have been, and will continue to be, disrupted by the actions of the DOJ in the creation and collection of the Survey data and its blunderbuss attempts at implementation of the Weaponization EO. FBIAA also now faces the prospect of culling back its own core activities, like External Advocacy, which includes lobbying, for risk of it being used as an indicator of "partisan intent" of its members. Finally, FBIAA's daily operations have been significantly disrupted by the DOJ's disorderly and intentionally non-transparent actions.

Dated: Fairfax County, VA
February 24, 2025

[REDACTION]

[REDACTION]
Executive Director
Federal Bureau of Investigation Agents Association