## SWORN DECLARATION OF FRANK FIGLIUZZI  (25-325)

I, Frank Figliuzzi, being of sound mind and over the age of eighteen (18), do hereby state that I have personal knowledge of the matters asserted herein, and should I be called to testify in a court of competent jurisdiction, would state the following:

1.    I served 25 years as an FBI Special Agent from 1987 to 2012.  During that time, I served in every leadership role in the FBI's career ladder up to the position of Assistant Director, including Supervisory Senior Resident Agent, Squad Supervisor, Unit Chief in the Office of Professional Responsibility (OPR), Assistant Special Agent in Charge, Inspector, Chief Inspector, Special Agent in Charge, Deputy Assistant Director, and Assistant Director.

2.    Over the course of my career at the FBI, I had countless opportunities to examine and participate in the assessment of FBI agents for professional development and promotional purposes, as well as to review their conduct for disciplinary purposes.

3.    These opportunities have given me a broad-based understanding of how the FBI functions, and more importantly, of how important an agent or other FBI employee's reputation for professionalism and ethical conduct is to his or her career.

4.    My roles in OPR and Inspection Division particularly related to the impact on an employee's career and post-FBI employment when such an employee is accused of misconduct, subject to personnel inquiries, or other administrative actions, some of which may fall outside the scope of long-established Human Resources Division practices.

5.    Being the subject of an internal investigation for misconduct, or even poor performance, has such a debilitating and interfering impact on an agent, the FBI has set out clear rules and guidelines to ensure such investigations are only initiated when there is good cause to believe an agent or employee has fallen short of expectations.

1

6.      While an employee is under investigation, he or she is not likely to be promoted, and may be taken off of active investigations until the matter is resolved. Again, this can have serious and long-lasting effects on the employee or agent's reputation, even if they are ultimately exonerated.

7.      During the course of my FBI career, I have never seen any administration gather a list of FBI employees for review or investigation based on direction from the White House. It is therefore my testimony that the Executive Order of January 20, 2025 (hereinafter "the Executive Order"), demanding review of FBI actions based on an assumption that those actions were "weaponized", or "partisan", is both unprecedented and extremely dangerous.

8.      My understanding of the Executive Order is that DOJ was instructed to identify FBI agents and personnel who were involved with the investigation and prosecution of the individuals who were involved in crimes related to the January 6, 2021, attack on and around the Capitol building and halls of Congress (hereinafter "January 6 Cases).

9.      I further understand that on or about February 2, 2025, Acting Deputy Attorney General Emil Bove (hereinafter "Mr. Bove") sent out a survey to thousands of agents and employees, ordering them to self-identify the work they did on January 6 cases, asserting that the data collected by that survey was to be aggregated into a list of employees who may be subjected to internal administrative review or disciplinary action.

10.     I have been advised by Counsel for the Plaintiffs that a list of employees who worked on January 6 Cases has, in fact, been provided to Mr. Bove and others within the government.[1]

11.     Per an email I reviewed that is in the record before the Court and has been widely publicized, Mr. Bove asserted that the list he has demanded from the FBI would only be used

---

[1] I have been informed that some personnel who worked on January 6 Cases were not included on the list for reasons that are not clear to me.

to determine whether the employees carried out their duties ethically, and whether they acted with corrupt or partisan intent. *See* EXHIBIT 1.

12.     I have reviewed the survey dissemninated by Mr. Bove, a copy of which is attached hereto at EXHIBIT 2.

13.     As is clear on the face of the survey, no information solicited by the survey questions provides any insight into whether the respondent engaged in any inappropriate or prohibited actions.

14.     I therefore conclude that the only way Mr. Bove could ascertain if any respondent executed his or her duties in a "weaponized" or "partisan" way, would be to gather additional information about the actions of the respondent, which would constitute an administrative investigation.

15.     Thus, for all intents and purposes, the personnel who are on that list are functionally "under investigation" for malfeasance, which, as explained below, has immediate impacts on their ability to execute their duties.

16.     The employees whose names were collected merely because they worked on their assigned January 6 cases are currently facing lasting harm within their local field offices or headquarters assignments, their potential promotional advancement opportunities, and potentially in their post-FBI careers if those careers are in law enforcement or national security, or private sector roles requiring security clearances.

17.     Mr. Bove's email states: "No FBI employee who simply followed orders and carried out their duties in an ethical manner with respect to January 6 investigations is at risk of termination or other penalties," and goes on to aver that the only individuals who should be concerned, "are those who acted with corrupt or partisan intent, who blatantly defied orders

from Department leadership, or who exercised discretion in weaponizing the FBI." *See* EXHIBIT 1.

18.    Based on my professional experience and years of service to the FBI, I state that Mr. Bove's representation is misleading and incorrect because Bove's stated intention – to ascertain whether those listed employees properly conducted their investigations, will – by necessity, require an administrative inquiry into each of those employees.

19.    The ***mere opening*** of any administrative inquiry on an FBI employee triggers personnel consequences that last through the remainder of the employee's career, and beyond.

20.    At the local level, the FBI's Giglio-Henthorn policy requires an individual employee and their field office to disclose to prosecutors any pending or adjudicated administrative inquiry that might tend to call into question their honesty, trustworthiness, veracity and ethics.[2]

21.    An inquiry opened to determine, as Mr. Bove asserts, whether an agent "…acted with corrupt or partisan intent," or "carried out their duties in an ethical manner," would fall under FBI policy as requiring the agent to disclose the inquiry to his or her leadership and to the Assistant United States Attorney's that he or she partners with to prosecute their investigations.

22.    Such mandated disclosures will inevitably harm an agent's career by causing his or her leadership, and the US Attorney's offices with which he or she works, to question future assignments, as well as the agent or employee's ability to convincingly testify before a grand jury or petit jury, and could lead to the agent suffering what the Office of Personnel Management and the FBI refer to as a "loss of effectiveness."

---

[2] *See Giglio v United States*, 405 U.S. 150 (1972), also provided that disclosure is required for any material that could damage the credibility of a witness for the prosecution based upon dishonesty, misconduct or bias.

4

23.     The term "loss of effectiveness," refers to any issue with the agent or employee's background that calls into question their personal integrity such that their credibility could be questioned, and could taint the results of their work.

24.     Specifically many, if not most of the agents assigned to January 6 cases were assigned to Joint Terrorism Task Forces (hereinafter "JTTF") in the field offices.

25.     An agent who would have to disclose to prosecutors that he or she is under inquiry for having been "partisan" or "weaponized," might have to be removed from that case or task force, and deprive that agent of an earned position on what many agents deem a prestigious assignment to the JTTF.

26.     That agent could not effectively work a violent extremist case again, because he or she would be cross-examined by a defense counsel as to why his or her name was on a list of agents who worked January 6 cases, and was investigated for being "weaponized" or otherwise "partisan."

27.     Furthermore, such an investigation could potentially undermine the agent or employee's ability to hold the highest levels of security clearance, as such matters are always considered in the granting of security clearances. Pending the outcome of the inquiries Mr. Bove would need to open, an employee's clearance might be suspended, which would preclude them from even accessing FBI office space.

28.     Thus, in the near and immediate term, merely being on Mr. Bove's list of agents to be investigated for partisanship does clearly, and in my opinion, irreparably cause harm to that agent or employees' ability to execute their duties, and would necessarily foreclose them from many of the activities of the FBI.

29.    The long-term reputational damage to an agent or employee is equally extremely serious. The FBI's Administrative Action Name Check Policy Directive 1249 (5.1) dated 2-13-2023, requires name checks to be conducted for any personnel actions that may benefit the employee. *See* EXHIBIT 3.

30.    These checks are to identify any items reflecting pending inquiries involving the subject employee. Such checks may cover their entire career in most circumstances (5.1.6).

31.    When such checks indicate a pending or adjudicated administrative matter involving the employee, the Assistant Director of Human Resources Division must review the findings and make recommendations as to whether to preclude the employee's promotion, award or preferential transfer (5.4).

32.    For promotion beyond mid-level management to the Senior Executive Service or other Senior Level ranks, further name checks are required to be run within DOJ databases as well.

33.    In the current highly politicized environment within the FBI and DOJ, it is not hard to envision either a formal or informal protocol where no employee who worked January 6 cases would be promoted, given an award or transferred to their office of preference.

34.    But even if such did not occur, an employee who has an administrative investigation in his or her work history, no matter how frivolous or ludicrous the predicate for that investigation, would be at a disadvantage as compared to an employee with no such "baggage."

35.    The simple act of keeping these unwarranted administrative inquiries open for the length of time it will take to investigate as many as 6,000 agents and their cases, will effectively preclude those agents from progressing in their careers.

36.     Furthermore, many FBI agents retire or resign and move on to the intelligence community, law enforcement or private sector jobs related to national security.

37.     In such cases, it is FBI policy to provide those prospective employers of retired or former FBI personnel the results of an FBI name check on the former employee.

38.     Specially, the FBI will advise those new employers whether the employee left "under inquiry" or had any derogatory information in his files. Such an indication would and does impact a new employer's decision to grant the former FBI employee a security clearance or a job within law enforcement or intelligence.

39.     Thus, the fact that FBI agents and personnel on a list gathered of persons to be administratively investigated for ethical violations, regardless of whether or not that person is ultimately exonerated, will have lasting and irreparable negative impact on their future job prospects.

40.     The intelligence community is a very small community, in which one's reputation for integrity and good judgment is paramount, and follows them wherever they go.

41.     A baseless accusation of partisanship, weaponization or lack of integrity has a clear, punitive effect on an agent or employee, regardless of the intention of the person(s) who initiated such an investigation or inquiry.

42.     While the FBI holds its employees to high standards of integrity and professionalism, it does not launch investigations into the conduct of its employees without a reason to believe they have trespassed on the rules that govern them. This is a minimum requirement of FBI leaders when it comes to managing their subordinates, because it is quite easy to ruin an employees' reputation and career prospects with unjustified investigations.

43.    In my 25 years with the FBI, I have never seen investigations of FBI agents launched without some factual predicate to justify the inquiry, and certainly never to the scale launched by the current administration.

44.    This process not only will likely ruin the careers of thousands of FBI employees, it will in turn, dramatically weaken the network of highly skilled and experienced FBI personnel who have given their entire careers to keeping the citizens of this country safe. America does not benefit from undermining the short and long term efficacy of hundreds of experienced personnel.


And further Affiant sayeth not.


I, Frank Figliuzzi, swear and/or affirm, under the federal penalties for perjury, that the matters asserted herein are true and accurate to the best of my knowledge.

2-21-2025
Date

Frank Figliuzzi

# EXHIBIT 1

Colleagues:

I write with additional information regarding the memo that I sent to the FBI's acting director on January 31, 2025.

Multiple times during the week of January 27, 2025, I asked the FBI's acting leadership to identify the core team in Washington, D.C. responsible for the investigation relating to events on January 6, 2021. The purpose of the requests was to permit the Justice Department to conduct a review of those particular agents' conduct pursuant to President Trump's Executive Order concerning weaponization in the prior administration. FBI acting leadership refused to comply. That insubordination necessitated, among other things, the directive in my January 31, 2025 memo to identify all agents assigned to investigations relating to January 6, 2021. In light of acting leadership's refusal to comply with the narrower request, the written directive was intended to obtain a complete data set that the Justice Department can reliably pare down to the core team that will be the focus of the weaponization review pursuant to the Executive Order. The memo stated unambiguously, and I stand by these words, that the information process" that will be used to "determine whether any additional personnel actions are necessary."

Let me be clear: No FBI employee who simply followed orders and carried out their duties in an ethical manner with respect to January 6 investigations is at risk of termination or other penalties. The only individuals who should be concerned about the process initiated by my January 31, 2025 memo are those who acted with corrupt or partisan intent, who blatantly defied orders from Department leadership, or who exercised discretion in weaponizing the FBI. There is no honor in the ongoing efforts to distort that simple truth or protect culpable actors from scrutiny on these issues, which have politicized the Bureau, harmed its credibility, and distracted the public from the excellent work being done every day. If you have witnessed such behavior, I encourage you to report it through appropriate channels.

In closing, I am extremely grateful for the service and sacrifices of those in the FBI's ranks who have done the right thing for the right reasons. You will be empowered to do justice as we work together to make America safe again. I very much look forward to continuing that work with you.



EXHIBIT
2

Colleagues:

I write with additional information regarding the memo that I sent to the FBI's acting director on January 31, 2025.

Multiple times during the week of January 27, 2025, I asked the FBI's acting leadership to identify the core team in Washington, D.C. responsible for the investigation relating to events on January 6, 2021. The purpose of the requests was to permit the Justice Department to conduct a review of those particular agents' conduct pursuant to President Trump's Executive Order concerning weaponization in the prior administration. FBI acting leadership refused to comply. That insubordination necessitated, among other things, the directive in my January 31, 2025 memo to identify all agents assigned to investigations relating to January 6, 2021. In light of acting leadership's refusal to comply with the narrower request, the written directive was intended to obtain a complete data set that the Justice Department can reliably pare down to the core team that will be the focus of the weaponization review pursuant to the Executive Order. The memo stated unambiguously, and I stand by these words, that the information

process" that will be used to determine whether any additional personnel actions are necessary.

Let me be clear: No FBI employee who simply followed orders and carried out their duties in an ethical manner with respect to January 6 investigations is at risk of termination or other penalties. The only individuals who should be concerned about the process initiated by my January 31, 2025 memo are those who acted with corrupt or partisan intent, who blatantly defied orders from Department leadership, or who exercised discretion in weaponizing the FBI. There is no honor in the ongoing efforts to distort that simple truth or protect culpable actors from scrutiny on these issues, which have politicized the Bureau, harmed its credibility, and distracted the public from the excellent work being done every day. If you have witnessed such behavior, I encourage you to report it through appropriate channels.

In closing, I am extremely grateful for the service and sacrifices of those in the FBI's ranks who have done the right thing for the right reasons. You will be empowered to do justice as we work together to make America safe again. I very much look forward to continuing that work with you.

Reply all

# EXHIBIT 2

## A/DAG Memo Response: Events that Occurred at or Near the US Capitol on January 6, 2021



When you submit this form, the owner will see your name and email address.

* Required

1. Are you submitting this form for yourself or on behalf of your employee? *

   ⦿ Me

   ◯ Employee

2. What is your/your employee's current title? *

   | Special Agent | ⌄ |

3. Are you/your employee currently a supervisor? *

   | Yes | ⌄ |

4. Are you/your employee currently an ASAC or SSIA? *

   | No | ⌄ |

5. Are you/your employee currently an SES employee (e.g., SAC, Section Chief, DAD, AD, etc...)? *

   | No | ⌄ |

6. What was your/your employee's title when you/your employee participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021?Select your answer *

6. What was your/your employee's title when you/your employee participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021?Select your answer *

Special Agent ⌄

7. Were you/your employee a supervisor when you/your employee participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021? Select your answer *

No ⌄

8. Were you/your employee an ASAC or SSIA when you/your employee participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021? Select your answer *

No ⌄

9. Were you/your employee an SES employee when you/your employee participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021? Select your answer *

No ⌄

10. What division are you/your employee currently in? (The drop down menu is sorted first by Field Offices, Legat Offices, then HQ divisions, and then in alphabetical order by the division's 2-character code). Select your answer *

▬▬▬▬▬▬ ⌄

11. What division were you/your employee in when you/your employee participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021? Select your answer *

▬▬▬▬▬▬ ⌄

12. What was your/your employee role in the investigation(s) or prosecution(s) relating to events that occurred at or near the US Capitol on January 6, 2021? Select all that apply. *

12. What was your/your employee role in the investigation(s) or prosecution(s) relating to events that occurred at or near the US Capitol on January 6, 2021? Select all that apply. *

☐ Analytical support

☐ Approved ECs or other documents in a case file

☑ Arrest - led operation or participated in arrest

☐ Assigned as case agent for investigation(s)

☑ Assigned as co-case agent for investigation(s)

☐ Conducted baseline database checks for case opening

☐ Conducted surveillance of subject(s)

☐ Discovery

☑ Evidence collection and/or disposition

☑ Grand jury subpoena - submission or review

☐ HQ Program Management Support

☑ Interviewed witness(es), subject(s), and/or complainant(s)

☑ Responded to lead set by another office

☐ Search warrant - led operation or participated in search

☐ Supervised squad conducting investigation(s)

☐ Testified at a trial

☑ The responses in this survey are provided

13. What was the approximate date of your/your employee's last activity relating to the investigation(s) or prosecution(s) relating to events that occurred at or near the US Capitol on January 6, 2021? *

████████                                                                        🗓

Submit

# EXHIBIT 3

**UNCLASSIFIED**

# FEDERAL BUREAU OF INVESTIGATION
## POLICY DIRECTIVE
## Administrative Action Name Check Policy Directive
## 1249D

### General Information

| | |
|---|---|
| **Proponent** | Human Resources Division (HRD) |
| **Publication Date** | 2023-02-13 |
| **Last Updated** | 2023-04-21 |
| **Supersession** | *Administrative Action Name Check Policy Directive (1184D)* |

### 1. Authorities

- Title 5 *United States Code* (U.S.C.) Section (§) 301
- 5 U.S.C. § 302
- 5 U.S.C. § 552a (Privacy Act of 1974)

### 2. Purpose

2.1. The Federal Bureau of Investigation's (FBI) reputation is largely dependent upon how employees conduct themselves in both their official and personal capacities. All FBI employees are expected to act in accordance with the highest standards of personal honor and integrity. Exercising good judgment and sound decision making is key in ensuring the effectiveness and credibility of the FBI.

2.2. This policy sets forth processes for conducting administrative action name checks for personnel actions, when an FBI employee is being considered for a personnel action that conveys benefits, such as a promotion, direct placement, transfer, program role, award or incentive, sabbatical, education program, committee or board, separated law enforcement officer (LEO) identification (ID) card, early retirement, and the like.

### 3. Scope

This policy directive (PD) applies to all FBI employees, task force officers (TFO), and retired FBI employees under consideration for participation in the Reserve Service Program.

### 4. Exemptions

There are no exemptions to this PD.

### 5. Policy Statement

5.1. The administrative action name check requires that a query be conducted, as requested, of an employee's records retained by the following FBI components: Office of Professional Responsibility (OPR), Security Division (SecD), Inspection Division (INSD), HRD's Performance Appraisal Unit (PAU), Office of Disciplinary Appeals (ODA), Office of

**UNCLASSIFIED**

Equal Employment Opportunity Affairs (OEEOA), and, for foreign assignments, the International Operations Division (IOD). Administrative action name checks for Senior Executive Service (SES) and Senior Level (SL) positions also require additional queries sent to the Department of Justice's (DOJ) OPR and Criminal Division.

5.1.1.   An administrative action name check must be conducted each time an employee is being considered for a personnel action that conveys a benefit.

5.1.2.   Processing must not occur on such personnel actions until the employees pass their administrative name checks.

5.1.3.   An administrative action name check is not required for a noncompetitive promotion (i.e., career ladder).

5.1.4.   An administrative action name check must be conducted on an employee's records for at least the three years immediately preceding the query for a proposed personnel action that conveys benefits, and up to the employee's entire career, pursuant to the HRD Name Check Preclusion Guide or as determined by the assistant director (AD), HRD. This includes, but is not limited to, competitive promotions, direct placements, potential transfers (including no-cost transfers), sabbatical and University Education Program (UEP) nominations, Reserve Service Program requests, award and incentive nominations, qualified separated LEO ID card requests, Student Loan Repayment Program (SLRP) requests, committee and board members selections, such as for the SES career board and the diversity advisory committees (DAC), and employees applying for Employee Assistance Program (EAP) roles, either full-time or collateral, and other preferential benefits, such as early retirement.

5.1.5.   For General Schedule (GS)-14, GS-15, SES, and SL personnel actions, and for all foreign assignments, an administrative action name check must be conducted on an employee's records spanning his or her entire career.

5.1.6.   An administrative action name check must be conducted on an employee's records spanning his or her entire career for any employee applying to a special agent (SA) position, receiving a supervisory promotion, an honorary award, an external award, as well as other personnel actions, as determined by the AD, HRD.

5.2.   Although there are penalties imposed by OPR when employees engage in misconduct, these penalties are separate and distinct from any preclusion period that may be imposed by HRD. See the HRD Name Check Preclusion Guide for further information.

5.2.1.   The preclusion period imposed by HRD allows a candidate an appropriate time frame to demonstrate improved judgment and the performance expected of all FBI employees, before receiving a benefit or a promotion. This preclusion period also helps mitigate any negative perception and morale implications associated with rewarding a candidate who has pending or substantiated misconduct, equal employment opportunity (EEO), security, or other performance issues. As such, a preclusion period may be applied to avoid perceptions of rewarding bad behavior, which can negatively affect the FBI's reputation and workforce morale.

5.3.   Any queried FBI employee who is found to be the subject of any administrative investigation, case, complaint, management deficiency, or IOD curtailment that is open, "no notice," pending, or closed (if found to be substantiated) must be referred to the AD, HRD (or designee) for further review.

5.4.   The AD, HRD (or designee) must determine whether the FBI employee is precluded or not precluded from further consideration for the personnel action. The AD, HRD (or designee) can use discretion when making preclusion decisions for all name check findings,

but specifically for those pending final adjudication. The decision of the AD, HRD is considered final and not subject to appeal.

5.4.1.    FBI employees approved (i.e., not precluded) by the AD, HRD (or designee) may proceed with their personnel actions, and FBI employees declined (i.e., precluded) by the AD, HRD (or designee) are removed from consideration for their personnel actions. The decision of the AD, HRD (or designee) is independent of DOJ and the reporting FBI components and considered final for personnel actions, as outlined in subsection 6.1. of this PD. All administrative action name checks and preclusion recommendations for selectees for SES and SL positions must be submitted to the Director (or designee) for review and approval.

5.4.2.    Individuals who are subjects or named in extended, ongoing investigations face potential preclusion, based on the discretion of the AD, HRD (or designee). In all instances, the decision of the AD, HRD (or designee) is based on several factors, including, but not limited to, the facts of the investigation, historical precedent, severity and recentness of the allegation, OPR's *Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process*, mitigating or aggravating factors, and potential penalties that could be imposed on the FBI employee. Typically, an investigation that goes beyond three years and has not been adjudicated should not preclude the named FBI employee from receiving his or her personnel action. However, lengthy investigations that involve egregious misconduct or behavior may preclude the named FBI employee from receiving his or her personnel action.

5.4.3.    The preclusion period begins from the date of the offense and not the date of final adjudication of the administrative action. In instances in which the employee was demoted, the preclusion period begins from the date the demotion took effect. In cases in which the date of the offense is unknown, the preclusion period should start from the investigation start date. The *HRD Name Check Preclusion Guide*, which outlines the recommended preclusion periods for personnel actions, is based on historical precedent and the guidelines established in OPR's *Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process*. For more information, please refer to the *HRD Name Check Preclusion Guide*, OPR's *Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process*, or Security Executive Agent Directive (SEAD) 4: *National Security Adjudicative Guidelines* (June 8, 2017).

5.5.    A no notice name check result refers to a pending investigation in which the named employee has yet to be notified of the existence of an investigation. In this case, a no notice name check result must be forwarded to the AD, HRD (or designee) for final review and approval of a preclusion decision. In SES and SL selections, a no notice name check result must be forwarded to the Director (or designee) for final review and approval.

5.6.    If OEEOA returns a positive response from a query, the Office of the General Counsel (OGC) must provide a letter with a legal opinion that addresses whether the matter should constitute an impediment to future personnel actions. An EEO allegation, in and of itself, should not preclude an individual from personnel actions. Unless OGC or INSD informs HRD that they believe there is evidence that the named employee did in fact discriminate against the complainant, the AD, HRD should not preclude the employee.

## 6.  Roles and Responsibilities

6.1. The AD, HRD (or designee) must:

6.1.1.    Review the administrative action name check summaries in which a queried FBI employee was found to be a subject of an administrative investigation, case, complaint, inspection deficiency, or IOD curtailment.

UNCLASSIFIED

6.1.2.    Decide to preclude or not preclude an employee from further consideration for a personnel action based on the information provided.

6.1.3.    Request further information if the information provided is insufficient to make a decision.

6.1.4.    Maintain consistency with the application of the *HRD Name Check Preclusion Guide*.

6.2.    The Leadership Selection Unit (LSU), HRD must:

6.2.1.    Coordinate the requested administrative action name check query for all Federal Bureau of Investigation Headquarters (FBIHQ) divisions, field offices (FO), or other appropriate entities.

6.2.2.    Receive requests for name checks of FBI employees who are in the scope for administrative action name check queries.

6.2.3.    Receive responses from the FBIHQ divisions and FOs conducting queries within their internal databases based on the names of FBI employees provided by LSU.

6.2.4.    Present the positive responses, including previous preclusion decisions, on administrative action name check queries for review to the AD, HRD (or designee).

6.2.5.    Maintain a historical record in the Enterprise Process Automation System (EPAS) automated name check system that provides names of FBI employees, requesting components, request dates, offices (i.e., FBIHQ divisions and DOJ) queried, response dates, and preclusion decisions from the AD, HRD.

6.2.6.    Solicit queried offices (i.e., FBIHQ divisions and DOJ) for more specific details to assist the AD, HRD (or designee) in making a sound decision.

6.2.7.    Provide historical data when requested by the AD, HRD (or designee).

6.3.    OPR must:

6.3.1.    Conduct a comprehensive search of its case management system for pending or closed matters, which were substantiated, for the named FBI employee.

6.3.2.    Provide an affirmative or negative response. If affirmative, provide the date of the offense, the date the matter was opened, the date the disciplinary matter was closed, a summary of OPR's findings, and the sanction imposed.

6.3.3.    For OPR affirmative finds for SES and SL selections and all other name check requests, provide LSU a copy of OPR's final disciplinary action letter and the results or finding from the infraction.

6.3.4.    ODA must:

6.3.5.    Conduct a comprehensive search of the relevant databases to determine if the named FBI employee filed a disciplinary appeal.

6.3.6.    Provide an affirmative or negative response to LSU. If affirmative, provide a copy of the final letter or other relevant documentation to LSU.

6.4.    PAU must:

6.4.1.    Conduct a comprehensive search of ☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐   b7E
☐☐☐☐☐☐☐☐☐☐ named FBI employees who have cases open for indefinite suspensions, performance cases, or leave cases.

6.4.2.    Provide an affirmative or negative response to LSU. If affirmative, PAU must provide a written summary of each named employee's case to LSU.

4
UNCLASSIFIED

**UNCLASSIFIED**

6.4.3.   For incentive awards and SLRP, present the positive responses on administrative action name check queries for review to the AD, HRD (or designee).

6.5.   The Clearance Investigations Unit (CIU), SecD must:

6.5.1.   Conduct a comprehensive search of the [                                    ] b7E [                              ] related SecD databases and case files.

6.5.2.   Analyze any records maintained in the legacy system known as the [                    ] [                                    ] for requests that require full career checks.

6.5.3.   Provide an affirmative or negative response to LSU. If affirmative, CIU must provide the date and details of the deficiency or administrative action to LSU.

6.6.   Internal Affairs Section (IAS), INSD must:

6.6.1.   Conduct a comprehensive search of the case management system for any named FBI employee who has a pending case matter pertaining to misconduct (internally or through the Office of the Inspector General [OIG], DOJ).

6.6.2.   Provide an affirmative or negative response to LSU. If affirmative, IAS must provide the date and details of the misconduct case(s) to LSU.

6.7.   Office of Inspections (OI), INSD must:

6.7.1.   Conduct a comprehensive search for any named FBI employee who has a pending matter pertaining to shooting incidents or management deficiencies.

6.7.2.   Provide an affirmative or negative response to LSU. If affirmative, OI must provide the date and details of the deficiency or administrative action to LSU.

6.8.   OEEOA must:

6.8.1.   Conduct a comprehensive search of its [                              ] to determine if b7E the named employee was identified as a responsible management official (RMO) in an EEO matter.

6.8.2.   Provide an affirmative or negative response to LSU. If an FBI employee is determined to be an RMO, OEEOA must provide a case write-up of the issues as it pertains to the specific RMO.

6.8.3.   Provide a copy of the case write-up to the Employment Law Unit (ELU), OGC, which must provide a written opinion to LSU on whether the complaint or findings are an impediment to the FBI employee's personnel action.

6.9.   IOD must:

6.9.1.   Conduct a comprehensive search of the [                              ] b7E [                              ]

6.9.2.   Provide an affirmative or negative response to LSU. If affirmative, IOD must provide a summary of the curtailment, type of curtailment, and sanctions imposed, if any.

6.10.   ELU must:

6.10.1.   Provide a written response to LSU regarding named FBI employees who have been identified as RMOs in OEEOA matters.

## 7.   References

- *HRD Name Check Preclusion Guide*

5

**UNCLASSIFIED**

- *Awards Program Policy Guide (1095PG)*
- *Disciplinary Appeals Process Policy Directive (0915D)*
- *Federal Bureau of Investigation Credentials and Special Agent Gold Badges Policy Guide (1097PG)*
- *Loss of Effectiveness Reassignments and Curtailments Policy Directive (1035D)*
- *Merit Promotion and Placement Plan Policy Directive and Policy Guide (0689DPG)*
- *Recruitment, Relocation, and Retention Incentives Policy Guide (0662PG)*
- *Reserve Service Program Policy Directive (1036D)*
- *Sabbatical Program Policy Guide (1019PG)*
- *Special Agent Midlevel Management Selection System Policy Guide (1101PG)*
- *Student Loan Repayment Program Policy Guide (1115PG)*
- *University Education Program Policy Guide (1127PG)*

## 8. Acronyms

### 8.1. Acronyms

| AD | assistant director |
|---|---|
|  |  |
| CIU | Clearance Investigations Unit |
| DAC | diversity advisory committee |
| DOJ | Department of Justice |
| EAP | Employee Assistance Program |
| EEO | equal employment opportunity |
| ELU | Employment Law Unit [I and II] |
| EPAS | Enterprise Process Automation System |
| FBI | Federal Bureau of Investigation |
| FBIHQ | Federal Bureau of Investigation Headquarters |
| FO | field office |
| GS | General Schedule |
| HRB | Human Resources Branch |
| HRD | Human Resources Division |

b7E

**UNCLASSIFIED**

| IAS | Internal Affairs Section |
|---|---|
| ID | identification |
| INSD | Inspection Division |
| IOD | International Operations Division |
| LEO | law enforcement officer |
| LSU | Leadership Selection Unit |
| ODA | Office of Disciplinary Appeals |
| OEEOA | Office of Equal Employment Opportunity Affairs |
| OGC | Office of the General Counsel |
| OI | Office of Inspections |
| OIG | Office of the Inspector General |
| OPR | Office of Professional Responsibility |
| PAU | Performance Appraisal Unit |
| PD | policy directive |
| RMO | responsible management official |
| SA | special agent |
| SEAD | Security Executive Agent Directive |
| SecD | Security Division |
| SES | Senior Executive Service |
| SL | Senior Level |
| SLRP | Student Loan Repayment Program |
| TFO | task force officer |
| U.S.C. | *United States Code* |
| UEP | University Education Program |

**UNCLASSIFIED**

**UNCLASSIFIED**

| Sponsoring Executive Approval | |
|---|---|
| **Name** | **Title** |
| **Michael H. Schneider** | Assistant Director<br>Human Resources Division |
| Final Approval | |
| **Name** | **Title** |
| **Jennifer Leigh Moore** | Executive Assistant Director<br>Human Resources Branch |