**SWORN DECLARATION OF LEWIS SCHILIRO**   (25-325)

I, Lewis Schiliro, being of sound mind and over the age of eighteen (18), do hereby state that I have personal knowledge of the matters asserted herein, and should I be called to testify in a court of competent jurisdiction, would state the following:

1. I recently retired from being the Managing Director of Freeh, Sporkin and Sullivan, an international firm that specializes in judicial, prosecutorial and law enforcement consulting. I was in that role from 2017 to 2024.

2. From 2009 to 2016, I was the Cabinet Secretary for the Delaware Department of Safety and Homeland Security. Amongst many other duties, in that role I served as the Chair of the Delaware Council on Police Training and the Police Accreditation Commission.

3. Prior to that, I was employed by the Federal Bureau of Investigation from 1975 until 2000. My last role in the FBI was as Assistant Director in Charge (hereinafter "ADIC") of the New York Field Office, which is the largest field office outside of the headquarters in Washington, DC.

4. At the time that I worked there, the New York Office (hereinafter "NYO") was the largest and most complex of all the FBI field offices. It is comprised of approximately 1200 special agents and an additional 300 support personnel. There were also approximately 150 New York Police Department officers assigned to the various Task Forces. I believe that the staffing level in the NYO increased after 9/11.

5. During my time at the FBI, I held every position to include case agent, squad supervisor, Assistant Special Agent in Charge (ASAC) for counter terrorism, Special Agent in Charge (SAC) for the Criminal Division, and finally ADIC.

1

6. As ADIC for the NYO, I was accountable for the supervision, management, and leadership of more than 1500 Special Agents and support personnel working in all areas of criminal, national security, and international and domestic terrorism law enforcement.

7. The NYO was responsible for all criminal, terrorism, and security cases in both the Southern and Eastern Districts of New York.

8. During my tenure, the men and women of the NYO took on the five La Cosa Nostra organized crime families, as well other violent gang investigations, white collar and corruption cases, and both domestic and international terrorism investigations and prosecutions.

9. The unparalleled success of the NYO was a direct result of the courage, integrity, and above all, the testimonial credibility of the personnel devoted to the most difficult and far-reaching investigations imaginable.

10. Because sophisticated organized crime syndicates were able to afford extremely astute and aggressive defense counsel, it was imperative that the work of the agents on those cases was able to stand-up to the highest level of scrutiny.

11. In accordance with FBI policies and binding Supreme Court precedent, prosecutors on these cases were required to divulge to any defense counsel any derogatory information in the background or record of any agent that worked on those cases.

12. In fact, it was routine for prosecutors to inquire about the background of any FBI personnel who handled critical evidence in any case, particularly if that background contained any information that would call into question the integrity and personal bias of the FBI agent or personnel.

13.    Because I had authority to assign agents to cases, on a few occasions I opted not to assign such cases to agents who had open investigations into their conduct or problems with their performance, even if I thought any claims against them may not be substantiated.

14.    The reason for this caution is that any defense counsel worth his or her salt would easily turn any derogatory information about an agent into a trial about the agent and his or her methods and motivations, rather than keeping the trial focused on the acts of the accused.

15.    I was the Government's expert witness in the infamous *United States v John Gotti* case. In that role, I was grilled for hours about the investigative methods of the FBI, and the propriety of the acts of FBI agents. I have personal experience with the import of the integrity of FBI agents and personnel.

16.    It is with this understanding of how information about an FBI agent's background impacts his or her ability to do their work that I state unequivocally that any accusation of unethical conduct against an FBI agent causes immediate and long-standing reputational damage.

17.    Such derogatory information is required to be documented in their personnel files, and is required to be disclosed by the FBI agent or personnel to their supervisors, the prosecutors they work with, on their security clearance paperwork, and to future employers within the law enforcement industry.

18.    Particularly with respect to agents, an accusation of "partisanship" or "weaponization" is extremely serious, and would harm their ability to be used as a testifying witness on any cases. An agent that cannot stand by the work he or she does, is likely to lose their career.

19. During my time in the NYO, I participated in numerous conferences with the United States Attorney, in order to determine whether information in an agent's personnel file was subject to disclosure pursuant to a *Giglio* finding.[1]

20. Even in cases where the allegation against the FBI agent was fairly innocuous, more often than not, adverse information in their background would foreclose their ability to be used as a testimonial witness.

21. The inability to be used as a witness is essentially the death knell for an FBI agent's career. It dramatically limits the kinds of investigations that agent can work on, and in turn, curtails their ability to promote or transfer into more desirable assignments.

22. That is why, as a supervisor of thousands of FBI agents, I was extremely careful to ensure that investigations into the conduct of personnel were only initiated when there was a credible factual predicate establishing that the agent or personnel had engaged in misconduct or a substantial policy violation.

23. During my tenure at the FBI, agents who were under investigation were not eligible for promotions, and were given administrative tasks that would not taint any ongoing investigations.

24. It was extremely humiliating for the person under investigation, and almost always lead to long-term reputational damage that was not undone merely by the person being cleared of the charges against them.

25. It was an essential part of my duties as ADIC to ensure that prior to an investigation into an agent was initiated, there was sufficient factual information to warrant such action. This is

---

[1] *See Giglio v United States*, 405 U.S. 150 (1972) (provides that disclosure is required for any material that could damage the credibility of a witness for the prosecution based upon dishonesty, misconduct or bias); *Brady v Maryland*, 373 U.S. 83 (1963) (establishing that the prosecution must disclose exculpatory evidence that could allow the defense to impeach the credibility of a prosecution witness).

4

because, as stated above, the very fact of initiating an investigation carries serious consequences that should not be taken lightly.

26. Notwithstanding that caution, there were occasions that the inquiry into the agent was resolved in favor of the agent, and yet disclosure to the prosecutor and opposing counsel was still required.

27. Once we removed the ability of an agent to testify, we essentially eliminated their ability to continue as an investigator.

28. Luckily, because the FBI invests so heavily in initial and ongoing training, investigations into the conduct of FBI agents and personnel were relatively infrequent.

29. If, however, a large number of agents were placed under suspicion of ethical violations, this would have crippled the investigative function of the NYO, and would have negatively impacted all of the cases they were working on.

30. While it has been some time since I worked at the FBI, one thing that has not changed is the importance placed on the integrity and professionalism of FBI agents in the critical work that they do.

31. It is my understanding that the White House issued an Executive Order on January 20, 2025, which essentially accused the FBI agents who worked on cases related to the events at or near the Capitol on January 6, 2021, of being "partisan" or "weaponized."

32. As a former ADIC within the FBI structure, I assert that there are few, if any, members of the FBI who had the authority to refuse to investigate any cases referred to them by the office of origin in Washington, DC, and certainly not the thousands of personnel who were asked to report the work they did on January 6 Cases.

33.     The mere accusation by the White House that the FBI acted without a factual basis for their January 6 investigations calls into question the integrity of thousands of people, and now places in jeopardy all of their work on hundreds of current matters.

And further Affiant sayeth not.

I, Lewis Schiliro, swear and/or affirm, under the federal penalties for perjury, that the matters asserted herein are true and accurate to the best of my knowledge.

_2/21/25_  
Date

_____  
Lewis Schiliro