**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

JOHN AND JANE DOES 1-9, et al.,

            Plaintiffs,

       v.                                                    Civil Action No. 25-0325 (JMC)

DEPARTMENT OF JUSTICE,

            Defendant.

---

FEDERAL BUREAU OF INVESTIGATION
AGENTS ASSOCIATION, et al.,

            Plaintiffs,

       v.                                                    Civil Action No. 25-0328 (JMC)

DEPARTMENT OF JUSTICE, et al.,

            Defendants.

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION**
**FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

Defendants, the Department of Justice ("Department") and the United States of America (collectively, "Defendants") argue that Plaintiffs[1] are not entitled to a preliminary injunction allegedly because they do not have standing to bring this suit and fail to meet the other preliminary injunction criteria.

But the facts and legal arguments set forth in this reply, as well as in Plaintiffs' memorandum of law in support of their preliminary injunction and opposition to Defendant's motion to dismiss, Dkts. 25-1 and 35, respectively, provide a well-founded basis for this Court to exercise its equitable powers to grant the limited injunctive relief requested here. An injunction will protect Plaintiffs, FBI personnel who brought January 6 rioters to justice, from the certain harm that would result from the release of their names and from the ongoing infringement of their constitutional rights.

Defendants downplay the facts, mischaracterizing a series of alarming events as unrelated to the current Administration's publicly stated intentions to root out all those who are disloyal to it. In reality, Plaintiffs have shown that FBI personnel who participated in the January 6 cases have been presumed disloyal and targeted. That has happened based on the demonstrably false premise that they harbored "partisan intent" and contributed to the "weaponization" of the FBI in carrying out their duties. In that regard, the events that followed the issuance of the Weaponization Executive Order—the collection of information from a survey of those who worked on the January

---

[1] Plaintiffs are the Federal Bureau of Investigation Agents Association ("FBIAA"), John Does 1, 3, and 4 and Jane Does 1-3 ("the 328 Doe Plaintiffs") and John and Jane Does 1-9 et al., individually and on behalf of their putative class ("the 325 Doe Plaintiffs") (collectively, "Plaintiffs" or the "consolidated Plaintiffs").

6 cases, the compilation of a list of those personnel identified by EIN and name, the transmission of that list within DOJ for further "review"—all demonstrate Defendants' willful targeting of these personnel. Defendants have still failed to provide answers as to why they initiated an investigation with the end goal of creating a list of names of January 6 investigative personnel.

The issuance of a narrow preliminary injunction is warranted here. Following the events of January 6, FBI personnel were assigned to investigate the crimes committed that day. As a part of those investigations, they questioned the rioters, swore out search warrants, executed arrests, and testified in court. These cases led to the convictions of the rioters. One of President Trump's first actions following his inauguration was to pardon every person prosecuted by the Department of Justice for their roles in connection to January 6. The result has been an express signal that the past violence of January 6 was justified, and the implicit signal that future violence will be equally forgiven. The last remaining step to facilitating this violence is the current Administration's release of the names it so purposefully collected.

Taking these facts into account, the Court should enjoin Defendants from disclosing any list derived from the Survey and any purported ongoing "review" outside DOJ, either directly or indirectly, and from further engaging in any politically motivated action in connection with Plaintiffs' work on the January 6 cases.

## ARGUMENT

### I.    THE COURT HAS SUBJECT MATTER JURISDICTION OVER THIS LAWSUIT.

#### A.  Plaintiffs Have Standing to Bring their Privacy Act and Due Process Claims.

Defendants' jurisdictional argument boils down to this—Plaintiffs do not have standing to seek a forward-looking injunction for prospective injury because the harm they allege has not yet occurred. *See* Defendant's Preliminary Injunction Opposition ("Defs.' Br..") at 11–16. Defendants

further aver that any "past harm" suffered by Plaintiffs cannot confer Article III standing because past harm, such as the compilation of the list, has already occurred. *Id.* at 14–16. The rest of Defendants' contentions concerning Plaintiffs' lack of standing are couched as deficiencies in the pleadings, which Plaintiffs have amply addressed in their opposition to Defendants' motion to dismiss. *See* Plaintiffs' Opposition to Motion to Dismiss ("Pls. Opp. MTD"), Doc. 35 at 15–20. The Court should reject these arguments for the reasons below.

To the extent that Defendants' position is that this Court can never grant a forward-looking injunction, that would make a mockery of the law and the Supreme Court has soundly rejected that position. In *TransUnion LLC v. Ramirez*, a case involving the risk of disclosure of inaccurate data in the credit card files of thousands of consumers, the Court reiterated that "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." 594 U.S. 413, 435 (2021). The plaintiffs in *TransUnion* had sought retrospective damages for an occurrence that had not taken place—the disclosure of inaccurate data in the credit files. *Id.* at 441. There, the Court clarified that in these types of "informational injury" cases, forward-looking relief may still be appropriate even when damages are not. *id.* at 435.

Defendants go on to argue that the harm identified by Plaintiffs—risk of disclosure—is speculative and does not meet the imminence standard. Defs.' Br at 7–9. In that regard, Defendants characterize the chain of events in Plaintiffs' First Amended Complaint ("FAC") and preliminary injunction as "news reports of unrelated events." *Id*. at 9. But these events are not unrelated; they are patterns and practices consistently employed by the Administration since the inauguration with predictable results. And because "a preliminary injunction requires only a likelihood of irreparable injury, Damocles's sword does not have to actually fall [on Plaintiffs] before the court will issue

an injunction." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) (internal citation omitted). When evaluating whether a strong threat of irreparable injury is sufficiently imminent, courts may draw reasonable inferences from the facts alleged. For example, in *League of Women Voters of United States v. Newby*, the D.C. Circuit acknowledged that it was "unclear whether Alabama and Georgia are currently enforcing their proof-of-citizenship laws." 838 F.3d at 8. Nevertheless, the court inferred "based on the experience" of voters dealing with a similar statute in Kansas that "it seems almost certain that similar obstacles to registration will spring up in Alabama and Georgia when those States decide to enforce their laws." *Id.*; *cf. Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, 485 F. Supp. 3d 1, 60 (D.D.C. 2020) (observing "courts routinely grant follow-on injunctions against the Government" where earlier injunction issued by another court technically renders it less likely that plaintiff will suffer irreparable harm).

Beginning even before the first day of his presidency, President Trump has regularly promised vengeance against FBI personnel who he claims engaged in fraudulent and politically driven investigations of him. Plaintiffs Memorandum of Law in Support of Preliminary Injunction ("Pls. PI Memo"), Dkt. 25-1 at 2–3; Pls. Opp. MTD, Dkt. 35 at 16–17. President Trump and members of his Administration have unconditionally pardoned January 6 rioters, while at the same time publicly identified or threatened to identify government officials. *See* Pls. PI Memo. at 5-6, 19; Pls. Opp to MTD at 19–20; FAC ¶¶. 57–60. *see also* Consent Order, Dkt. 14 at ¶ 2. DOJ identified and terminated, without warning, high-ranking FBI officials solely because they had supervisory responsibility over the January 6 investigations, and the names of those individuals are now public knowledge. *Id.* at 6–7. DOJ then pivoted its attack to the FBI rank-and-file by attempting to "identify" FBI personnel who participated in the January 6 investigations and who

are not "faithful[]." *Id.* at 6. DOJ created and disseminated the Survey based on the conclusory presumption that some, if not all, Survey respondents had weaponized their law enforcement roles against President Trump. *Id.* at 7–8. The FBI initially provided DOJ with employee identifying numbers, but, for reasons the Government has not articulated, DOJ insisted that the FBI provide the names of every Survey respondent. Driscoll Feb. 4. Email, Dkt. 11-2 at 2; Driscoll Feb. 6 Email Doc. 28-1 at 1. To any reasonable observer, these actions are not "unrelated" as Defendants would have this Court believe. In fact, they are logical sequential steps leading to the Administration's promised goal: retribution through "transparency," that is, the release of the identities of FBI personnel responsible for the purported "injustice" of investigating January 6.[2]

Typically, issues related to future risks in connection with the disclosure of personally identifiable information arise in data breach cases involving claims for damages as opposed to injunctive relief. These cases nevertheless are instructive because of how they characterize future risk of harm from disclosure of information or from the misuse of data. In *In re OPM Data Security Data Breach Litigation v. OPM*, the plaintiffs sought, in part, damages against OPM for failing to adopt safeguards to protect their confidential information against *future* security breaches by hackers. 928 F.3d 42, 52 (D.D.C. 2019).

Defendants claim that *OPM* is not helpful here because it is factually distinct. Defs.' Br. 7–8. They argue that in *OPM* hackers had stolen, in the past, the personal information of millions of taxpayers, rendering the plaintiffs' allegations of future harm, *i.e.*, the future misuse of their data by the hackers, more concrete than Plaintiffs' claims here. *OPM*, 928 F.3d at 58–59. But a

---

[2] Defendants cite *Aliotta v. Blair*, 614 F.3d 566 (D.C. Cir. 2010), as support for their argument that Plaintiffs have not identified "a pattern or practice of public disclosure." Defs.' Br. at 9. But *Aliotta* involved a pattern and practice age discrimination claim against the FDIC at the summary judgment stage and had nothing to do with the disclosure of private or sensitive information on a preliminary injunction.

key fact in *OPM* was that the plaintiffs had waited two years since the data breach to file their complaint, and they had not even alleged that they personally suffered identity theft or other misuse, only that they *could* suffer misuse in the future. In fact, the defendants in *OPM* raised the same argument that Defendants raise here—that the "threatened injuries" claimed by the *OPM* plaintiffs, *i.e.*, potential future misuse of their personal information, were speculative and insufficient to confer Article III standing. *Id.* at 59. The D.C. Circuit rejected the defendants' argument, concluding "we are unwilling at this stage to assume that the passage of a year or two without any clearly identifiable pattern of identity theft or financial fraud means that all those whose data was compromised are in the clear." *Id. OPM* is therefore instructive because it supports a finding that a future risk, *i.e.*, identity theft that had not yet occurred, was sufficient to confer Article III standing on the plaintiffs.

This case does not involve a data breach. But it does involve the future risk of a disclosure that links Plaintiffs' personally identifying information (EIN and name) to the fact they investigated and/or participated in the January 6 cases. Driscoll Feb. 4 Email, Doc. 11-2 at 2; Driscoll Feb. 6 Email Doc. 28-1 at 1. This Administration has recast the work of FBI personnel in connection with the January 6 cases as political. Their named participation in the January 6 cases constitutes sensitive, personal information that they reasonably expect the Defendants will publicize as part of their continuing campaign of retribution.

In fact, in footnote 3 of their Brief, Defendants appear to concede that a future risk of disclosure of Plaintiffs' sensitive information "might be sufficient to establish standing." Defs'. Br. at 8 fn.3. That reasoning is supported by a recent decision of this District, *Alliance for Retired Americans v. Bessent*, in which Judge Kollar-Kotelly found that the Bureau of Fiscal Service's disclosure of taxpayers' personal information to members of the DOGE team conferred Article III

standing even though there was no "publication" of the information. 2025 WL 740401, at *16 (D.D.C. Mar. 7, 2025). Judge Kollar-Kotelly reasoned that the privacy-related harm faced by the plaintiffs in that case bore "a close relationship" to privacy harm arising at common law from an "intrusion upon seclusion." *Id.* The requirements for demonstrating intrusion upon seclusion, she explained, are that the defendant intentionally intruded "upon the solitude or seclusion of another or his private affairs or concerns" and that such intrusion "would be highly offensive to a reasonable person." *Id* (*quoting* Restatement (Second) of Torts § 652B)*.* The judge further noted that intrusion upon seclusion "does not depend upon any publicity given to the person whose interest is invaded, but instead "[t]he intrusion itself makes the defendant subject to liability, even though there is no publication." *Id.* This reasoning in Judge Kollar-Kotelly's opinion supports a finding that even absent "publication" or disclosure of the sensitive information, a plaintiff may still suffer an injury-in-fact from an intrusion.

In *Alliance for Retired Americans*, Judge Kollar-Kotelly, further reasoned that the "intrusion" was "highly offensive to the reasonable person," citing declarations of individual plaintiffs that explained their anxiety stemming from the government's violation of their trust. *Id.* at 17. The Judge explained "that anxiety is reasonable given the sensitivity of the information at issue." *Id.* The same logic applies here. The fact that Defendants collected the names of *only* FBI personnel and *only because* they worked on the January 6 cases, when those FBI personnel have already been named in social media posts or their names have been expressly demanded by January 6 rioters, has caused tremendous anxiety. *See* FAC 43–45, 48, 55–57; *see, e.g.*, Dkt. 25-10 (Decl. Jane Doe 1 (328), ¶ 21; Dkt. 25-13 (Decl. John Doe 1 (328), ¶ 23; Dkt. 25-16 (Decl. Jane Doe (325), ¶ 25. As in *Alliance for Retired Americans*, that is sufficient to confer standing.

7

Defendants claim that disclosure of the list and Survey information beyond DOJ is unlikely after the statements of Todd Blanche. Defs.' Br. at 9. But these statements do not demonstrate that the list and the results of the Survey will be kept confidential within the confines of DOJ. Deputy Attorney General Blanche's vague, unenforceable statement as a nominee that he would not harm FBI employees is (1) not binding, (2) not specific to FBI personnel who worked on the January 6 cases, and (3) contrary to Attorney General Bondi's expressed plan to root out and make transparent FBI personnel who she believes "despise" President Trump. It is also undermined by the DOJ's own reservation of its perceived right to "terminate" the prohibitions of the current consent order. Dkt. 14, ¶ 2.

Defendants cite a recent case, *University of California Student Ass'n v. Carter*, for the presumption that in the absence of clear evidence to the contrary, courts must presume that the government will exercise its powers "responsibly" and with "due regard" to affected individuals. 2025 WL 542586, at *6 (D.D.C. Feb. 17, 2025). But in that case, Judge Moss relied on the declaration submitted by one of the six DOGE employees who was given access to student loan information stating that members of the DOGE team had completed ethics and information security training. *Id.* at 1. Judge Moss also noted that the DOGE's only purpose was "[t]o assist program administrators with tracking refunds and discharges" of loans, as well as "[t]o support the investigation of possible fraud or abuse and to detect and prevent fraud or abuse" in ED's loan programs. *Id.* Defendants here have offered no such sworn declaration. And unlike in this case, where Defendants' "investigation" seeks to root out "weaponization" and "partisan intent," among other things, the DOGE declarants in *University of California* had a specific goal and a mission. Defendants' intent and mission are not only unclear here, but exceptionally broad. Thus,

Defendants' suggestion that the Court accord a presumption of good faith here is far less persuasive.

### B. Plaintiffs Have Standing to Assert Their First Amendment Claims.

Defendants complain that Plaintiffs have not established a concrete injury-in-fact under the First Amendment theory of political retaliation because Plaintiffs cannot point to any "imminent adverse employment action." Defs.' Br. at 11. But the actions targeting Plaintiffs—that they were required to fill out the Survey, appear on the list, and are subject to ongoing "review" and potential "additional" personnel action *because* they worked on the January 6 cases—are employment actions that fall within the ambit of the First Amendment. The First Amendment recognizes a broad range of employment actions as potentially "adverse" if the government undertakes these actions because of an employee's perceived political affiliation. In that regard, the Supreme Court in *Rutan v. Republican Party of Illinois*, observed that employment decisions—including "even an act of retaliation as trivial as failing to hold a birthday party"—when intended to target an employee's perceived political affiliation (including a mistaken perception), are considered adverse, and therefore support a claim under the First Amendment. 497 U.S. 62, 75, fn.8 (1990). This Circuit applied the principles set forth in *Rutan* and found that requiring an employee to work an additional twenty-seven hours to be considered for promotion was an adverse action for First Amendment purposes. *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994); *see also Manhattan Beach Police Officers Ass'n, Inc. v. City of Manhattan Beach*, 881 F.2d 816, 819 (9th Cir. 1989) (if police officers could establish they were denied promotion because government "acted in order to quell public criticism and not because of plaintiffs' actual qualifications for the job, or the nature of the assignment itself," then they could clearly establish violation of First Amendment rights).

Next, Defendants contend that Plaintiffs' inclusion on the list cannot have a chilling effect on speech. Defs.' Br. at 12. The only circumstances in which Plaintiffs could experience a chilling effect, according to them, is if they had "alleged to what extent they worked on January 6 matters" and that "they might be considered part of the 'core team' about which the 'weaponization review' would be focused."[3] *Id.* This particular concession is not only alarming because it belies Defendants' claim that there will be some sort of "weaponization review," but also because it mischaracterizes how First Amendment jurisprudence describes "chilling effect." When governmental action has the effect of curtailing "core political speech" resulting in the "limit[ing] the number of voices" and "reduc[ing] the total quantum of speech," the Supreme Court has made clear that First Amendment "protection is at its zenith." *Meyer v. Grant*, 486 U.S. 414, 423, 425 (1988). Contrary to Defendants' arguments, Plaintiffs need not demonstrate they are on some undefined "core team" or have been identified as the targets of "weaponized review." The fact that they have been separated from their peers who did not work January 6 cases and are now tainted with disloyalty simply for being on the list has had the effect of chilling their speech and establishes that they have suffered an injury-in-fact under the First Amendment. *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333 (D.C. Cir. 2020) ("Nonetheless, post-*Laird* cases plainly establish that a subjective chill of First Amendment rights, paired with a credible threat of imminent, adverse government action against the claimant, may create a cognizable injury." (collecting cases)).

---

[3] Then-A/DAG Bove's statements in the February 5 email are so illogical as to be untrustworthy; he claimed the FBI's refusal to name a "core team in Washington, D.C." forced him to send out a nationwide survey to over 5,000 rank-and-file across the country. His actions only make sense if his primary intent was to create a list, not a review process. Dkt. 25-6.

Plaintiffs' declarations support this. After being placed under "review" as one of the agents who worked on the January 6 cases, Jane Doe 3, has started avoiding political conversations in her private life because she fears she may be targeted if she asserts any "political views with friends or family." Jane Doe #3 (325) Decl. ¶ 25. She has continued to censor her political speech in private emails and text messages, and she has taken extraordinary steps to ask her county election supervisor whether her voter registration information can be made private. *Id*. ¶¶ 25–27. The same is true for FBIAA's members who have curtailed their private political speech for fear that their political views, if contrary to the current administration's, will be discovered. FBIAA Decl. ¶¶ 46–49.[4]

Defendants next argue that Plaintiffs have not established a "chilling effect" because the FBI already has regulations that prevent them from engaging in "public speech on political matters." Defs.' Br. at 13. But the FBI's Ethics and Integrity Program Policy Guide cited by Defendants states that while FBI personnel may never use their FBI title or position in any way to "advance particular partisan activity," FBI Ethics & Integrity Program Policy Guide, at § 7.1 (Feb. 2, 2015), 7.1, an "FBI employee retains the right to express his or her opinion as an individual privately and publicly on political subjects and candidates," *id.* at 7.4.2. The Guide further expounds upon the balance between carrying out official duties in a nonpartisan manner and exercising free speech in an individual capacity: FBI employees may "sign a political petition as an individual," "be politically active in connection with a question which is not identified with a political party, such as a constitutional amendment, referendum, approval of a municipal

---

[4] Contrary to Defendants' assertion, there is no requirement that to state a claim under the First Amendment, Plaintiffs must plead that their private speech has become known to their employer. Defs. Br. at 12. The inquiry is whether Defendants' actions, whatever they may be, have had the effect of chilling Plaintiffs' speech, not that Defendants might later become aware of what Plaintiffs are saying in their individual capacities so as to further deter Plaintiffs' speech.

ordinance, or any other question or issue of a similar character," among others. *Id.* at 7.4.2. Thus, the FBI's own Guide seems to protect speech consistent with the First Amendment. Plaintiffs have established that their current exposure to scrutiny within DOJ for their work on the January 6 cases has had a chilling effect on precisely these types of activities (sharing of political views in private life, registering to vote, among other things).

Defendants' reliance on *Martin v. EPA*, 271 F. Supp. 2d 38 (D.D.C. 2002) is unavailing. That case did not involve a chilling effect on core political speech, but rather a non-profit group's "right to receive information" from an employee, a government ombudsman, who claimed that his speech had been chilled as a result of specific employment-related actions.[5] *Id.* at 47. The organization alleged that because an EPA "ombudsman" would be less likely to speak to the public about ongoing investigations, the organization stood to suffer an informational injury-in-fact under the First Amendment. *Id.* at 48. *Martin* is thus inapplicable here because Plaintiffs have shown that their association with January 6 has been recast as political. The dire consequences Plaintiffs would face if DOJ decided they acted politically has had the predictable effect of chilling their speech.

Finally, Defendants claim that Plaintiffs may not seek relief for "past harm" because it has already occurred and is not redressable. Defs.' Br. at 14–15. But the injunctive relief Plaintiffs seek is for the prospective harm. Plaintiffs discovery requests, if answered, could very well assuage these fears if Defendants in fact have some sort of coherent, apolitical method for evaluating "weaponization" and can explain why agents' first and last names, without more, were relevant to such a review. But Defendants have rejected transparency on this issue. They have refused to provide any substantive information that might shed light on its internal investigation processes.

---

[5] The court did not decide the EPA employee's chilling effect claim because he failed to exhaust his administrative remedies under the Civil Service Reform Act. *Id.* at 47.

12

Thus, Plaintiffs "seek not only to be made whole for the harm they have already allegedly suffered, but also 'to reform the conduct of [the d]efendants in the future.'" *Tunica-Biloxi Tribe of La. v. U.S.*, 577 F. Supp. 2d 382, 402 (D.D.C. 2008). And this Court has the power to redress Plaintiffs' prospective injuries by ordering Defendants to refrain from engaging in any actions and/or conduct that would violate Plaintiffs' constitutional rights.

### C. The FBIAA Has Established Standing Under Both Associational and Organizational Theories.

Defendants contend that the FBIAA does not have associational standing on behalf of its members for the same reasons that the Individual Does do not have standing. Defs.' Br. at 17. But for all the reasons above, FBIAA's members have standing to bring their claims. *See, e.g.*, FBIAA Decl. ¶¶ 25–27, 49 (discussing FBIAA members' inclusion in the January 6 Survey list).

Next, Defendants argue that the FBIAA cannot assert organizational standing because, according to them, the FBIAA's only injury is an impairment to their advocacy. Defs.' Br. at 18–19. This Circuit has found that an organization has standing where agency action hinders an organization's ability to "accomplish[] its mission" through its typical means. *PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015). The FBIAA has had to respond to an overwhelming number of requests from members who participated in January 6 cases. FBIAA Decl. ¶¶ 50–52. The FBIAA's resources are strained, and it has struggled to provide continuing services. Id. ¶¶ 50–52. The volume and nature of these requests for assistance have also forced the FBIAA to restructure its daily operations, re-train staff, retain counsel, and defer and/or abandon other initiatives that are vital to FBIAA's mission. *Id.* ¶ 52.

The cases upon which Defendants rely are inapposite because there the organizations' injuries were reactive—that is, the harm was purely to the organizations' issue advocacy, often in response to the very issue being litigated. *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d

13

213, 220 (D.D.C. 2020) (no impairment of mission because challenged action fell within the ambit of organization's ongoing work to devote "significant resources to advocating in favor of individuals' online free expression rights and the legal frameworks that support them"); *Food & Water Watch Inc.*, 808 F.3d 905, 921 (D.C. Cir. 2015) (allegations that USDA's action "restricted flow of information that organization used to educate members" insufficient to confer organizational standing). In other words, Defendants' cases dealt with organizations who alleged the *expenditure* of resources *in response to* government action. Here, FBIAA discusses the *reduction* (chilling) of its speech as a *consequence* of government action as its injury-in-fact.

This case deals with FBIAA's chilling of lobbying efforts that exist entirely outside of, and predate, the January 6 Survey and corresponding fallout. These efforts regularly require public, bipartisan engagement to garner support for its legislative goals. *See, e.g.*, FBIAA Decl. ¶¶ 38–45; *Nat'l Ass'n of Mfrs. v. Taylor*, 549 F. Supp. 2d 33, 51 n.10 (D.D.C. 2008), aff'd, 582 F.3d 1 (D.C. Cir. 2009). Defendants' invocation of *Environmental Working Group v. FDA*, 301 F. Supp. 3d 165 (D.D.C. 2018) is also unpersuasive. In that case, the organization's claimed injury claim was that, in the absence of a regulation restricting and/or banning the use of formaldehyde in hair straighteners, it would have to spend more money to lobby the FDA by focusing the agency's attention on the harms of hair straightening products on a case-by-case basis. *Id.* at 172. In contrast, the FBIAA has not stated that it will have to lobby or advocate for or against a position but instead stated that it has significantly culled its lobbying efforts for fear that the DOJ or Administration may characterize its efforts as harboring "partisan intent." FBIAA Decl. ¶¶ 43–45. That is an example of a chilling effect on an organization's speech. The Supreme Court has recognized that lobbying itself is speech which may be regulated but may not be banned altogether. *United States*

*v. Harriss,* 347 U.S. 612, 625 (1954). The Court's precedents therefore cover governmental action that has the effect of chilling the protected speech of an organization like the FBIAA.

## II.    PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION

### A.  Plaintiffs Have Established a Likelihood of Success on the Merits.

Defendants' attempt to diminish  Plaintiffs' Privacy Act claim on the basis that the Act does not authorize declaratory or injunctive relief is unavailing. Defendants contend that the Privacy Act provides an adequate remedy, and that relief through the APA is not feasible. Def. Br. At 26–27. This misreads the case law and the facts of the present case.

Contrary to Defendants' assertion, the Privacy Act, by itself, does not provide an adequate remedy. Defs.' Br. at 27. As Plaintiffs described in their preliminary injunction memorandum of law, the Privacy Act only authorizes monetary damages for violations of 5 U.S.C. 552a(b). Pls. PI Memo, Dkt. 25-1 at 21. Due to that statutory limitation, both the D.C. Circuit and the Fourth Circuit have clarified that declaratory and/or injunctive relief concerning an unauthorized dissemination requires a separate, supporting statutory cause of action, such as the APA. *See Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C. Cir. 1988); *Doe v. Chao*, 435 F.3d 492, 505 (4th Cir. 2006). Defendants' reference to *Wilson v. McHugh* is a red herring, Defs.' Br. at 27, as that district court case involved an entirely different type of Privacy Act claim for which the statute clearly did provide an adequate remedy. 842 F. Supp. 2d 310, 320 (D.D.C. 2012) (requested equitable relief concerned amendment of records, a remedy authorized under Section 552a(g)(2)(A)).

Defendants' other citations, *see* Defs.' Br. at 26, rest upon the same flawed premise that the Privacy Act provides an adequate remedy. In *Bowen v. Massachusetts* and *Garcia v. Vilsack*, the courts confronted situations where equitable relief under the APA was sought notwithstanding potentially duplicative statutory procedures that separately provided other relief. *See Bowen*, 487

15

U.S. 879, 903-05 (1988) (rejecting argument that monetary relief potentially available in Claims Court under Tucker Act provided special and adequate review procedure that would justify disallowing APA review of agency action in federal district court); *Garcia*, 563 F.3d 519, 522–23 (D.C. Cir. 2009) (clarifying D.C. Circuit precedent that adequate remedy need not be "identical" but at least the "same genre" of relief).  As explained in this Section, the Privacy Act does not provide an adequate remedy that meets either the "special and adequate review" or "same genre" thresholds. To the contrary, the Privacy Act specifically does not authorize injunctive or declaratory relief to prevent violations of 5 U.S.C. 552a(b), only monetary relief after the fact, thereby necessitating reliance upon the APA to secure that equitable relief. *See Bowen*, 487 U.S. at 904 ("The legislative material elucidating that seminal act manifests a congressional intention that it cover a broad spectrum of administrative actions, and this Court has echoed that theme by noting that the Administrative Procedure Act's 'generous review provisions' must be given a 'hospitable' interpretation.") (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–41 (1967)).

Defendants attempt to disassemble the D.C. Circuit's ruling in *Doe v. Stephens*, asserting that the case held only that the Privacy Act does not authorize injunctive relief with respect to violations of 5 U.S.C. 552a(b) and that the APA cannot salvage the Plaintiffs' claims because there is no "final agency action." Defs.' Br. at 27–28. But that misreading of *Doe* results in the perversion of the very spirit of the Privacy Act. In *Doe*, the D.C. Circuit confronted a situation in which psychiatric records had been disseminated by the Department of Veterans Affairs ("VA") to local law enforcement in violation of the Privacy Act.  851 F.2d at 1466–67. The plaintiff sought to prevent further dissemination or use of those records. *Id.* The Circuit granted declaratory relief in reliance upon the APA, finding that the VA's "routine use" regulation was invalid, but did not

find any reason to grant further injunctive relief given that the only disseminated copy had been placed under the court's control and under seal. *Id.*

As in *Doe*, Plaintiffs here have established that their records, including information contained within the Survey and the list that has already been disseminated from the FBI to DOJ, is protected under the Privacy Act. For the reasons discussed previously, Plaintiffs have sufficiently demonstrated a reasonable likelihood that this information will be publicly disseminated outside of DOJ absent injunctive relief. In *Doe*, the records were already placed under seal; here no such protection exists, and therefore, an injunction is necessary. Any dissemination beyond DOJ would violate 5 U.S.C. 552a(b), *see* Pls. PI Memo. Dkt. 25-1 at 20–21, and only equitable relief using the APA as a vehicle – just like in *Doe* – could prevent that violation from occurring. *See Doe v. DiGenova*, 779 F.2d 74, 84 (D.C. Cir. 1985) ("One of Congress' explicit goals in enacting the Privacy Act was to preclude overzealous investigators from running roughshod over an individual's privacy …[]")(emphasis added).

Next, Defendants assert that Plaintiffs have not established a likelihood of success on the merits of their First Amendment political affiliation claim because the compilation of the lists and the ongoing internal review process is "official conduct" and this type of "official conduct" is not protected speech. Defs.' Br. at 30. This argument misses the point because the issue is not whether Defendants' "official conduct" is speech, it is whether Defendants' official conduct amounts to retaliation based on perceived political affiliation. In their prior briefing and in Section I.B, *supra*, Plaintiffs have addressed in depth why they believe Defendants' actions—reviewing their work in connection to January 6, collecting information from them because they participated in the January investigations, placing their names on a list for further review and investigation—amount to political targeting.

17

Defendants claim that they are simply reviewing Plaintiffs' performance of their duties in connection with January 6, and therefore, anything Plaintiffs did to carry out those duties is official conduct not subject to First Amendment protections. Defs.' Br. at 30. They cite *Garcetti v. Ceballos* as support for their argument that the First Amendment does not prohibit their "review" and any future retaliatory actions based on Plaintiffs' expressions made pursuant to official responsibilities. *See* 520 U.S. 410 (2006). But *Garcetti* involved a different set of facts—there, the Supreme Court rejected a deputy district attorney's First Amendment claim against his employer for subjecting him to a series of retaliatory employment actions, demotion and transfer, because he criticized the contents of a warrant affidavit and conveyed his opinion and recommendation in a memo to his supervisor. *Id.* at 420. The Court concluded that the district attorney's memo was drafted pursuant to his official duties and therefore was not subject to First Amendment protections. *Id.* at 421. The main difference between this case and *Garcetti* is that Plaintiffs here have shown that they have been subject to *political* targeting. Plaintiffs' work on January 6 is a political issue for the new Administration, as detailed in the factual background in Plaintiffs' prior briefs. Therefore, here the question is whether Defendants' current and ongoing actions amount to retaliation based on perceived political affiliation.

*Rutan* and its progeny, not *Garcetti*, provide the appropriate framework for evaluating Plaintiffs' First Amendment claims. Defendants make much hay of the fact that *Rutan* involved more explicit political targeting based on party affiliation. 497 U.S. at 66. In that case, the defendants conditioned hiring decisions—promotions, transfers, and recalls—of low-level state government employees based on whether they had a track record of supporting the Republican Party. *Id.* The defendants rejected the plaintiffs' job applications because plaintiffs had not been supporters of the Republican Party. The Court explained that the defendants' actions "based on

18

political affiliation or support are an impermissible infringement on the First Amendment rights of public employees." *Id.* at 75. The Court made clear that it was in the district court's province to decide the factual question of "whether the four employees were in fact denied promotions, transfers, or rehires for failure to affiliate with and support the Republican Party." *Id.*

The Court in *Rutan* did not indicate that political discrimination cases can only be brought when defendants express their intention to discriminate based on politics. Rather, the *Rutan* Court recognized that innocuous employment decisions, such as refusing to throw a birthday party of an employee if the intent was to target the employee based on his or her perceived political affiliation, could violate the First Amendment. *Id.* at 75, fn.8. So too, here. Defendants' actions thus have asserted, without evidence, that Plaintiffs' lawful work on January 6 investigations was politically tainted. Once the DOJ does find the evidence to support its conclusion, *i.e.*, once it can identify what the Plaintiffs' personal political beliefs are, it has threatened to "root out" the Plaintiffs with "radical transparency." This conduct is prohibited by the First Amendment.

With respect to Plaintiffs' chilling effect claim, Defendants largely repeat what they have said before. Defs.' Br. at 31–32. Plaintiffs have responded to these arguments in Section I.B. As for Defendants' contention that Plaintiffs' First Amendment chilling effect claim is "a veiled challenge to the constitutionality of Executive Order 14,147," that is a mischaracterization. Defs.' Br. at 31. Plaintiffs' challenge stems not just from the Executive Order, but from a series of actions by the new Administration and leadership that manufacture politicization of Plaintiffs' work on January 6. It is DOJ's statements, not the Weaponization EO, that used dog whistle terms of "righteous spirit," "partisan intent," and "exercis[ion of] discretion," and it is the DOJ who refuses to transparently define any of those metrics.

19

Defendants' various arguments that Plaintiffs have not established a likelihood of success on the merits of their due process privacy claim can be easily dispatched. First, Defendants claim that there is no substantive right to privacy under the Fifth Amendment. Defs.' Br. at 33. But in *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977), the Supreme Court acknowledged the existence of a constitutional right to privacy to protect a person's interest in avoiding the disclosure of personal information which would be harmful if disclosed. *See Nixon v. Admin. of Gen. Servs.*, 433 U.S. 425, 457 (1977) ("One element of privacy has been characterized as 'the individual interest in avoiding disclosure of personal matters'") (quoting *Whalen*, 429 U.S. at 599). In *National Aeronautics and Space Admin. v. Nelson*, 562 U.S. 134 (2011), the Supreme Court once again recognized that the Constitution protects a right to informational privacy and that government agencies have a "statutory and regulatory duty to avoid unwarranted disclosures" of information that poses a threat to privacy. *Id.* at 155 (quoting *Whalen*, 429 U.S. at 605).

Second, Defendants press this Court not to rely on *Kallstrom v. City of Columbus*, because there, the unwarranted disclosure to third parties had already occurred. 136 F.3d 1055 (6th Cir. 1998). But *Kallstrom* is instructive because the court recognized that disclosure of sensitive information to the wrong individuals "encroached upon [the plaintiffs'] fundamental right to privacy and personal security under the Due Process Clause of the Fourteenth Amendment." *Id.* at 1069–70. The court awarded damages for the disclosure that had already occurred, but that did not stop the Court from granting relief for unwarranted future disclosures by requiring the defendants to provide the undercover officers with meaningful notice and opportunity to be heard before their identities were disclosed. *Id.*

Finally, this Court should reject any suggestion by Defendants that *Kallstrom* is inapplicable because it was a challenge under the Fourteenth Amendment as opposed to the Fifth

20

Amendment. Defs.' Br. at 33. Liberty interests preserved by the Due Process Clause of the Fifth Amendment have been incorporated into the Fourteenth Amendment as applied to the states. *See Molina Aviles v. District of Columbia*, 824 F. Supp. 2d 4, 9 fn.8 (D.D.C. 2011) (collecting cases). The Due Process Clause of the Fifth Amendment (and the Fourteenth Amendment) protects "those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *see also Ingraham v. Wright*, 430 U.S. 651, 673 (1977). "Among the historic liberties long cherished at common law was the right to be free from 'unjustified intrusions on personal security.'" *Kallstrom*, 136 F.3d at 1061 (quoting *Ingraham*, 430 U.S. at 673). "As far back as 1891, the Supreme Court recognized that '[n]o right is held more sacred, or is more carefully guarded . . . than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.'" *Id.* (quoting *Union Pacific Railroad Co. v. Botsford*, 141 U.S. 250, 251 (1891).

For all these reasons, Plaintiffs have established a likelihood of success on the merits of their claims.

## B. Plaintiffs Have and Continue to Suffer Irreparable Harm.

In arguing that Plaintiffs have not suffered irreparable harm, Defendants rehash much of what they already raised in the sections of their Brief in which they address Plaintiffs' standing. Their main arguments concerning harm are that a future risk of disclosure does not result in irreparable harm and that any harm to Plaintiffs' rights under the First Amendment is "past harm" that is insufficient to support the issuance of injunctive relief. Defs.' Br. at 20–26. Plaintiffs have addressed both arguments in detail in Section I.A and I.B but draw the Court's attention to the following points below.

Defendants again cite *Alliance for Retired Americans*, where Judge Kollar-Kotelly found that the plaintiffs' inability to show the likelihood of future wrongful dissemination weakened their claim of irreparable harm. Crucially, the judge relied on the defendants' representations during the hearing that Treasury "would not share information with USDS unless it were authorized by the Privacy Act or the Internal Revenue Code." 2025 WL 740401, at *22. The judge explained, "[b]ecause Plaintiffs have not produced any evidence to rebut this representation, they have not shown that unlawful dissemination of their members' private information is likely in the absence of a preliminary injunction." *Id.*

The same was true in *University of California Student Ass'n*, a recent case involving DOGE's request for access to student loan information. 2025 WL 542586, at *5. There, Judge Moss relied on affirmative representations, in the form of a sworn declaration submitted by DOGE members, that DOGE had no intent to use the information beyond the narrow purpose of assisting program administrators with tracking refunds and discharges and investigating fraud or abuse in the Department of Education's loan programs. *Id.* at 1. Judge Moss also referred to the defendants' representations at oral argument, noting in the opinion that when asked whether "'any reason to believe this [information] is being used for immigration purposes,' counsel for UCSA conceded that there was not." *Id*. at 6 fn.4 (*quoting* Hrg. Tr. (Rough at 10)). Judge Moss further explained,

> Given Defendants' representations to the Court regarding how the DOGE-affiliated employees intend to use the information at issue, and the Court's reliance on those representations, the Court would expect Defendants promptly to notify the Court should those representations prove inaccurate or incomplete. As the record now stands, however, the Court has no reason to believe that any of the information at issue will be used for any purpose unrelated to the statutory mission of the Department of Education itself.

*Id.*

Defendants have not made any representations that come even remotely close to what they have said in these other cases. To the contrary, when this Court asked Defendants whether the Privacy Act prohibited disclosure to the White House, Defendants equivocated: "The Attorney General has been directed to provide a report. What the attorney general -- in the context of the Attorney General's official duties, what the Attorney General chooses to put in that report to support whatever recommendations are made to the President is within the discretion of the Attorney General, and I don't believe there would be a Privacy Act prohibition to that." Feb. 6, 2025, TRO Hrg. Tr. at 65:13–67:11. When the Court continued to press whether "any government agency beyond the DOJ have a present intent to release the information while the Court is considering the PI motion," counsel for Defendants demurred, stating "Your Honor, I'm not in a position to make representations." *Id.* at 67:19–68:12. The opaque equivocations made by Defendants counsel here stand in stark contrast to the clear representations that were made by defense counsel and the defendants themselves (DOGE employees) in the cases that were before Judges Kollar-Kotelly and Moss.

As for Plaintiffs' First Amendment claims, those are not predicated only on the risk of future disclosure, although disclosure would surely harm Plaintiffs' constitutional rights. Plaintiffs' First Amendment claims are broader—they encompass the ongoing harm resulting from the investigation that ties Plaintiffs by name to their work on January 6, and by Defendants' own admission, subjects them to weaponization review. Plaintiffs therefore may seek prospective injunctive relief to enjoin Defendants from engaging in any action that infringes on Plaintiffs' constitutional rights. S*ee supra* Argument, Section I.B.

**C. The Issuance of an Injunction Serves the Public Interest.**

As Plaintiffs have set forth in their Preliminary Injunction Memo of Law, the issuance of an injunction serves the public interest. Pls.' PI Memo Dkt. 25-1 at 33. On January 6, 2021, a violent mob armed with weapons stormed the Capitol and violently broke into the building to prevent Congress from certifying the results of the 2020 General Election. The mob scaled walls, smashed through barricades, shattered windows, and attacked law enforcement. Four years later, FBI personnel, including Plaintiffs, find that their work investigating, prosecuting, and obtaining convictions of the rioters is politically anathema to the Administration and, therefore, the subject to what appears to be a sham and undefined "review." Instead of unconditionally agreeing to protect Plaintiffs privacy and safety, Defendants have passionately argued to reserve their presumed right to put Plaintiffs in danger by publishing their names.

The only argument Defendants offer is that an injunction preventing them from publicly releasing a list of January 6 law enforcement officers to January 6 rioters would be a "breathtaking" and "extraordinary intrusion" into the "internal affairs of the Executive." Defs.' Br. at 37. But courts routinely grant injunctions where a plaintiff has met his or her burden of establishing the preliminary injunction factors. *See Sampson v. Murray*, 415 U.S. 61, 63 (1974) (in case involving termination of probationary employee, expressly noting that district court had the "authority to grant interim injunctive relief to a discharged Government employee") (collecting cases).

The two cases Defendants cite, *Seila Law v. CFPB*, 591 U.S. 197 (2020) and *Harris v. Bessent*, 2025 WL 679303 (D.D.C. Mar. 4, 2025) (RC) are wholly inapplicable here. Those cases concern the scope of the President's removal powers with respect to the heads (*e.g.*, *Seila Law*) or to the members (*e.g.*, *Harris*) of independent agencies. And in *Harris*, the court *did* issue a

preliminary injunction against subordinate officials to effectuate Harris's "de facto reinstatement" by continuing to let her exercise the privileges of her office. 2025 WL 679303 at *10, *15.

Defendants have therefore failed to provide any persuasive reasons for why issuance of an injunction here would not serve the public interest.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue declaratory and injunctive relief in their favor.

March 21, 2025

Respectfully submitted,

LAW OFFICE OF MARK S. ZAID, P.C.

By:      *Mark S. Zaid*
　　MARK S. ZAID, D.C. Bar #440532
　　BRADLEY P. MOSS, D.C. Bar #975905
　　1250 Connecticut Avenue, NW, Suite 700
　　Washington, D.C. 20036
　　(202) 498-0011
　　Mark@MarkZaid.com
　　Brad@MarkZaid.com
　　*Attorneys for John Does 1,3-4,*
　　*Jane Does 1-3 (25-328)*

CENTER FOR EMPLOYMENT JUSTICE

By:      *Pamela M. Keith*
　　PAMELA M. KEITH, D.C. Bar #448421
　　SCOTT M. LEMPERT, D.C. Bar #1045184
　　650 Massachusetts Ave., NW, Suite 600
　　Washington, DC 20001
　　(202) 800-0292
　　pamkeith@centerforemploymentjustice.com
　　Slempert@centerforemploymentjustice.com
　　*Attorneys for John and Janes Does 1-9, et al.*
　　*(25-325)*

STATE DEMOCRACY DEFENDERS FUND

By:      *Norman L. Eisen*
　　NORMAN L. EISEN, D.C. Bar # 435051
　　POOJA CHAUDHURI, D.C. Bar #
　　888314523
　　600 Pennsylvania Avenue, SE, #15180
　　Washington, D.C. 20003
　　(202) 594-9958
　　norman@statedemocracydefenders.org
　　pooja@statedemocracydefenders.org
　　*Attorneys for John Does 1,3-4,*
　　*Jane Does 1-3 (25-328)*

KOSKOFF, KOSKOFF & BIEDER, PC

By:      *Margaret M. Donovan*
　　CHRISTOPHER M. MATTEI, Bar # 27500 (*phv*)
　　MARGARET M. DONOVAN, Bar # 31787 (*phv*)
　　350 Fairfield Ave., Suite 501
　　Bridgeport, CT 06604
　　(203) 336-4421
　　cmattei@koskoff.com
　　mdonovan@koskoff.com
　　*Attorneys for Federal Bureau of Investigation*
　　*Agents Association (25-328)*