**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN AND JANE DOES 1-9, *et al.*, | |
| Plaintiffs, | Case No. 25-cv-325 (JMC) |
| v. | |
| DEPARTMENT OF JUSTICE, | |
| Defendant. | |
| FEDERAL BUREAU OF INVESTIGATION AGENTS ASSOCIATION, *et al.*, | |
| Plaintiffs, | Case No. 25-cv-328 (JMC) |
| v. | |
| DEPARTMENT OF JUSTICE, *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

Federal Bureau of Investigation (FBI) agents who worked on January 6 investigations, along with the FBI Agents Association (FBIAA), sue to enjoin Defendants from disclosing agents' personal identifying information and retaliating against them in violation of the First Amendment. ECF 24.[1] Defendants move to dismiss for lack of subject matter jurisdiction and failure to state a claim. ECF 28. Plaintiffs' claims are too speculative. They do not plausibly allege that Defendants

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page. ECF cites in this opinion refer to docket numbers in Case No. 25-cv-325, the lead case, unless otherwise indicated.

are about to engage in any of the conduct agents are worried about. Accordingly, Plaintiffs lack standing, and the Court **GRANTS** Defendants' motion to dismiss.

Plaintiffs filed these cases in a whirlwind of chaos and fear. Department of Justice (DOJ) leadership demanded the names of FBI agents who worked on January 6 cases. *See* ECF 25-6. The FBI refused. *See id.* Things escalated quickly. The DOJ fired eight FBI officials for purported "weaponization." *See* ECF 25-5. Agents were required to complete a survey identifying whether and in what capacity they worked on January 6 investigations. ECF 24 ¶¶ 68–69. And some former January 6 defendants, now pardoned and at large, called for FBI agents to be doxed (or worse). *Id.* ¶¶ 42–56. Agents raced to court, terrified that they would be at real risk of physical harm if their identities were somehow made public. *See* ECF 3; *FBIAA v. DOJ*, No. 25-cv-328, ECF 2 (D.D.C. Feb. 4, 2025). The parties submitted a consent order under which Defendants confirmed that they would not publicly disclose the list of agents who worked on January 6 cases while the parties briefed motions. *See* ECF 14.

Since then, the dust has settled some—and this case has evolved. Defendants moved to dismiss. ECF 28. The Court ordered expedited jurisdictional discovery to cut through the chaos and allow Plaintiffs to shore up their standing allegations before the Court resolved Defendants' motion. ECF 38. That discovery revealed *no* evidence that Defendants are on the verge of disclosing Plaintiffs' identities, *see* ECF 45-1, nor have Plaintiffs plausibly alleged that such a disclosure is imminent. The Court must therefore dismiss Plaintiffs' disclosure-related claims (Counts I–IV and VI) because Plaintiffs have not established that they have standing to bring them.

That leaves Counts V and VII, Plaintiffs' First Amendment retaliation claims. In their briefs, Plaintiffs contend that Defendants are conducting an internal investigation of FBI agents who worked on January 6 cases solely because Defendants believe that they are not loyal to the

current administration. *See* ECF 35 at 29; ECF 37 at 18–20. Plaintiffs further argue that the mere fact of being placed under investigation adversely impacts their careers. *See* ECF 35 at 29; ECF 37 at 18–20. But the Court cannot assess that claim—because it is nowhere in the amended complaint. The amended complaint alleges only that "anticipated" employment actions, ECF 24 at 2, like terminations or other unspecified future "adverse actions," *id.* at 29, would violate the First Amendment. *See, e.g.*, *id.* ¶¶ 85–86, 88, 90, 120, 127. Plaintiffs lack standing to challenge such hypothetical, contingent actions. And Plaintiffs cannot amend their complaint via their briefs. The Court must therefore dismiss their First Amendment claims too.

## I.    BACKGROUND

The Court draws these factual allegations from Plaintiffs' amended complaint. ECF 24. Where facts may be relevant to standing, the Court also considers the limited record before it: Plaintiffs' documentary evidence appended to their motion for preliminary injunction, *see* ECF 25, Defendants' responses to Plaintiffs' jurisdictional discovery requests, *see* ECF 45, and Plaintiffs' subsequent filings alerting the Court to new factual developments, *see* ECF Nos. 51–53; *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005) (holding that courts may consider "facts developed in the record beyond the complaint" to assess standing).

On January 6, 2021, "an angry mob stormed the United States Capitol seeking to prevent Congress from fulfilling its constitutional duty to certify the electoral votes in the 2020 Presidential election." *Fischer v. United States*, 603 U.S. 480, 498 (2024) (Jackson, J., concurring). FBI agents from across the country were called upon to aid DOJ's subsequent investigation into the events of that day. ECF 24 ¶¶ 27, 30. They gathered evidence, executed search warrants, and testified before grand juries. *Id.* ¶¶ 28–30. Ultimately, DOJ charged nearly 1,600 individuals with criminal activity

related to January 6. *Id.* ¶ 39. Of the approximately 261 defendants who opted to go to trial, 257 were convicted. *Id.*

Four years later, on January 20, 2025, President Donald Trump pardoned or commuted the sentence of every January 6 defendant. *Id.* ¶ 42; *see* Proclamation No. 10887, 90 Fed. Reg. 8331 (Jan. 20, 2025). That same day, the President issued Executive Order (EO) 14147, entitled "Ending the Weaponization of the Federal Government." ECF 24 ¶¶ 62–63; *see* Exec. Order. No. 14147, 90 Fed. Reg. 8235 (Jan. 20, 2025). The EO stated that the prior administration "had engaged in an unprecedented third-world weaponization of prosecutorial power to upend the democratic process," including "ruthlessly prosecut[ing] more than 1,500 individuals associated with January 6, and simultaneously dropp[ing] nearly all cases against BLM rioters." Exec. Order. No. 14147, 90 Fed. Reg. 8235. The EO directed the Attorney General to "review the activities" of certain agencies (including DOJ, of which FBI is a component), "identify any instances where a department's or agency's conduct appears to have been contrary to the purposes and policies of this order," and recommend remedial actions to the President. *Id.*

On January 31, 2025, Acting Deputy Attorney General (A/DAG) Emil Bove issued a memo entitled "Terminations," ordering the Acting Director of the FBI to fire eight named FBI officials. ECF 24 ¶ 65; *see* ECF 25-5 (Terminations Memo). The memo (quoting EO 14147) stated that the prior administration had engaged in a "systemic campaign against its perceived political opponents, weaponizing the legal force of numerous Federal law enforcement agencies," including the FBI. ECF 25-5 at 2. Per the memo, the FBI "actively participated in what President Trump appropriately described as 'a grave national injustice that has been perpetrated upon the American people over the last four years' with respect to events that occurred at or near the United States

Capitol on January 6, 2021."[2] *Id.* Bove stated that he "d[id] not believe that the current leadership of the Justice Department can trust these FBI employees to assist in implementing the President's agenda faithfully," and "deem[ed] these terminations necessary, pursuant to President Trump's [EO 14147]." *Id.* The memo listed eight FBI officials by name and directed that they be terminated.

*Id.* at 3. It closed with the following directive to the Acting FBI Director:

> You are also directed to identify to the Office of the Deputy Attorney General, by noon on February 4, 2025, all current and former FBI personnel assigned at any time to investigations and/or prosecutions relating to (1) events that occurred at or near the United States Capitol on January 6, 2021; and (2) *United States v. Haniyeh, et al.*, 24 Mag. 438 (S.D.N.Y.). These lists should include relevant supervisory personnel in FBI regional offices and field divisions, as well as at FBI headquarters. For each employee included in the list, provide the current title, office to which the person is assigned, role in the investigation or prosecution, and date of last activity relating to the investigation or prosecution. Upon timely receipt of the requested information, the Office of the Deputy Attorney General will commence a review process to determine whether any additional personnel actions are necessary.

*Id.*

---

[2] At a hearing on the parties' motions, the Court asked the government what it believes went wrong with the FBI's January 6 investigations. *See* Apr. 30, 2025 Hr'g Rough Tr. 31:16–33:9. Having presided over many January 6 cases— including cases in which defendants admitted under oath that they violently assaulted police officers and damaged property on the U.S. Capitol grounds—the Court legitimately wanted to understand what "grave national injustice" the FBI "perpetrated upon the American people" while investigating the events of January 6. Exec. Order. No. 14147, 90 Fed. Reg. 8235; *see, e.g.*, *United States v. Bonawitz*, No. 23-cr-55, ECF 26 ¶¶ 12–13, 16–18, 22 (D.D.C. Aug. 17, 2023) (admitting to assaulting at least eight MPD officers, including tackling one officer to the ground and placing another "in a chokehold"); *United States v. Miles*, No. 22-cr-136, ECF 52 ¶¶ 13, 18–20 (D.D.C. Oct. 19, 2023) (admitting to "shov[ing] and attempt[ing] to punch officers," and "smash[ing] [a] window" with a wooden board in order to break into the Capitol building). (The EO's only supporting example—a reference to that fact that January 6 defendants were prosecuted while charges against other "rioters" were dismissed—has nothing to do with the FBI which, at least as far as the Court has always understood, does not decide which cases to prosecute or dismiss. *See* Exec. Order. No. 14147, 90 Fed. Reg. 8235.) So, the Court asked the government what, exactly, it is investigating— "what was so wrong with that [January 6 investigation] process"? Apr. 30, 2025 Hr'g Rough Tr. 31:16–31:21. Did the government receive information that FBI agents were doctoring evidence? *Id.* at 32:13–32:14. Fabricating charges against innocent people? *Id.* at 32:14–32:15. Did agents otherwise go rogue in their investigations? *Id.* at 33:2–33:5. Apparently not. The government could not provide answers to the Court's questions. Instead, Defendants represented that the very purpose of the internal review process is to figure out what (or whether any) improper conduct may have occurred. *Id.* at 33:10–33:12. So, as the Court understands it, Defendants are investigating to determine whether FBI agents may have done anything worth investigating.

On Sunday, February 2, Defendants ordered certain FBI agents, including some of the Plaintiffs in this case, "to answer a questionnaire about their work on cases related to the events of January 6, 2021," and to do so by 3:00 p.m. the following day. ECF 24 ¶ 68. The survey was titled "A/DAG Memo Response: Events that Occurred at or Near the US Capitol on January 6, 2021," and required recipients to answer the following questions:

1. Are you submitting this form for yourself or on behalf of your employee?

2. What is your current title?

3. Are you currently a supervisor?

4. Are you currently an ASAC or SSIA?

5. Are you currently an SES employee (e.g., SAC, Section Chief, DAD, AD, etc…)?

6. What was your title when you participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021?

7. Were you a supervisor when you participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021?

8. Were you an ASAC or SSIA when you participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021?

9. Were you an SES employee when you participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021?

10. What division are you currently in? (The drop-down menu is sorted first by Field Offices, Legal Offices, then HQ divisions, and then in alphabetical order by the division's 2-character code).

11. What division were you in when you participated in investigation(s) or prosecution(s) of events that occurred at or near the US Capitol on January 6, 2021?

12. What was your role in the investigation(s) or prosecution(s) relating to events that occurred at or near the US Capitol on January 6, 2021?

> 13. What was the approximate date of your last activity relating to the investigation(s) or prosecution(s) relating to events that occurred at or near the US Capitol on January 6, 2021?

*Id.*; *see* ECF 25-19 at 14–16 (copy of the survey). Approximately 5,100 FBI employees completed the survey. ECF 25-9 ¶ 24.

Around this time, some January 6 pardonees began calling on the administration to take action against FBI agents who worked on January 6 cases. *See* ECF 24 ¶¶ 43–44, 48. On February 1, January 6 pardonee Enrique Tarrio[3] posted on X demanding that an FBI agent who testified against him be fired, arrested, and "made to answer for her crimes." ECF 24 ¶ 44. On February 3, a January 6 attendee posted—about a particular FBI agent—"This FBIer better have filled out that survey today asking about his J6 prosecution (persecution) involvement." *Id.* ¶ 48.

On February 4, Plaintiffs filed two related lawsuits, which have since been consolidated. *See Does 1-9 v. DOJ*, No. 25-cv-325, Feb. 6, 2025 Min. Entry; *FBIAA v. DOJ*, No. 25-cv-328. Consolidated Plaintiffs are the Federal Bureau of Investigation Agents Association ("FBIAA") and a number of John and Jane Does. ECF 24 ¶¶ 4, 6. The FBIAA is a non-profit professional organization that "advocate[s] for the careers, economic interests, conditions of employment, and welfare of its members." *Id.* ¶ 4. The FBI employs approximately 13,800 Special Agents, about 12,000 of whom are FBIAA members. *Id.* The Doe Plaintiffs are current FBI agents and employees who worked on January 6 investigations, proceeding individually and on behalf of a putative class.[4] *Id.* ¶¶ 6, 7. Defendants are the DOJ and the United States. *Id.* ¶¶ 8–9.

---

[3] In Defendants' own words: Tarrio, the former leader of the Proud Boys, was sentenced to 22 years in prison for seditious conspiracy and other charges related to the events of January 6. *See* Press Release, Dep't of Just., Proud Boys Leader Sentenced to 22 Years in Prison on Seditious Conspiracy and Other Charges Related to U.S. Capitol Breach (Sept. 5, 2023) (available at https://perma.cc/76Y8-44K4). At sentencing, the district court found that Tarrio's conduct constituted an official act of terrorism, meriting an enhancement. *See id.*

[4] At the parties' request, the Court held in abeyance the requirement to file a motion for class certification, pending the Court's resolution of dispositive motions and the entry of any scheduling order. *See* Apr. 28, 2025 Min. Order; Loc. Civ. Rule 23.1(b).

Plaintiffs in each case also moved for a temporary restraining order (TRO) seeking to enjoin Defendants from publicly disclosing the names of FBI agents who worked on January 6 investigations. *See* ECF 3; *FBIAA v. DOJ*, No. 25-cv-328, ECF 2. On February 5, the day after Plaintiffs filed suit, A/DAG Bove sent an email to all FBI personnel with "additional information" about the January 31 memo. ECF 24 ¶ 73. The email stated:

> Multiple times during the week of January 27, 2025, I asked the FBI's acting leadership to identify the core team in Washington, D.C. responsible for the investigation relating to events on January 6, 2021. The purpose of the requests was to permit the Justice Department to conduct a review of those particular agents' conduct pursuant to President Trump's Executive Order concerning weaponization in the prior administration. FBI acting leadership refused to comply. That insubordination necessitated, among other things, the directive in my January 31, 2025 memo to identify all agents assigned to investigations relating to January 6, 2021. In light of acting leadership's refusal to comply with the narrower request, the written directive was intended to obtain a complete data set that the Justice Department can reliably pare down to the core team that will be the focus of the weaponization review pursuant to the Executive Order. The memo stated unambiguously, and I stand by these words, that the information requested was intended to "commence a review <u>process</u>" that will be used to "determine <u>whether</u> any additional personnel actions are necessary."

> Let me be clear: No FBI employee who simply followed orders and carried out their duties in an ethical manner with respect to January 6 investigations is at risk of termination or other penalties. The only individuals who should be concerned about the process initiated by my January 31, 2025 memo are those who acted with corrupt or partisan intent, who blatantly defied orders from Department leadership, or who exercised discretion in weaponizing the FBI. There is no honor in the ongoing efforts to distort that simple truth or protect culpable actors from scrutiny on these issues, which have politicized the Bureau, harmed its credibility, and distracted the public from the excellent work being done every day. If you have witnessed such behavior, I encourage you to report it through appropriate channels.

ECF 25-6 at 3 (emphases in original).

Also on February 5, Attorney General Pamela Bondi issued a memo to all DOJ employees entitled, "Restoring the Integrity and Credibility of the Department of Justice." ECF 25-7 at 2. The memo stated that, pursuant to EO 14147, the DOJ "must take immediate and overdue steps to restore integrity and credibility with the public . . . and to ensure that the Department's personnel are ready and willing to faithfully implement the policy agenda of the duly elected President of the United States." *Id.* The memo called for "review and accountability," and remarked: "No one who has acted with a righteous spirit and just intentions has any cause for concern about efforts to root out corruption and weaponization." *Id.* The memo announced a new "Weaponization Working Group" to examine, among other things, "[t]he pursuit of improper investigative tactics and unethical prosecutions relating to events at or near the United States Capitol on January 6, 2021— **as distinct from good-faith actions by federal employees simply following orders from superiors**." *Id.* at 3 (emphasis in original).

On February 6, the Court held a TRO hearing. *See* ECF 13. At that time, the parties seemed to agree that the FBI's Acting Director had not provided the names of those agents who completed the survey to the DOJ, and had instead provided only their Employee Identification Numbers (EINs). *See* ECF 13 at 12–13, 34, 41 (Hr'g Tr. 12:21–13:4, 34:14–18, 41:12–23). Plaintiffs allege that, while the hearing was underway, "A/DAG Bove was contemporaneously in a meeting with acting FBI leadership demanding that the FBI turn over the Survey names." ECF 24 ¶ 79. Ultimately, the FBI turned over the names of survey respondents, linked to their EINs, to DOJ. *Id.* ¶ 80.

On February 7, the parties negotiated a consent order to preserve the status quo until the Court could rule on Plaintiffs' motion for preliminary injunction. ECF 14. Thereafter, Plaintiffs filed an amended complaint, ECF 24, and a motion for preliminary injunction, ECF 25. They argue

that Defendants intend to disclose their personal identifying information in violation of the Privacy Act and the Fifth Amendment's Due Process Clause, and plan to take adverse actions against them in retaliation for their (perceived) First Amendment-protected political beliefs. ECF 25-1 at 27–37. Defendants filed a motion to dismiss, arguing that the Court lacks subject matter jurisdiction and that Plaintiffs have failed to state a claim. ECF 28. Per Defendants, Plaintiffs lack standing because their alleged future injuries are too speculative and are not "certainly impending." *Id.* at 21–22 (quoting *Kareem v. Haspel*, 986 F.3d 859, 865 (D.C. Cir. 2021)).

On February 17, Plaintiffs filed a motion for expedited discovery. ECF 20. That motion sought "extensive, expedited discovery," that was not tailored to the pending motions before the Court. Feb. 28, 2025 Min. Order. The Court "decline[d] to order full-blown merits discovery, particularly with a pending motion to dismiss that raises jurisdictional concerns," and therefore denied Plaintiffs' motion without prejudice. *Id.*

On March 10, Plaintiffs filed a renewed, narrowed motion for discovery. ECF 32. The Court granted the motion in part and denied it in part, allowing Plaintiffs to obtain limited and targeted jurisdictional discovery. ECF 38. The Court permitted Plaintiffs to serve two of their interrogatories and two related documents requests. First, Plaintiffs asked Defendants to "[i]dentify every non-DOJ person, including White House personnel and DOGE personnel, who is known to have, or had, access to the data collected pursuant to the Survey" and produce "[a]ny Document that relates to the Government's intent for any potential future disclosure of the Survey." *Id.* at 18. And second, Plaintiffs requested that Defendants "[i]dentify and describe the 'process' identified by Mr. Bove" in his Terminations Memo and February 5, 2025 message, and to produce any documents related to the government's interrogatory responses. *Id.*

On April 18, Defendants filed a notice indicating that jurisdictional discovery was complete and appending their discovery responses. ECF 45. First, the Department explained that it "has not shared the lists, or any data collected pursuant to the survey of FBI personnel, with any non-DOJ person." ECF 45-1 at 3. Second, DOJ identified no documents (that are not already on the public docket or in Plaintiffs' possession) that relate "to the Government's intent for any potential future disclosure of the Survey" or to any of its interrogatory requests. *Id.* at 4–6. And third, DOJ provided the following description of the "process" identified by Bove:

> [T]he Department states that it plans to lead a review process that will begin with an evaluation of documents relating to investigations concerning events on January 6, 2021, including communications by Department and FBI personnel as well as other relevant materials such as documents relating to arrests, searches, and other operational plans. Following that review, the Department will conduct interviews with certain FBI personnel identified during the review, as appropriate. Depending on the outcome of the process, if any FBI personnel are determined to have engaged in criminal behavior or other misconduct, appropriate disciplinary actions may be taken, which may include, without limitation, demotions, suspensions, or terminations. However, the Department has not commenced this process; the Department has neither accessed the unclassified list of names that prior acting FBI leadership claimed to have sent to the Department via classified email nor reviewed documents or conducted interviews.

*Id.* at 4.

The Court held a hearing on Plaintiffs' motion for preliminary injunction and Defendants' motion to dismiss on April 30, 2025. *See* Apr. 30, 2025 Min. Entry.

On May 13, 2025, Ed Martin—the newly appointed head of DOJ's Weaponization Working Group—held a press conference and had the following exchange with a journalist:

> Question: On weaponization, you have been making a lot of public comments in media appearances saying that you intend to release information on people even who you don't charge. My reading of the Justice Department Manual is that it clearly states prosecutors shouldn't name people, especially people who they don't intend to

charge. So, how do you square those two things? What you have been saying publicly and what the DOJ Manual says.

Mr. Martin: Well, I'd have to look at what the provision you are referring to to see. We will want to square ourselves with doing the things correctly. But I will say that the prosecutor's role and at this moment in our history is to make clear what the truth is and to get that out. And when [Senator] Chuck Grassley is asking for more transparency from the government, we need to listen. When whistleblowers are talking about what is going on, and it can't be that the system is stifling the truth from coming out because of some procedure. If it is in the Manual, if there is a law, look, I am the guy that stands here and tells you the January 6 defendants, every one of them wants all their documents back. They want us to release all the video. And we said that's not how it works. We have to be thoughtful and serious about how the system works. If you want all that information, there is a path. If you are suing about it, there is a way. But we have to be serious about it, just like we have to be serious about getting to the truth. There are some really bad actors, some people who did some really bad things to the American people. And if they can be charged, we will charge them. But if they can't be charged, we will name them. And we will name them and in a culture that respects shame, they should be people that are shamed and that's a fact. That's the way things work. And so, that's how I believe the job operates.

ECF 52 at 2.[5] Plaintiffs filed a notice alerting the Court to those statements, ECF 51, and Defendants filed a response, ECF 52.

Plaintiffs filed a reply flagging similar comments Martin made in subsequent interviews. *See* ECF 53. During an interview on a political talk show, Martin was asked whether government officials who "committed crimes . . . with their government position" would realistically "go to prison in the next four years." @TheFirstonTV, X (May 15, 2025, 9:05 PM), https://perma.cc/4DVD-3HSX, at 0:17–0:33. Martin responded that there are "three parts" of such a process, one of which is to "name and shame." *Id.* at 2:09–2:12. He continued:

I did a press conference and they said, you can't do that, and I said, watch me. Name and shame. I mean, these guys are scum. The guys

---

[5] Video of the press conference is available at https://perma.cc/8URG-2LRX.

> like Brennan and Schiff, these people are destroying the country.
> Name and shame.

*Id.* at 2:13–2:23. During a May 15 interview, Martin was asked about pardons made by former

President Joe Biden. *See* @AnnieFrey, *ASLEEP on the job??*, YouTube, https://perma.cc/FDW7-

QBTV, at 0:00–0:18. Martin responded:

> Well look, what we have right now is we have a government that,
> for the last four-plus years, was really aimed at destroying
> Americans and destroying the rule of law. They said things
> like . . . Donald Trump is a threat to democracy. . . . They were
> using the law against the citizens. We saw it on January 6th. We saw
> it on targeting Catholics. We saw it on targeting school board
> attending families, right. One after another, incidents where the
> government is weaponized against we the people. When it comes to
> something like the pardons . . . the President of the United States can
> do what he wants on that. But when there is something that doesn't
> make sense . . . we have an obligation to name it. And if it's bad, we
> should shame it. And if it's illegal, we should prosecute it. But we
> shouldn't shy away from any of those two things, and I think that's
> what the President has taught us, that's what he asked me to do in
> this new role that I have. And we're gonna do it, we're not gonna be
> afraid of it. And let the chips fall where they may.

*Id.* at 0:19–1:09.

## II.    LEGAL STANDARDS

Defendants move to dismiss Plaintiffs' complaint for lack of subject matter jurisdiction

under Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim under Rule 12(b)(6).

The Court need only reach Defendants' jurisdictional arguments, and therefore relies solely on

Rule 12(b)(1).

Federal courts are courts of limited jurisdiction and they cannot hear a case unless a

plaintiff has standing. *See Murthy v. Missouri*, 603 U.S. 43, 56–57 (2024); U.S. Const. art. III, § 2.

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete,

particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and

(iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The burden is on Plaintiffs to establish that they have standing "for each claim that they press and for each form of relief that they seek." *Id.* at 430–31. At the same time, a court evaluating standing "must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *In re Navy Chaplaincy*, 697 F.3d 1171, 1175 (D.C. Cir. 2012).

When an organization like FBIAA sues in federal court, it can establish standing on its own behalf (organizational standing) or on behalf of its members (associational standing). For organizational standing, an entity must—like any individual plaintiff—show "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *PETA v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)). An entity has associational standing "if at least one member would have standing to sue in its own right, the interests the association seeks to protect are germane to its purpose, and neither the claim asserted nor the relief requested requires that an individual member of the association participate in the law suit." *Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1005 (D.C. Cir. 2014).

At the motion-to-dismiss stage, "plaintiffs need not yet establish each element of standing by a preponderance of the evidence"—instead, the court asks simply "whether plaintiffs have plausibly alleged standing." *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 54 (D.C. Cir. 2019) ("*OPM*") (per curiam). The court therefore accepts the complaint's allegations as true, *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015), and "where necessary . . . may consider the complaint supplemented by undisputed facts evidenced in the

record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts," *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

## III.    ANALYSIS

Plaintiffs' claims fall into two categories. The first relates to the potential disclosure of the survey results. Plaintiffs "fear[] that their identities, specifically their names, will be released to the public," ECF 24 ¶ 81, in violation of the Privacy Act and the Fifth Amendment's Due Process Clause, putting their lives and livelihoods at risk. Although Plaintiffs fear the repercussions of disclosure, a fear that something may happen in the future—even if that fear is serious and sincere—is not enough to bring a lawsuit. Plaintiffs' amended complaint does not include allegations that sufficiently support their belief that Defendants will imminently disseminate their names or personnel information. The Court will therefore grant Defendants' motion to dismiss Counts I–IV and VI because Plaintiffs lack standing.

Plaintiffs' second set of claims, Counts V and VII, are brought under the First Amendment. But here, too, Plaintiffs lack standing because they challenge only hypothetical, future terminations and unspecified "adverse actions" that may never occur. *See, e.g.*, *id.* ¶ 85. Plaintiffs argue in their briefs that Defendants' ongoing internal review of FBI agents is itself an adverse action that violates the First Amendment. *See* ECF 35 at 29; ECF 37 at 18–20. But those allegations are conspicuously absent from the amended complaint—the document in which Plaintiffs must make the contours of their claims clear. The Court cannot overlook that deficiency and must therefore dismiss Counts V and VII for lack of standing.

### A.  Disclosure Claims

Plaintiffs allege that Defendants plan to disseminate the list of names and other personnel information of FBI agents who worked on January 6 cases, in violation of the Privacy Act (Counts I

and II) and the Fifth Amendment's Due Process Clause (Count VI).[6] ECF 24 ¶¶ 94–101, 122–25.

They seek alternative relief in the form of mandamus, arguing that disclosing agents' names would

violate Defendants' non-discretionary duty to safeguard the identities of their personnel (Count

IV). *See id.* ¶¶ 105–10; Apr. 30, 2025 Hr'g Rough Tr. 14:22–15:7.

A party alleging a future injury "confronts a significantly more rigorous burden to establish

standing." *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 201 (D.C. Cir. 2011) (quoting *United*

*Transp. Union v. Interstate Com. Comm'n*, 891 F.2d 908, 913 (D.C. Cir. 1989)). Plaintiffs only

have standing to bring their claims if future disclosure—their alleged injury—is "imminent."[7] *See*

*TransUnion LLC*, 594 U.S. at 423. Imminence is "concededly a somewhat elastic concept," but it

"cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too

speculative for Article III purposes." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)

(quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 556 n.2 (1992)). An injury is "imminent" only

if it is "*certainly* impending," *id.* (emphasis in original), or "there is a 'substantial risk' that the

harm will occur," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*,

---

[6] Plaintiffs also bring an Administrative Procedure Act (APA) claim, Count III, as the vehicle for the injunctive relief they seek under the Privacy Act. *See* ECF 24 ¶¶ 102–04; ECF 35 at 21–23.

[7] One sentence in Plaintiffs' 132-paragraph amended complaint alleges, "on information and belief," that Defendants "have disseminated" information about Plaintiffs and their work on January 6 investigations. ECF 24 ¶ 95. As the Court will shortly explain, allegations made "on information and belief" must be accompanied by a statement of the facts that support the belief asserted. But Plaintiffs' amended complaint includes no factual allegations to support their conclusion that Defendants have already disseminated their information. It includes only a stray reference to the fact that, at the time of the amended complaint, Defendants could not represent to the Court that they had not disseminated the information beyond the DOJ. *Id.* ¶ 59. Such allegations are insufficient as the Court will explain *infra*. *See* n.10. And regardless, Defendants have since confirmed in their sworn discovery responses that they have not released the survey results publicly—indeed, they have not disseminated the information outside of the DOJ. ECF 45-1 at 3.

Every other paragraph of the amended complaint (and Plaintiffs' subsequent briefing) focuses on potential future dissemination. *See, e.g.*, ECF 24 ¶ 75 ("Plaintiffs continue to live in a state of fear that their names will be disclosed to the public."); *id.* ¶ 81 ("Plaintiffs remain fearful that their identities, specifically their names, will be released to the public."); ECF 20-1 at 1 (representing that "[a]s alleged in Plaintiffs' Complaints, Plaintiffs expect that the Defendants . . . intend to disseminate publicly the names of numerous FBI personnel"); ECF 25-1 at 19 (describing Plaintiffs' Privacy Act injury as "the potential disclosure of the Doe Plaintiffs' personal information" to the public); ECF 35 at 22 (arguing that this information "will be unlawfully disclosed"). Accordingly, this opinion focuses on Plaintiffs' standing to challenge any future disclosure of their information.

568 U.S. at 414 n.5). The Court considers Plaintiffs' amended complaint, the attachments to their motion for preliminary injunction, Defendants' discovery responses, and Plaintiffs' supplemental filings on recent statements by government officials to determine whether Plaintiffs have standing. *See Settles*, 429 F.3d at 1107 (holding that the court may consider "facts developed in the record beyond the complaint" to assess standing). The Court ultimately finds that Plaintiffs have not plausibly alleged that any disclosure of their identities is certainly impending.

### a.  Plaintiffs' Amended Complaint

Turning first to the amended complaint: Plaintiffs allege, "[o]n information and belief," that Defendants "will imminently disseminate records about the Plaintiffs and their involvement in sensitive investigations." ECF 24 ¶ 95. "[P]leadings on information and belief are permitted when 'the necessary information lies within defendants' control.'" *Kareem*, 986 F.3d at 866 (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994)). Defendants' plan for the information collected in response to the January 6 surveys is certainly information within their control. However, the D.C. Circuit requires that allegations based on information and belief "be accompanied by a statement of the facts upon which the allegations are based," which the court must then evaluate for plausibility. *Id.* (quoting *Kowal*, 16 F.3d at 1279 n.3).

Plaintiffs point to six factual allegations that they believe "permit a reasonable inference . . . that their identities *may* be released to individuals outside DOJ." ECF 35 at 16 (emphasis added). First, they allege that "President Trump has consistently promised vengence against FBI personnel." *Id.* Second, they claim that the President has "started to make good on that promise" by pardoning January 6 defendants and "publicly identifying and threatening to identify government officials." *Id.* at 16–17. Third, DOJ "identified and summarily terminated, without warning, high-ranking FBI officials solely because they had supervisory responsibility over the

January 6 investigations." *Id.* at 17. Fourth, DOJ created the survey "based on the conclusory presumption" that FBI agents "had weaponized their law enforcement roles against President Trump." *Id.* Fifth, after the FBI provided DOJ with survey respondents' EINs, DOJ "insisted that the FBI provide the names of every Survey respondent, notwithstanding that this did nothing to support its stated purpose for Weaponization EO." *Id.* And sixth, according to Plaintiffs, the government has not "identified any lawful purpose for which they could disseminate the identities of FBI personnel, but even now are fighting for that option." *Id.*

For ease of explanation, the Court divides Plaintiffs' allegations into three categories: (1) President Trump's statements about FBI agents, (2) Defendants' past conduct—including disclosures of other employees' identities and treatment of January 6 defendants, and (3) the survey itself (and Defendants' conduct related to it). But even accepting Plaintiffs' well-pled factual allegations as true and drawing all reasonable inferences in their favor, their "standing theory does not cross the line from conceivable to plausible." *Kareem*, 986 F.3d at 862.

### i. President Trump's Statements About FBI Agents

To support their allegation that Defendants plan to disseminate sensitive information about FBI agents who responded to the January 6 survey, Plaintiffs emphasize that "President Trump has consistently promised vengeance against FBI personnel who he claims engaged in fraudulent and politically driven investigations of him." ECF 35 at 16. Their amended complaint cites to statements the President has made on social media calling FBI agents "[t]hugs," "[t]yrants," and "Gestapo." ECF 24 ¶ 41. Those statements certainly suggest animus toward some Plaintiffs, but they do not remotely indicate that Defendants intend to take the particular action at issue here— disclosing the list of agents' names to the public.

### ii.  Past Disclosures and Past Treatment of January 6 Defendants

Plaintiffs also point to the government's past conduct as evidence of what it might do in the future. First, according to Plaintiffs, the administration has "publicly identif[ied] and threaten[ed] to identify government officials," including "identif[ying] and summarily terminat[ing], without warning, high-ranking FBI officials" who supervised January 6 investigations. ECF 35 at 17; *see* ECF 24 ¶¶ 57, 60, 65–66; ECF 25-5. Plaintiffs fear that the same thing will happen to them. *See* ECF 35 at 16–17. Similarly, Plaintiffs argue that disclosure is imminent because this administration has a history of "acquiescing to and pandering to" the demands of January 6 defendants (including by pardoning them), and those pardonees are now calling on the administration to disclose agents' identities. Apr. 30, 2025 Hr'g Rough Tr. 4:5–21; *see* ECF 25-1 at 19; ECF 35 at 16–17.

A plaintiff seeking prospective injunctive relief "may not rest on past injury" alone. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015); *see City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (holding that respondent's allegations that he had been illegally choked by police officers and that officers routinely employed unlawful chokeholds were insufficient to establish standing to enjoin future use of chokeholds). "Of course, past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). But the Court must be able (as with any inquiry on a motion to dismiss) to reasonably infer from those allegations of past wrongs that future harm is imminent. *See Lyons*, 461 U.S. at 106 n.7 (explaining that plaintiff failed to "credibly allege that he faced a realistic threat" that he would be subject to unlawful action in the future, despite allegations that challenged practice was common); *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 242 (D.C. Cir. 2015) (holding that "general averments" and "conclusory allegations" about past injury were insufficient to establish imminent future injury); *Lebron v. Rumsfeld*, 670 F.3d 540, 561 (4th Cir. 2012) ("[I]t is . . . insufficient for

a plaintiff claiming standing to observe that the challenged conduct is repeatable in the future."). The Court cannot make that inference here, because the past disclosures Plaintiffs rely on do not resemble the future disclosure they fear.

First, the connection between past injury and future conduct that Plaintiffs ask the Court to make here is arguably even more attenuated than in cases like *Lyons*, where the plaintiff was himself subject to the challenged action. 461 U.S. at 105. Plaintiffs point only to actions that Defendants allegedly took against a handful of other government employees. Two of the alleged disclosures did not involve FBI agents or January 6 at all. *See* ECF 24 ¶ 57 (alleging that Elon Musk "shared the names and titles of individual civil servants" who hold climate-related positions); *id.* ¶ 60 (alleging that the CIA "sent a list of employees' names over an unclassified system to the Office of Personnel Management"). Even the sole "disclosure" that involved FBI employees— the public identification of eight FBI officials in the Terminations Memo, *see* ECF 24 ¶ 65; ECF 25-5—is not analogous to what Plaintiffs fear will happen to them. By Plaintiffs' own admission, the Terminations Memo identified eight "high-ranking" FBI officials, not necessarily Special Agents like Plaintiffs. *See* ECF 35 at 17. Bove did not source these officials' names from the list at issue in this case (i.e. the results of the survey), because the Terminations Memo predated the survey. *See* ECF 24 ¶¶ 65–68.[8] And, although Plaintiffs are asking the Court to make the inferential leap that the government will violate the Privacy Act in the future, they have not even argued that the Terminations Memo itself violated the Privacy Act. Likewise, the fact that the administration previously pardoned January 6 defendants does not give rise to a reasonable inference that the administration will do something very different here—namely, disclose

---

[8] It is also unclear from the record whether Defendants deliberately disclosed the Terminations Memo to the public, or whether it was otherwise leaked to the public outside of official channels. *See* ECF 13 at 16 (Hr'g Tr. 13:8–13:22).

Plaintiffs' identifying information to appease pardonees. To find otherwise would be pure speculation.

When it comes to standing, the fact that the administration may have previously disclosed other employees' identities under quite different circumstances, or has supposedly "acquiesced" to the requests of January 6 pardonees, cannot establish that a future disclosure of Plaintiffs' personnel information is "certainly impending," rather than merely "possible." *Clapper*, 568 U.S. at 409. Anything may be possible, but courts are concerned with what is plausible.

The cases Plaintiffs discuss in their papers—*In re Office of Personnel Management Data Security Breach Litigation* ("*OPM*"), 928 F.3d 42, and *League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)—do not help them. *See* ECF 35 at 17–18; ECF 37 at 4–5.[9] Unlike in this case, the plaintiffs in *OPM* and *League of Women Voters* challenged an allegedly unlawful action that had already occurred. In *OPM*, plaintiffs challenged the Office of Personnel Management's existing, "woefully inadequate" cybersecurity practices. 928 F.3d at 49. In *League of Women Voters*, plaintiffs challenged Alabama, Georgia, and Kansas's requirement that voters show proof of citizenship. 838 F.3d at 1, 6. The question in each case was not, as here, whether the defendant would take the allegedly unlawful action at all, but whether and how an unlawful action the defendant had already taken would cause concrete injury to plaintiffs. *See OPM*, 928 F.3d at 54–55, 60–61; *League of Women Voters*, 838 F.3d at 6. In support of that inquiry, the D.C. Circuit drew reasonable inferences about future harm based on how plaintiffs had been harmed in the past. For example, in *League of Women Voters*, plaintiffs provided detailed information about how Kansas's enforcement of its proof-of-citizenship requirement had limited voting rights organizations' ability to register voters. *See* 838 F.3d at 8. There was no question that

---

[9] Plaintiffs only cite *League of Women Voters* in their motion for preliminary injunction, but because it bears on standing, the Court considers it here.

Alabama and Georgia had the same proof-of-citizenship requirement—new instructions listing the requirement had already gone into effect—but it was unclear whether Alabama and Georgia were enforcing that requirement at the time of the lawsuit. *See id.* at 6, 8. The D.C. Circuit concluded that "based on the experience of the Kansas [organizations], it seems almost certain that similar obstacles to registration will spring up in Alabama and Georgia when those States decide to enforce their laws," and therefore the Alabama and Georgia organizations had standing. *Id.*

In *OPM*, plaintiffs alleged that OPM's inadequate cybersecurity protections enabled hackers "to gain access to the agency's treasure trove of employee information, which in turn exposed plaintiffs to a heightened risk of identity theft." 928 F.3d at 49. There, the threat to plaintiffs' privacy was "ongoing" and non-speculative, because OPM had done nothing since the data breach to shore up its poor cybersecurity protections and prevent it from happening again. *See id.* at 52, 54–55, 60. Given plaintiffs' allegations about "OPM's continued failure to adequately secure its databases," the D.C. Circuit drew the unsurprising inference that "there remains a 'substantial risk' that their personal information will be stolen from OPM again in the future." *Id.* at 54–55. But Plaintiffs have not alleged any *ongoing* unlawful activity here.

Although past conduct can be relevant, the past conduct Plaintiffs have alleged here is not. The past events Plaintiffs rely on—discrete disclosures of employee information under different, non-analogous circumstances, and the fact that President Trump pardoned January 6 defendants— just do not match up with the future injury alleged in this case. The Court cannot reasonably infer from these events—taken alone or considered alongside Plaintiffs' other allegations—that Defendants will imminently disclose Plaintiffs' identities.

### iii. Defendants' Conduct Related to the Survey

Plaintiffs argue that disclosure is imminent because there was no lawful reason for Defendants to create the list (and specifically, a list of *names* rather than the list of EINs that FBI initially provided) other than to disclose it. *See* Apr. 30, 2025 Hr'g Rough Tr. 4:5–21, 7:9–7:12; ECF 25-1 at 19; *see* ECF 35 at 17. But the complaint does not support that conclusion. It alleges that Defendants compiled the list of names to target Plaintiffs for adverse actions, like termination. *See* ECF 24 ¶¶ 119, 127. That would not necessarily involve disclosing Plaintiffs' names to the public. Nor is there anything in the record that supports Plaintiffs' argument. Defendants' discovery responses indicate, and government counsel confirmed during the preliminary injunction hearing, that the list is part of the Department's "internal review" of January 6 prosecutions. *See* Apr. 30, 2025 Hr'g Rough Tr. 31:10–12, 37:23–38:7; ECF 45-1 at 4. While there may be a real dispute here about the motivations of that investigation, there does not seem to be much dispute that an investigation of some kind is happening and that the list is related to it. *See* ECF 45-1 at 4 (describing review process). In other words, both Plaintiffs' own complaint and the record indicate that Defendants compiled the list of names as part of their investigation. The Court cannot infer—without more—that Defendants have any plans to disseminate Plaintiffs' information simply because they asked the FBI to provide them with a list of Plaintiffs' names.

Plaintiffs also argue that DOJ created the survey "based on the conclusory presumption" that FBI agents "had weaponized their law enforcement roles against President Trump." ECF 35 at 17. Again, that might bear on the motivations for Defendants' investigation, but it is a leap to say that it indicates Plaintiffs' identities will be *imminently* disclosed.

Finally, Plaintiffs emphasize that Defendants "will not disclaim the possibility that in the future they will disclose these names." Apr. 30, 2025 Hr'g Rough Tr. 28:21–22; *see* ECF 35 at 17

("[D]efendants have not identified any lawful purpose for which they could disseminate the identities of FBI personnel, but even now are fighting for that option."). Their complaint alleges that "[d]espite being served with a lawsuit seeking a restraint of his suspected planned public release of the survey results, A/DAG Bove did not disavow his intention to . . . release the results of the survey" to either the public or a third party. ECF 24 ¶ 74. But it is Plaintiffs' burden, not Defendants', to establish standing. *TransUnion LLC*, 594 U.S. at 430–31. The Court cannot construe any purported silence as an affirmative allegation supporting imminent disclosure.[10] Nor can the Court reasonably infer that Defendants intend to take the unlawful action alleged because a high-level government official has not publicly commented on the pending litigation.

### b. Discovery Responses

Looking beyond the amended complaint, Defendants' discovery responses did not provide any information that supports Plaintiffs' standing allegations. (Notably, Plaintiffs have not sought to further amend their complaint to include any information they received through discovery). Discovery revealed that the list of names has not left the DOJ. ECF 45-1 at 3. According to Defendants' responses, the Department has not shared the list of names or any data collected pursuant to the survey "with any non-DOJ person," including Department of Government Efficiency (DOGE) personnel or White House personnel. *Id.* Defendants clarified, in response to Plaintiffs' inquiry, that this means "persons outside of the Department of Justice have not 'accessed'" the list. ECF 45-2 at 1. In fact, the Department itself has not accessed the list of names that FBI shared with it. ECF 45-1 at 4. Furthermore, discovery turned up no documents relating

---

[10] Plaintiffs filed a notice of supplemental authority purporting to identify cases where a court has relied on a party's failure to disclaim a particular course of action, *see* ECF 49, but each of the cited cases is plainly inapposite. *See United States v. Hale*, 422 U.S. 171, 176 (1975) (probative weight of criminal defendant's silence during pretrial detention); *Wright v. District of Columbia*, No. 05-cv-990, 2007 WL 1141582, at *4 (D.D.C. Apr. 17, 2007) (waiver); *United States v. Project on Gov't Oversight*, 526 F. Supp. 2d 62, 64–65 (D.D.C. 2007) (employer's silence following organization's disclosure of intent to make a particular payment may bear on what the employer believed about the propriety of that payment); *Al-Hela v. Biden*, 66 F.4th 217, 237 (D.C. Cir. 2023) (presumption of regularity).

"to the Government's intent for any potential future disclosure of the Survey." *Id.* at 4. These discovery responses were accompanied by a signed certification attesting to their accuracy, and Defendants have a continuing obligation to supplement or correct those responses if they learn that they are "incomplete or incorrect." *See id.* at 8; Fed. R. Civ. P. 26(e). Plaintiffs have not informed the Court that they believe these responses are deficient. Reading these responses, the Court can discern no evidence that disclosure of the survey results is "imminent."

### c.  Martin's Recent Statements

Finally, Plaintiffs contend that Martin's statements during the May 13 press conference "indicated a clear, unmistakable intent to 'name' and 'shame' federal employees, i.e., the Plaintiffs, who investigated January 6th." ECF 51 at 3. But even assuming that Martin's statements (which do not refer to FBI agents on their face) in fact apply to Plaintiffs, they do not suggest that any disclosure is "certainly impending." Rather, Martin indicated that any "naming" and "shaming" would be contingent on (1) some future finding that Plaintiffs are "bad actors" or did "something that does not make sense," and (2) a determination that Plaintiffs' bad acts were not illegal or that Plaintiffs cannot otherwise be criminally charged for those actions. *See* ECF 52 at 2 ("There are some really bad actors, some people who did some really bad things to the American people. And if they can be charged, we will charge them. But if they can't be charged, we will name them."); ECF 53 at 3 ("When there is something that does not make sense, we have an obligation to name it, and if it's bad we should shame it, and if it's illegal we should prosecute it."). Because any disclosure is dependent on two future events—a finding that Plaintiffs are "bad actors," and a

determination that Plaintiffs cannot be charged—each of which may or may not come to pass, disclosure cannot be "certainly impending."[11]

To be clear, the Court takes Martin at his word that he intends to "name and shame" those "bad actors" he is unable to charge. When government officials speak, courts listen. When the White House Press Secretary posts on social media stating that a memo purporting to rescind a federal funding freeze is doing no such thing, the court takes that seriously. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 597959, at *3, *8 (D.D.C. Feb. 25, 2025). When the Secretary of Defense announces on X that "[t]ransgender troops are disqualified from service without an exemption," the court will not speculate that the Secretary might have meant otherwise. *See Talbott v. United States*, No. 25-cv-240, 2025 WL 842332, at *10 (D.D.C. Mar. 18, 2025). If Martin made statements from which the Court could reasonably infer that he imminently planned to release the information at issue in this case, that would be a different story. But the problem for Plaintiffs is that, even taking Martin at his word, his statements indicate only a contingent (and therefore, not "certainly impending") future action. That is not enough to confer standing.

*    *    *

It is worth pausing to note that, in a case where both the facts and the law are hotly contested, the parties agree on something. They agree (or at least, Defendants did not dispute during the initial hearing in this case) that releasing Plaintiffs' identities to the public would put FBI agents at serious risk of physical danger. *See* ECF 13 at 43:17–44:6. January 6 pardonees have

---

[11] In the alternative, one could construe this as a ripeness problem. "A claim is premature and therefore unripe for judicial review if it depends on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Saline Parents v. Garland*, 88 F.4th 298, 306 (D.C. Cir. 2023), *cert. denied*, 145 S. Ct. 144 (2024) (quoting *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam)). Whether the Court views it as a standing deficiency or a ripeness problem, however, the outcome is the same: Plaintiffs' claims cannot go forward.

explicitly targeted individual FBI agents and have even referenced the very survey that is at the heart of this case. *See* ECF 24 ¶¶ 44–56. And there is a history of these sorts of threats escalating into physical violence. *See id.* ¶¶ 51–52. Just a few months ago, a January 6 defendant was convicted of plotting to murder the FBI agents who investigated him. *Id.* ¶ 53.[12] Agents are, understandably, terrified. They have submitted declarations stating that they fear for their safety and the safety of their families if the fact that they worked on January 6 cases is publicly disclosed. *See* ECF 25-10 ¶ 21; ECF 25-11 ¶ 21; ECF 25-12 ¶ 23; ECF 25-13 ¶ 23; ECF 25-14 ¶ 23; ECF 25-15 ¶ 23; ECF 25-16 ¶ 25; ECF 25-17 ¶ 28; ECF 25-18 ¶¶ 23–24. The Executive Director of the FBIAA agrees that disclosing the survey data publicly "would immediately put . . . Special Agents in physical danger from individuals who feel emboldened to seek what they believe is justified retribution that will be condoned by the Department of Justice." ECF 25-9 ¶ 53. The FBIAA has received an "overwhelming" increase in calls from members, including agents requesting security assistance, and has had to create a process to assist members in reporting threats to the Bureau. *Id.* ¶¶ 50–51. The Association has even had to perform a security assessment of its own offices due to threats to the organization. *Id.* ¶ 52. And "[i]f FBI agents are killed, which is the expressed desire of many individuals who survey respondents investigated," it will fall to the FBIAA to "provid[e] funding and support to surviving family members." *Id.* ¶ 54.

The Court makes this observation because it understands why Plaintiffs are afraid. The Court understands why Plaintiffs want certain assurances from the government and may be frustrated that they are not getting answers. And the Court understands why Plaintiffs want the Court to provide such assurances through court order. But there is "[n]o principle . . . more fundamental to the judiciary's proper role in our system of government than the constitutional

---

[12] *See* Press Release, Dep't of Just., Federal Jury Convicts Man of Conspiring to Murder FBI Employees (Nov. 20, 2024) (available at https://perma.cc/K527-6C3A).

limitation of federal-court jurisdiction to actual cases or controversies." *Clapper*, 568 U.S. at 409

(quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)). This Court cannot enjoin

Defendants from disclosing the identities of FBI agents who worked on January 6 cases because

Plaintiffs have not established that they have standing. There is nothing in Plaintiffs' amended

complaint or the record before the Court—taken separately or considered together—from which

the Court can reasonably conclude that Defendants have any plan to release Plaintiffs' identities

to the public.

Because the individual Plaintiffs lack standing to bring their disclosure claims, the FBIAA

cannot assert associational standing on their behalf. *See Sierra Club v. FERC*, 827 F.3d 59, 65

(D.C. Cir. 2016) (holding that associational standing requires that at least one of the association's

members has suffered an injury-in-fact). Nor does the FBIAA have standing to sue in its own right.

The FBIAA alleges the same future, hypothetical injuries as the Doe Plaintiffs. *See* ECF 24 ¶¶ 94–

131 (not distinguishing between Doe Plaintiffs and FBIAA). Those allegations are insufficient for

all the reasons discussed above. *See PETA*, 797 F.3d at 1093 (requiring organization, "like an

individual plaintiff, to show 'actual or threatened injury in fact'" (quoting *Equal Rights Ctr.*, 633

F.3d at 1138)). The Court accordingly grants Defendants' motion to dismiss Counts I–IV and VI

for lack of subject matter jurisdiction.

## B.  First Amendment Claims

The Court now turns to Plaintiffs' First Amendment retaliation claims, which have become

a moving target. In their opposition brief, Plaintiffs explain that they are not challenging any future

"termination, demotion, or other reputational harm." ECF 35 at 16 n.6; *see id.* at 8 n.1. Instead,

they argue that their purported injury is rooted in Defendants' internal review (or investigation) of

FBI agents who worked on January 6 cases, which is already in progress.[13] According to Plaintiffs, just placing an agent under investigation imposes immediate adverse professional consequences, regardless of the stage or potential outcome of that investigation.[14] And, Plaintiffs argue that Defendants have launched this investigation only because they believe—incorrectly—that agents who worked on those cases are not loyal to President Trump. *See* ECF 35 at 29 (arguing that Defendants have "targeted Plaintiffs and subjected them to review based on their alleged political affiliation"); ECF 37 at 18–20. Per Plaintiffs, Defendants' investigation therefore violates the First Amendment. *See* ECF 35 at 29; ECF 37 at 18–20; *Heffernan v. City of Paterson*, 578 U.S. 266 (2016); *Branti v. Finkel*, 445 U.S. 507 (1980); *Elrod v. Burns*, 427 U.S. 347 (1976).

The problem, however, is that those arguments do not follow from the amended complaint. ECF 24. Plaintiffs' amended complaint references DOJ's "review process." *See* ECF 24 ¶ 67, 77–78. But it does not allege that the review process or investigation is itself an adverse action motivated by an impermissible purpose that Plaintiffs are challenging in this case. In fact, Plaintiffs never allege that Defendants are currently taking any adverse actions against them. The only adverse actions complained about in the amended complaint are those that Plaintiffs "anticipate[]" will occur—either termination or other "adverse action" that Plaintiffs never specify. *See e.g.*, ECF 24 at 2; *id.* ¶ 85 ("On information and belief, acting leadership at DOJ is planning the imminent, mass, unlawful termination, or other adverse action, of Bureau employees . . ."); *id.* ¶ 90 (referencing unspecified "unlawful adverse employment actions" that Defendants "are planning").

---

[13] *See* ECF 25-5 at 3 (stating that, upon receipt of the survey results, the Department "*will commence* a review process" (emphasis added)); ECF 45-1 at 4 (describing the investigative steps Defendants will take); ECF 25-10 ¶ 14 ("[W]hatever review is forthcoming into January 6 Cases will include me.").

[14] *See* ECF 25-19 ¶¶ 5–6, 19–23 (former senior FBI official, explaining that merely opening an investigation into an FBI agent imposes immediate and debilitating professional consequences); ECF 25-20 ¶¶ 16–27 (same); ECF 25-16 ¶ 18 (Plaintiff FBI agent averring that because of Defendants' review, she is "no longer being assigned to any tasks associated with the investigation of domestic terrorism and extremist activity"); ECF 25-17 ¶ 19 (same); *id.* ¶ 25 (Plaintiff FBI agent, stating that she is currently applying for a competitive internal position and is now at a disadvantage because of Defendants' review).

Count V, Plaintiffs' First Amendment retaliation claim, specifically alleges that Plaintiffs "fear retaliation—in the form of *disclosure of their identities and/or termination from the FBI*—based on their perceived political affiliation." ECF 24 ¶ 120 (emphasis added).

The Court thus does not understand Plaintiffs' insistence that "termination" is "not part of the counts alleged in the First Amended Complaint." ECF 35 at 16 n.6. The Court reads Plaintiffs' amended complaint in the same way that Defendants do: Plaintiffs bring First Amendment claims because they "fear retaliation—in the form of disclosure of their identities and/or termination from the FBI." ECF 24 ¶ 120. The Court has already explained at length why Plaintiffs lack standing to challenge any future disclosure. And as to terminations—even if Plaintiffs had not abandoned that claim twice over in their opposition brief and thus conceded the point, *see* ECF 35 at 8 n.1; *id.* at 16 n.6, they would lack standing to challenge future terminations, which are at this stage only hypothetical, not "certainly impending." *See* ECF 45-1 at 4 ("*Depending* on the outcome of the [review] process, *if* any FBI personnel are determined to have engaged in criminal behavior or other misconduct, appropriate disciplinary actions *may* be taken, which *may* include . . . demotions, suspensions, or terminations." (emphases added)). Plaintiffs have thus staked their First Amendment retaliation claims on the idea that Defendants' review process is itself an adverse action taken for an impermissible purpose—but that allegation, inexplicably, appears nowhere in the Amended Complaint. "It is axiomatic that a party may not amend his complaint through an opposition brief." *Singh v. District of Columbia*, 55 F. Supp. 3d 55, 70 (D.D.C. 2014). If Plaintiffs intended to bring a claim challenging the review process (rather than its contingent, hypothetical outcomes) as unlawful, they must file a motion for leave to amend their complaint. The Court will therefore dismiss Count V because it alleges no adverse action as to which Plaintiffs would plausibly have standing.

Count VII fails for largely the same reason. It alleges that Plaintiffs' First Amendment expression has been chilled because "Defendants have indicated that they will specifically be basing adverse action and possible disclosure of names based on what they determine is 'partisan intent' or 'weaponization.'" ECF 24 ¶¶ 127–29. But a First Amendment plaintiff cannot get into court simply by alleging that she is subjectively chilled. *See Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). Instead, she must allege "a specific present objective harm or a threat of specific future harm." *Id.* As the D.C. Circuit has explained, "[a]ll of the Supreme Court cases employing the concept of 'chilling effect' involve situations in which the plaintiff has unquestionably suffered some concrete harm (past or immediately threatened) apart from the 'chill' itself." *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984) ("'Chilling effect' is cited as the *reason* why the government imposition is invalid rather than as the *harm* which entitles the plaintiff to challenge it." (emphases in original)). And here, for all the reasons explained above, Plaintiffs have not adequately alleged an "*immediately* threatened" concrete harm that will befall them. Any future termination or disclosure of the survey results is too hypothetical and contingent. So, as to Count VII, the only injury Plaintiffs have plausibly alleged is a subjective chilling effect, and that is insufficient for Article III standing. *See id.*

Once again, Plaintiff FBI agents have failed to allege any adverse action that is "imminent" and "certainly impending." They therefore lack standing to bring their First Amendment claims, and the FBIAA lacks associational standing. *See Sierra Club*, 827 F.3d at 65. And because the Doe Plaintiffs and the FBIAA allege the same hypothetical, contingent future injuries, the FBIAA similarly lacks standing to sue in its own right. *See PETA*, 797 F.3d at 1093. Accordingly, the Court will grant Defendants' motion to dismiss Counts V and VII for lack of subject matter jurisdiction.

*     *     *

For the foregoing reasons, the Court **GRANTS** Defendants' motion to dismiss, ECF 28, for lack of subject matter jurisdiction. This case is therefore **DISMISSED** without prejudice. Plaintiffs' motions for temporary restraining order (which the Court previously deferred ruling on in light of the Parties' consent order), ECF 3; *FBIAA v. DOJ*, No. 25-cv-238, ECF 2, and motion for preliminary injunction, ECF 25, are **DENIED** as moot because the Court has dismissed the underlying case.

A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: July 17, 2025